EXHIBIT A

LOYENS | LOEFF

**WRIT OF SUMMONS BEFORE THE COURT OF APPEAL DEN HAAG CONCERNING ARTICLE 1064A DCCP**

This day, the eighth day of April, two thousand and twenty-four, at the request of,

**BANK J. SAFRA SARASIN AG**, a company incorporated under the laws of Switzerland, having its registered office and principal place of business at Elisabethenstrasse 62, CH-4051 Basel, Switzerland, who in this case elects domicile in (3011 GA) Rotterdam at Blaak 31 at the offices of Loyens & Loeff N.V., from which office Mr T.L. Claassens will act as attorney-at-law, and is hereby appointed as such,

**DAWNED:**

**AIG EUROPE S.A.**, trading among others under the name AIG Europe S.A. (Netherlands Branch), a company incorporated under the laws of Luxembourg, having its registered office in Luxembourg and also its principal place of business at Crystal Building B, Rivium Boulevard 216, 2909 LK Capelle aan den IJssel, and at that address doing this writ and leaving a copy of this writ to:

, employed there.

**TO:**

to appear on Tuesday, May 21, 2024, in the morning at 10:00 a.m. (ten o'clock), not in person but represented by an attorney, at the hearing of the Court of Appeal of The Hague, location The Hague, civil sector, which hearing will be held in the courthouse at Prins Clauslaan 60 in (2595 AJ) The Hague, The Netherlands;

**WITH THE NOTICE THAT:**

(a)     if the defendant neglects to appoint attorney at law or fails to pay the court fee hereinafter specified, and the prescribed time and formalities have been complied with, the court shall default against such defendant and award the claim hereinafter described, unless it appears to the court to be unlawful or unfounded;

**LOYENS** *L* **LOEFF**

(b)      upon appearance in the proceedings of the defendant, court fees will be charged, payable within four weeks from the time of appearance;

(c)      the amount of the court fee is listed in the most recent appendix belonging to the Civil Court Fees Act, which can be found on the website: www.kbvg.nl/griffierechtentabel, among others;

(d)      from a person who is impecunious, a court fee for impecunious persons established by or under the law is levied, if at the time the court fee is levied he has submitted:

(i)      a copy of the decision to add, referred to in Section 29 of the Legal Aid Act, or if this is not possible due to circumstances not reasonably attributable to him, a copy of the application, referred to in Section 24(2) of the Legal Aid Act; or

(ii)      a statement from the Board of the Legal Aid Board, referred to in Article 7, third paragraph, under e, of the Legal Aid Act, which shows that his income does not exceed the income referred to in the general order under Article 35, second paragraph, of that Act;

**TO:**

hear claims and conclude as follows:

LOYENS  LOEFF

**<u>CONTENTS</u>**

| | | |
|---|---|---|
| 1 | ESSENCE OF THE CASE | 4 |
| 2 | PROCEDURAL ISSUES | 4 |
| 3 | THE RELEVANT FACTS | 4 |
| 3.1 | The arbitration | 4 |
| 3.2 | The appointment of the arbitrators and the disclosure of the arbitrator appointed by AIG | 5 |
| 3.3 | The Arbitral Award | 6 |
| 3.4 | The relevant facts that came to light after the Arbitral Award | 6 |
| 4 | THE ARBITRAL AWARD MUST BE SET ASIDE ON THE GROUNDS OF LACK OF AN INDEPENDENT AND IMPARTIAL ARBITRAL TRIBUNAL | 8 |
| 4.1 | Introduction | 8 |
| 4.2 | Legal framework | 8 |
| 4.2.1 | Supreme Court's strict standard in *Nordström* case | 8 |
| 4.2.2 | The ECtHR's (considerably) less stringent standard in the *Beg S.p.a.* v. *Italy* case | 10 |
| 4.2.3 | The IBA Guidelines on Conflicts of Interest in International Arbitration. | 13 |
| 4.3 | Application of the legal framework to the relevant facts of this case | 15 |
| 4.4 | International case law also provides support for setting aside the Arbitral Award on the basis of the above facts | 17 |
| 4.5 | Conclusion | 19 |
| 5 | PROCEDURE | 19 |
| 5.1 | Evidence | 19 |
| 5.2 | Known defenses of AIG | 20 |
| 6 | CONCLUSION | 20 |



**1    ESSENCE OF THE CASE**

1    At issue in these proceedings is the setting aside of an arbitral award issued on January 8, 2024, in an arbitration proceeding conducted under the rules of the Netherlands Arbitration Institute of 1 January 2015 (the **NAI Rules**) between plaintiff (**BJSS**) as *claimant* and defendant (**AIG**) as *respondent* (the **Arbitration**), in which the arbitral tribunal dismissed all of BJSS's claims and ordered BJSS to pay the costs of the Arbitration in excess of EUR 18 million (the **Arbitral Award**).[1]

2    The ground on which BJSS bases its claim to set aside the Arbitral Award concerns violation of public policy as referred to in Section 1065(1) under (e) Dutch Code of Civil Procedure (DCCP), more specifically the fact that the Arbitral Award was not made by an independent and impartial arbitral tribunal.

3    As BJSS has recently learned, the relationship between the (small) law firm, to which the arbitrator appointed by AIG at the time of the Arbitration was affiliated, on the one hand, and AIG on the other, is much more significant than this arbitrator described at the time in his *disclosure* prior to the Arbitration.

4    The relationship between the law firm of the arbitrator in question and AIG is, and was at the time of the Arbitration, such that there is (i) an objectified appearance of bias on the part of the arbitrator and (ii) serious doubt about the arbitrator's impartiality and independence. Therefore, the Arbitral Award cannot be upheld.

**2    PROCEDURAL ISSUES**

5    The place of arbitration that led to the Arbitral Award, the setting aside of which BJSS claims, is Rotterdam.[2] Rotterdam is located within the jurisdiction of the Court of Appeal of The Hague, so that this court has jurisdiction to hear the claim for setting aside the Arbitral Award (Section 1064a paragraph 1 DCCP).

6    The claim was filed in time, because within the period of three months from the date of the Arbitral Award mentioned in Section 1064a paragraph 2 DCCP.

7    Pursuant to Section 1073(1) DCCP, Dutch arbitration law (Sections 1020 through 1073 DCCP) applies to the present proceedings.

**3    THE RELEVANT FACTS**

**3.1    The arbitration**

8    The Arbitration that resulted in the Arbitral Award involved a coverage dispute between BJSS (as insured) and AIG (as insurer). BJSS claimed coverage under the relevant policy for claims (and related expenses) suffered by some of its customers as a result of faulty

---

[1]    A copy of the Arbitral Award will be brought into the proceedings as **Exhibit 1**.
[2]    Arbitral Award, paragraph 283.

**LOYENS & LOEFF**

investment products purchased by them from BJSS.[3] For various reasons, AIG denied coverage under the policy in question.[4]

**3.2**   **The appointment of the arbitrators and the disclosure of the arbitrator appointed by AIG**

9   On December 1, 2017, BJSS filed a *Request for Arbitration*. In it, BJSS nominated former attorney Willem van Baren as party arbitrator.[5]

10   On December 12, 2017, AIG filed a *Short Answer*, in which AIG in turn nominated attorney Jan ter Meer (**Ter Meer**) as party arbitrator.[6]

11   On December 19, 2017, Ter Meer accepted his appointment and confirmed his independence and impartiality. In doing so, he made - in accordance with Article 11 paragraph 3 of the NAI Rules applicable to the Arbitration - several "disclosures" (the **Ter Meer Disclosure**). [7]To the extent relevant, he stated the following:

(i)   Cox Ten Bruggencate - the law firm he was and is associated with - acts "*occasionally*" for AIG in transportation and logistics cases:

> 1. Occasionally Cox Ten Bruggencate (CXTB) acts for (insureds) of AIG in matters relating to transportation and logistics (as defence counsel and in recovery actions). I am not personally involved in those matters.

(ii)   Cox Ten Bruggencate is included on AIG's "*panel*" "*of Dutch law firms for legal services in relation to Marine Insurance (not for other lines of business)*."

> 2. AIG included CXTB in its panel of Dutch Law firms for legal services in relation to Marine Insurance (not for other lines of business).

(iii)   Ter Meer is currently acting personally for a large number of insurers, including AIG, in a coverage dispute under a professional liability insurance policy. In doing so, Ter Meer is primarily in contact with the *"leading insurers,"* other than AIG and Allianz:

> 5. I am currently assisting a large number of insurance companies in a dispute with their insured about coverage under a PI insurance. AIG and Allianz are amongst those insurers. Court proceedings are pending. Emke Tielens is involved for AIG. I mainly have contact with the respective leading insurers on the primary and the excess layers. Those leading insurers do not include AIG and Allianz.

12   BJSS saw no reason to challenge Ter Meer in these disclosures, on the basis of which it concluded - and was entitled to conclude - that the relationship between Cox Ten Bruggencate and AIG was limited in scope. Accordingly, on January 4, 2018, pursuant to

---

3   See paragraphs 8-11 of the Arbitral Award for a "letter summary" of the dispute in the arbitration proceedings.
4   See paragraph 12 of the Arbitral Award (*"For various reasons to be further discussed in this award, AIG denies coverage for BJSS' claims Page 3 of 212 under the Policy."*).
5   Arbitral Award, paragraph 13.
6   Arbitral Award, paragraph 14.
7   A copy of the Ter Meer Disclosure will be brought into the proceedings as **Exhibit 2**.

LOYENS LOEFF

Rule 16(1) of the NAI Rules, the NAI Administrator confirmed the appointment of Ter Meer (and Van Baren).[8]

13    Subsequently, on March 5, 2018, Mr. Sjef Huisman was appointed Chairman of the Arbitral Tribunal, which appointment was confirmed by the NAI Administrator on March 27, 2018.[9] With this, the arbitral tribunal was complete.

**3.3    The Arbitral Award**

14    Almost six years later, namely on 8 January 2024, the arbitral tribunal issued the Arbitral Award, in which, as noted, the arbitral tribunal rejected BJSS's claims and ordered BJSS to pay (i) the costs of the Arbitration (fees and disbursements of the arbitrators and the administrative costs of the NAI) totaling EUR 825,000 and (ii) AIG's legal fees totaling EUR 18 million.[10] BJSS voluntarily paid the amount of EUR 18 million to AIG on 22 January 2024.

**3.4    The relevant facts that came to light after the Arbitral Award**

15    As already briefly indicated, BJSS recently became aware - and to be clear: after the Arbitral Award was rendered - that the relationship between Cox Ten Bruggencate, the (small) law firm to which Ter Meer was affiliated at the time of the Arbitration, on the one hand, and AIG on the other, is much more significant than described in the Ter Meer Disclosure cited above.

16    Whereas Ter Meer had stated to BJSS and the NAI that Cox Ten Bruggencate acts "*occasionally*" for AIG in matters concerning transportation and logistics, according to Cox Ten Bruggencate herself, AIG is one of her *"major clients,"* has listed AIG as one of four *"key clients,"* and speaks of the *"longstanding relationship"* that *"[n]ame partners Joeri Cox and Carlijn ten Bruggencate have developed"* with AIG, among others. BJSS refers by way of example to the 2020 Legal 500 (Transportation): [11]

### Cox Ten Bruggencate Advocaten

Boutique firm Cox Ten Bruggencate Advocaten's expertise in areas including carriage of goods, freight forwarding, logistics and maritime law makes it a reliable and popular choice for transport, logistics and insurance companies both domestically and internationally. Name partners Joeri Cox and Carlijn ten Bruggencate have developed longstanding relationships with major clients including AIG and Allianz. Notably, Cox is advising the cargo owners involved in the Wetteren railway disaster of May 2013, having recently secured €1m of damages for the clients following a Court of Appeal judgment. The firm also has ample experience in mediation and alternative dispute resolution for complex and high-value cases.

### Key clients

---

[8]    Arbitral Award, paragraph 18.
[9]    Arbitral Award, paragraphs 19 and 20.
[10]   Arbitral Award, paragraph 724.
[11]   A copy of the 2020 Legal 500 (Transportation) will be brought into the proceedings as **Exhibit 3**.

LOYENS LOEFF

| AIG | Allianz |
| DMI | Navigators |

17    The 2020 Legal 500 for Insurance Law also lists AIG as a "*longstanding*" and "*key client*" of Cox Ten Bruggencate: [12]

### Cox Ten Bruggencate Advocaten

The team at **Cox Ten Bruggencate Advocaten** brings its '*personal approach*' to a variety of matters, including D&O; liabilities, national and international policy disputes, and advising on policy wording, assisting insurers and insured parties. The firm counts notable names including Allianz, Aon and AIG among its longstanding clients. The practice handles all manner of claims, including those

**Key clients**

| Liberty | Tokio Marine |
| XL Catlin | HDI |
| MS Amlin | AIG |
| Delta Lloyd / Nationale Nederlanden | Aon |
| Avéro Achmea | Reaal |
| Allianz | ASR |

18    Also in the following years (2021, 2022, 2023 and 2024), AIG is listed as a "*key client*" in both the insurance and transportation categories.[13]

19    It should be noted in this regard that the Legal 500 is compiled on the basis of information provided by the firms themselves, among other things:

> "Each year we write to firms inviting them to provide information on their specialist areas of practice and requesting specific details of work undertaken in the preceding year (some of which will be confidential and not in the public domain)."[14]

20    This includes information about the clients, which a firm serves, and the qualification of those clients as *"key"* and *"major."*

---

[12]   A copy of the Legal 500 for 2020 (Insurance) will be brought into the proceedings as **Exhibit 4**.
[13]   A copy of the Legal 500 for 2021, 2022, 2023 and 2024 regarding both Transportation and Insurance will be brought into the proceedings as **Exhibit 5**.
[14]   See: https://www.legal500.com/how-it-works/.

LOYENS LOEFF

**4      THE ARBITRAL AWARD MUST BE SET ASIDE ON THE GROUNDS OF LACK OF AN INDEPENDENT AND IMPARTIAL ARBITRAL TRIBUNAL**

**4.1      Introduction**

21      Section 1065(1)(e) DCCP provides that an arbitral award may be set aside if:

>   "the judgment, or the manner in which it was reached, [is] contrary to public policy."

22      Breaches of public policy can (thus) be a procedural issue ("*the manner in which it came about*") or a substantive one. On the procedural side, this usually involves violations of the principles of due process and fair trial, such as the right to be heard and the right of a party to present its case to an independent and impartial arbitral tribunal, as enshrined in Article 17 of the Constitution and Article 6 of the European Convention on Human Rights (the **ECHR**).[15]

23      After explaining the relevant legal framework, BJSS will explain that the Arbitral Award was not rendered by an independent and impartial arbitral tribunal and therefore the Arbitral Award must be set aside under Section 1065(1)(e) DCCP.

**4.2      Legal framework**

24      BJSS will first address below the strict standard, which the Supreme Court applied in 1994 in the *Nordström* case*,* for setting aside an arbitral award on the ground that there was no independent and impartial arbitral tribunal (section 4.2.1). Next, BJSS will discuss the 2021 ECtHR judgment in the *Beg S.p.a. v. Italy* case (section 4.2.2). In that case, the ECtHR held, based on a significantly less stringent standard, that in respect of an arbitral award rendered in Italy there was a violation of Article 6(1) ECHR because the arbitral tribunal in question was not independent and impartial. Next, the *IBA Guidelines on Conflicts of Interest in International Arbitration* will be addressed (section 4.2.3), since, according to the ECtHR and Advocate-General de Bock, among others, these are relevant when assessing a claim to set aside an arbitral award on the ground of the lack of an independent and impartial arbitral tribunal.

**4.2.1      Supreme Court's strict standard in *Nordström* case**

25      In *Nordström v. Nigoco* (1994), the Supreme Court held that a stricter standard must be applied for setting aside an arbitral award on the grounds of lack of impartiality and independence than in wrecking proceedings. More specifically, the Supreme Court ruled that an arbitral award may be set aside on this ground only if (i) facts and circumstances have come to light on the basis of which it must be assumed that an arbitrator was not impartial or independent at the time the award was rendered or (ii) given the circumstances of the case, there is such serious doubt as to his impartiality or independence that it would be unacceptable to uphold the arbitral award:

---

[15]    See, for example, Amsterdam Court of Appeal Feb. 7, 2023, ECLI:NL:GHAMS:2023:310, r.o. 4.11.

LOYENS & LOEFF

"3.8 (...). After the arbitral award has been rendered, challenge or excusal is no longer possible. In the situation that then arises, in which the parties have conducted the arbitral proceedings to the end and arbitrators have completed their task, a **stricter standard** must be applied when answering the question of whether the arbitral award is voidable for being contrary to public policy than when it comes to challenging or excusing the arbitrator. The award can only be set aside on grounds of public policy in connection with an appeal to an arbitrator's lack of impartiality or independence if **facts and circumstances have come to light on the basis of which it must be assumed that either an arbitrator was in fact not impartial or not independent when he rendered the arbitral award, or that the impartiality or independence of the arbitrator at the time was so seriously in doubt that, taking into account the other circumstances of the case, it would be unacceptable to expect the party which was ruled against in the arbitration to comply with the award**. (...).

3.9 Parts 1 and 2 of the plea are based on the **erroneous view of the law**, as appears from the foregoing under 3.8 above, **that even the mere appearance of a lack of impartiality or independence can lead to the annulment** of an arbitral award for being contrary to public policy. These parts therefore fail."[16]

26    The grounds for challenging an arbitrator are less stringent: justified doubt (including an appearance of bias) is sufficient to successfully challenge an arbitrator.[17]

27    The *Nordström* judgment was immediately met with criticism. For example, in his critical *NJ* note, Snijders stated that one may "*wonder whether the judgment is not at odds with Article 6 ECHR*" and that "*[e]ny doubt as to the tenability of this judgment in Strasbourg*" is justified.[18] In this context, Snijders referred to the ECtHR's judgment in Hauschildt v. Denmark, which dealt with the objective test of the judge's impartiality.[19] In it, the ECtHR held that "*[u]nder the objective test, it must be determined whether, quite apart from the judge's personal conduct, there are ascertainable facts which may **raise doubts as to his impartiality**. In this respect even **appearances** may be of a certain importance*.".[20] Snijders noted that while the Supreme Court does apply this ruling to the challenge of state judges[21] and to the challenge of arbitrators, it apparently does not apply it to the determination of grounds for setting aside arbitral awards.[22]

28    Snijders further argued that *Nordström* provides no incentive to comply with the legal obligation of arbitrators to 'disclosure' (communication of probable grounds for challenge to the parties under Section 1034 DCCP): after all, anyone who manages to keep a ground for

---

[16]    Supreme Court Feb. 18, 1994, ECLI:NL:HR:1994:ZC1266, para. 3.8. Emphasis added.
[17]    Section 1033(1) DCCP.
[18]    Supreme Court Feb. 18, 1994, ECLI:NL:HR:1994:ZC1266, *NJ* 1994/765, cf. H.J. Snijders, at 7.
[19]    In the 'Guideline on impartiality and ancillary positions of judges' (2014 version), reference is also made to this judgment under 1.2 and 1.7 (definition of impartiality): "*For the concept of impartiality, this guideline is in line with what has been considered in this respect in the judgments of the European Court of Human Rights (hereinafter: ECHR) of 24 May 1989, NJ 1990, 627 (Hauschildt) and the Supreme Court of 18 November 1997, NJ 1998, 244. **Those judgments still form the basis for answering the question of whether impartiality is affected**.*" (emphasis added).
[20]    ECHR 24 May 1989, *NJ* 1990/627. Emphasis added.
[21]    Supreme Court Nov. 30, 1990 (*Stokkermans/Lührman*), *NJ* 1992/94 cf. HJS under *NJ* 1992/95. For a recent application, see, for example, District Court of The Hague February 26, 2024, ECLI:NL:RBDHA:2024:2356, at 3.
[22]    Supreme Court Feb. 18, 1994, ECLI:NL:HR:1994:ZC1266, *NJ* 1994/765, cf. H.J. Snijders, at 7.

LOYENS _L_ LOEFF

challenge secret up to and including the arbitral award will no longer be exposed to the standard for challenge, but only to the stricter standard for setting aside. He also argued that it seems wise not to allow the natural relationship between legal figures designed to guard impartiality and independence - the "disclosure," the excusal, the challenge and setting aside for insufficient impartiality or independence - to diverge, which is precisely what the Supreme Court in _Nordström_ does.[23]

29     Nevertheless, the European Commission on Human Rights (the **ECRM**)[24] subsequently ruled, in response to a complaint by Nordström et al. against the Netherlands, that the standard set by the Supreme Court in _Nordström_ (the **Nordström standard**) did not violate Article 6 ECHR:

> "In view of this interpretation by the Supreme Court of what could be considered to be contrary to public order interests, **the Commission observes that the applicant's argument that the mere appearance of a lack of independence or impartiality should lead to a quashing of the arbitral award has no basis in Dutch law. It considers that Article 6 para. 1 of the Convention does not require the Dutch courts to apply a different criterion in determining whether or not to quash an arbitral award**. It finds it reasonable that in this respect Dutch law requires strong reasons for quashing an already rendered award, since the quashing will often mean that a long and costly arbitral procedure will become useless and that considerable work and expense must be invested in new proceedings."[25]

### 4.2.2     The ECtHR's (considerably) less stringent standard in the _Beg S.p.a._ v. _Italy_ case

30     In the fairly recent (_i.e.,_ May 20, 2021) judgment in _Beg S.p.a. v. Italy,_ the European Court of Human Rights (**ECtHR**) applied a less stringent annulment standard than the Nordström standard (the **Beg** standard).[26]

31     _Beg S.p.a./Italy_ concerned - like _Nordström_ - a setting aside procedure of an arbitral award for alleged partiality of an arbitrator. In the judgment, the ECtHR held that - according to "_the Court's settled case law_" - the impartiality of an arbitrator has a subjective and an objective test. The subjective test involves whether the personal beliefs and conduct of a judge or arbitrator give the party concerned reason to doubt the impartiality of that judge or arbitrator. The objective test - relevant to this case - involves whether, for example, professional, financial or personal ties between the judge/arbitrator and a party give rise to objectively justifiable doubts about the judge/arbitrator's impartiality. This may also include

---

[23]     Supreme Court Feb. 18, 1994, ECLI:NL:HR:1994:ZC1266, _NJ_ 1994/765, cf. H.J. Snijders, at 6.

[24]     The ruling was made by the Second Chamber of the Commission; apparently, the case was not considered of sufficient importance to submit it to the plenary committee (see: ECRM 27 November 1996, ECLI:NL:XX:1996:AD2654, _TvA_ 1997, p. 26, cf. R.A. Lawson, at 11); Boersma states about the ECRM's ruling, "_a line of reasoning that strikes me as outdated and unconvincing_" (ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, _JBPR_ 2022/48 cf. B.A. Boersma (_Beg S.p.a.v. Italy_), at 5).

[25]     ECRM November 27, 1996, ECLI:NL:XX:1996:AD2654, _NJ_ 1997/505 cf. P.J. Boon. Emphasis added.

[26]     ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, _JBPR_ 2022/48 cf. B.A. Boersma (_Beg S.p.a.v. Italy_).

LOYENS _L_ LOEFF

the appearance of partiality. After all, the ECtHR explicitly considered, "*justice must not only be done, it must also be seen to be done.*"[27]

"129. (...) **According to the Court's settled case-law, for the purposes of Article 6 § 1 the existence of impartiality must be determined** according to a subjective test, that is, on the basis of the personal convictions and conduct of a particular judge, by ascertaining whether he showed any personal prejudice or partiality in a given case, and **also according to an <u>objective test</u>, that is, whether the court offered, in particular through its composition, guarantees sufficient to exclude <u>any legitimate doubt about his impartiality</u>** (see, among many authorities, Nicholas v. Cyprus, no. 63246/10, § 49, January 9, 2018).

130. (...). **As to the objective test, it must be determined whether, quite apart from the judge's conduct, there are ascertainable facts which may raise doubts as to his impartiality**. This implies that, in deciding whether in a given case there is a legitimate reason to fear that a particular judge lacks impartiality, the standpoint of the person concerned is important but not decisive. **What is decisive is whether this fear can be held to be objectively justified** (see among many authorities, Ilnseher v. Germany [GC], nos. 10211/12 and 27505/14, § 287, Dec. 4, 2018).

131. **In itself, the objective test is functional in nature: for instance, <u>professional</u>, <u>financial</u> or personal <u>links between a judge and a party to a case</u>** (see, for example, Pescador Valero, cited above, § 27, and Wettstein, cited above, § 47), **may give rise to objectively justified misgivings as to the impartiality of the tribunal, which thus fails to meet the Convention standard under the objective test** (see Kyprianou v. Cyprus [GC], no. 73797/01, § 121, ECHR 2005-XIII). It must therefore be decided in each individual case whether the connection in question is of such a nature and degree as to indicate a lack of impartiality on the part of the tribunal (see Ramos Nunes de Carvalho e Sá v. Portugal [GC], nos. 55391/13 and 2 others, § 148, Nov. 6, 2018).

132. **In this connection even <u>appearances</u> may be of a certain importance, a principle that is reflected in the adage "<u>justice must not only be done, it must also be seen to be done</u>**." (...).[28]

32      The ECtHR then ruled that, given that the arbitrator in question (i) had held a management position with the parent company of one of the parties to the arbitration and (ii) had acted as a lawyer for that parent company, there were indeed legitimate doubts about the impartiality of that arbitrator and (thus) a violation of Article 6 ECHR, with the ECtHR reiterating that "*even appearances may be of certain importance*."

---

[27]   See also: B. van Zelst, Beg S.p.a. t. Italy (ECHR, 5312/11) - Arbitration in the shadow of principles of fundamental procedural law. EHRC Updates. 2021 Jul 13;EHRC 2021/0133.
[28]   ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, *JBPR* 2022/48 cf. B.A. Boersma (*Beg S.p.a.v. Italy*). Emphasis added.

LOYENS _L_ LOEFF

> "149. In this regard, **the Court reiterates that even** <u>appearances</u> **may be of a certain importance** (see paragraph 134 above). It would therefore note that, given the importance and the economic stakes of the business project, N.I.'s senior role in the entity which had conducted the first negotiations and whose subsidiary ENELPOWER would later oppose the applicant in the arbitration proceedings, seen from the point of view of an external observer, **could legitimately give rise to doubts as to his impartiality**. (...).

> 153. To conclude, having regard to N.I.'s role as Vice-Chairman and member of the Board of Directors of ENEL between 1995 and 1996 and his role as lawyer for ENEL in at least one dispute which overlapped with the arbitration proceedings, **the Court is of the view that N.I.'s impartiality was capable of being, <u>or at least appearing</u>, open to doubt and that the applicant's fears in this respect can be considered reasonable and objectively justified**.

> 154. **There has accordingly been a violation of Article 6 § 1 of the Convention."**[29]

33      The *Beg* standard set by the ECtHR corresponds to (i) the grounds for challenge under Dutch arbitration law (see Section 1033 DCCP and paragraph 26 above) and (ii) the standard applied to government judges[30] and is thus (considerably) less strict than the *Nordström* standard applied by the Supreme Court almost 30 years ago.

34      In the literature the (rhetorical) question has been raised, whether the (considerably) stricter *Nordström* standard of the Supreme Court is not in the meantime outdated, because in conflict with Article 6 ECHR and the case law of the ECtHR in this respect since its judgment in *Beg S.p.a.v. Italy*. See, for example, the Asser series:

> "One can strongly question whether the Supreme Court's stricter standard in Nordström v. Nigoco does not conflict with the case law of the European Court since its decision in BEG S.P.A. v. Italy."[31]

35      See further Boersma's note to the *Beg S.p.a.* v. *Italy* judgment:

> "However, the second criterion used by the Supreme Court (serious doubt as to impartiality or independence) is **significantly stricter** than the ECHR's test (justified doubt). Moreover, according to the Supreme Court, the outward appearance of a lack of impartiality or independence cannot lead to the annulment of an arbitral award (see Nordström's r.o. 3.9), whereas, according to the ECtHR in BEG (r.o. 132), that is precisely when things can go wrong, obviously depending on all the circumstances of the case, because "justice must not only be done, it must also be seen to be done. In summary, assuming the applicability of art. 6 (1) ECHR because the right to an impartial and independent tribunal has not been waived, the same standard should, in

---

[29]   ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, *JBPR* 2022/48 cf. B.A. Boersma (*Beg S.p.a.v. Italy*). Emphasis added.
[30]   Supreme Court Nov. 30, 1990 (*Stokkermans/Lührman*), *NJ* 1992/94 cf. HJS under *NJ* 1992/95. See also the 'Guideline on impartiality and ancillary positions of judges' (2014 version) under 1.7 'bias'.
[31]   Asser Litigation Law/Sanders, Meijer & Ernste 8 2023/518.

LOYENS LOEFF

my view, be applied on the basis of BEG when assessing an application to set aside an arbitral award as when challenging it in arbitration proceedings. This is therefore different from what follows from the Supreme Court's **judgment in** Nordström, which in my view is now **outdated**, and which wrongly - **because in violation of Art. 6(1) ECHR** - makes a distinction between challenge in the arbitration proceedings (justified doubt is then sufficient according to Section 1033(1) DCCP) and the subsequent setting aside of an arbitral award on the same basis (this requires serious doubt)."[32]

### 4.2.3    The IBA Guidelines on Conflicts of Interest in International Arbitration.

36    In assessing whether an arbitral award should be set aside based on the absence of an impartial and independent arbitral tribunal, the *International Bar Association Guidelines on Conflicts of Interest in International Arbitration* (the **IBA Guidelines**) are relevant.[33] Again, the ECtHR confirmed this in the *Beg S.p.a. v.* Italy *judgment*:

> "II. **Relevant international material**
>
> (...).
>
> 44. **In particular, the 2004 IBA Guidelines, revised in 2014**, reflect the **understanding of the IBA Arbitration Committee as to the best current international practice. They seek to assist** parties, practitioners, arbitrators, institutions and courts in dealing with the important questions of impartiality and independence."[34]

37    In this context, see also again Boersma's note to the *Beg S.p.a./Italy* judgment:

> "First, noteworthy is **the great importance the ECtHR attaches to the International Bar Association Guidelines on Conflicts of Interest in International Arbitration (the IBA Guidelines)**, adopted in 2004 and last revised in 2014. Although the application use of the IBA Guidelines is limited to international arbitrations, which was not the case in this instance (indeed, the IBA Guidelines are from a later date than the arbitration proceedings), **the ECtHR apparently views the IBA Guidelines as an important source in domestic cases as well. Accordingly, these Guidelines are rightly regularly applied in the Netherlands in** both national and international arbitration and annulment proceedings (...)."[35]

38    Advocate-General de Bock also confirms that the IBA Guidelines can be followed in an annulment proceeding:

---

[32]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, *JBPR* 2022/48 cf. B.A. Boersma (*Beg S.p.a.v. Italy*), at 7. Emphasis added.

[33]    A copy of the IBA Guidelines (version 2014) will be brought into the proceedings as **Exhibit 6**.

[34]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, *JBPR* 2022/48 cf. B.A. Boersma (*Beg S.p.a.v. Italy*). Emphasis added.

[35]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, *JBPR* 2022/48 cf. B.A. Boersma (*Beg S.p.a.v. Italy*), at 8. Emphasis added.



> **"Nor is it erroneous or incomprehensible that the court in these annulment proceedings sought a connection to the IBA Guidelines specifically drawn up for international arbitrations,** and it is precisely in keeping with the restrained test to be applied on the basis of Supreme Court case law."[36]

39    The IBA Guidelines elaborate on the reasons for disclosure. According to the IBA Guidelines, the purpose of disclosure is to inform parties of facts and circumstances that they might wish to investigate further to determine whether there is objectively justifiable doubt about the arbitrator's impartiality and independence.[37] 'Disclosure' by arbitrators also serves "*to protect awards against challenges based upon alleged failures to disclose.*"[38]

40    The IBA Guidelines contain so-called *Application Lists*, which contain a non-exhaustive enumeration of circumstances (i) subject to a disclosure requirement (the **Red List**, which breaks down into a *Non-Waivable Red List* and a *Waivable Red List*); (ii) that must be disclosed (the **Orange List**) and (iii) that are not subject to a disclosure requirement (the **Green List**).

41    The circumstances listed on the Green List are circumstances in which "*no appearance and no actual conflict of interest exists from an objective point of view*"[39] and in respect of which (therefore) there is no disclosure obligation.

42    The Orange List contains circumstances, which "*may, in the eyes of the parties, give rise to doubts as to the arbitrator's impartiality or independence.*"[40] and therefore do need to be disclosed.

43    The Red List contains the most objectionable circumstances, which circumstances "*give rise to justifiable doubts as to the arbitrator's impartiality and independence.*"[41] The Red List, as noted, is again divided into a *Non-Waivable Red List* and a *Waivable Red List*.

44    The conditions listed on the *Non-Waivable Red List* are, as the title suggests, "non-waivable" because of the severity of those conditions. See:

- General Standard 2(d) of the IBA Guidelines:

---

[36]   Opinion of A-G De Bock dated March 23, 2018, ECLI:NL:PHR:2018:263, r.o. 3.38 (emphasis added) on The Hague Court of Appeal December 6, 2016, ECLI:NL:GHDHA:2016:4377, r.o. 8.6. For other examples from Dutch case law in which connection has been sought with the IBA Guidelines, see Court of Appeal Arnhem-Leeuwarden January 25, 2019, ECLI:NL:GHARL:2019:634, r.o. 5.4 ("*In assessing the question whether, on the basis of the foregoing within the meaning of Section 1033 Rv, there is justifiable doubt as to the impartiality and independence of [appellant2] as an arbitrator, the so-called red, orange and green lists of the IBA Guidelines may serve as a point of view. There is reason to do so if and insofar as the situations described therein are in line with or can be equated to the case at hand. It should be noted, however, that these lists are not intended to be exhaustive*") and Court of Rotterdam January 1, 2021, ECLI:NL:RBROT:2021:1680, ground 4.6.
[37]   See IBA Guidelines (2014 version), p. 18 at 4: "*The purpose of disclosure is to inform the parties of a situation that they may wish to explore further in order to determine whether objectively - that is, from the point of view of a reasonable third person having knowledge of the relevant facts and circumstances - there are justifiable doubts as to the arbitrator's impartiality or independence.*".
[38]   IBA Guidelines (2014 version), p. 1, subd. 1.
[39]   IBA Guidelines (2014 version), p. 19, at 7.
[40]   IBA Guidelines (2014 version), p. 18, at 3.
[41]   IBA Guidelines (2014 version), p. 17, at 2.

LOYENS _L_ LOEFF

> "**Justifiable doubts <u>necessarily</u> exist** as to the arbitrator's impartiality or independence **in any of the situations described in the Non-Waivable Red List**."[42]

- The Notes to General Standard 2 of the IBA Guidelines:

  > "**The Non-Waivable Red List describes circumstances that <u>necessarily raise justifiable doubts</u> as to the arbitrator's impartiality or independence.** For example, because no one is allowed to be his or her own judge, there cannot be identity between an arbitrator and a party. **The parties, therefore, <u>cannot</u> waive the conflict of interest arising in such a situation**."[43]

- General Standard 4(b) of the IBA Guidelines:

  > "However, **if facts or circumstances exist as described in the Non-Waivable Red List, any waiver by a party** (including any declaration or advance waiver, such as that contemplated in General Standard 3(b)), or any agreement by the parties to have such a person serve as arbitrator, **shall be regarded as invalid**."[44]

- "*Part II*" of the IBA Guidelines (the "*Practical Application of the General Standards*") also emphasizes the seriousness of the situations mentioned on the *Non-Waivable Red List*:

  > "**The Non-Waivable Red List includes situations deriving from the overriding principle that no person can be his or her own judge. <u>Therefore, acceptance of such a situation cannot cure the conflict.</u>** The Waivable Red List covers **situations that are serious but not <u>as severe</u>**."[45]

45    The *Non-Waivable Red List* consists of only four situations, including the situation where the arbitrator's office regularly advises one of the parties to the arbitration and the arbitrator's office derives significant financial revenue from it:

> "1.4 The arbitrator or his or her firm regularly advises the party, or an affiliate of the party, and the arbitrator or his or her firm derives significant financial income therefrom."[46]

## 4.3    Application of the legal framework to the relevant facts of this case

46    Cox Ten Bruggencate - the law firm with which AIG-appointed arbitrator Ter Meer was and is associated - is a relatively small, so-called *boutique* firm: it employs nine lawyers, according to its website, and specializes in "*Transportation*" and "*Insurance and Liability*" in both of which areas the firm is renowned.[47] This is also confirmed by the Legal 500 guide,

---

42    IBA Guidelines (2014 version), p. 5(d). Emphasis added.
43    IBA Guidelines (2014 version), p. 6(d). Emphasis added.
44    IBA Guidelines (2014 version), p. 10(b). Emphasis added.
45    IBA Guidelines (2014 version), p. 17, at 2. Emphasis added.
46    IBA Guidelines (2014 version), p. 20, at 1.4. Emphasis added.
47    https://www.cxtb.nl/.

**LOYENS** *L* **LOEFF**

in which Cox Ten Bruggencate is named and praised with regard to those two categories (*i.e.*, transportation and insurance).

47       BJSS was aware that Cox Ten Bruggencate "*occasionally*" acted for AIG "*in matters relating to transportation and logistics (as defense counsel and in recovery actions*" and that the firm had been included on AIG's "*panel*" regarding "*legal services in relation to Marine Insurance (not for other lines of business).*" Indeed, this follows from the Ter Meer Disclosure.

48       *'Occasionally'* can reasonably be interpreted as 'sometimes, but not often' or 'occasionally.' See, for example, the Cambridge Dictionary:[48]



Or Merriam-Webster:[49]



49       BJSS thus thought that Cox Ten Bruggencate "sometimes, but not often" or "occasionally" acted for AIG in disputes related to transportation and logistics. That, of course, is something fundamentally different from AIG being a *"major client"* and one of only four named "*key clients*" of Cox Ten Bruggencate in that area for many years - and thus also at the time of the Arbitration.

50       Further, BJSS knew from the Ter Meer Disclosure that Cox Ten Bruggencate had been included by AIG on AIG's *"panel"* for legal services in the limited area of (only) *"Marine Insurance.*" That meant, as far as BJSS was concerned, that AIG employees could/might engage Cox Ten Bruggencate for issues in that particular area. What BJSS did *not* know was that AIG had been/is one of Cox Ten Bruggencate's *"key clients"* in the area of insurance as well for many years.

51       The fact that Cox Ten Bruggencate has had a longstanding relationship with AIG ("*longstanding relationship*") and that AIG has also been one of its *"major"* and *"key"* clients for many years in the limited areas, in which Cox Ten Bruggencate operates (namely, transportation and insurance), implies that the firm has realized significant revenues from/with that relationship.

---

[48]    See: https://dictionary.cambridge.org/dictionary/english/occasionally. Emphasis added.
[49]    See: https://www.merriam-webster.com/dictionary/occasionally. Emphasis added.

LOYENS LOEFF

52    The objective test from ECtHR case law - which was also applied in *Beg S.p.a. v. Italy* -
      involves the question of whether, for example, professional or financial ties between the
      arbitrator and a party give rise to objectively justifiable doubts about an arbitrator's
      impartiality. This may also involve the appearance of partiality ("*justice must not only be
      done, it must also be seen to be done*") (see paragraph 31 above).

53    BJSS is of the view that it follows from the foregoing that there are indeed professional
      and/or financial ties between Ter Meer and his firm on the one hand and AIG on the other
      that give rise to objectively justifiable doubts about his impartiality. These circumstances
      also lead to "*so serious a degree [of] doubt*" about Ter Meer's impartiality and independence
      that it would be "*unacceptable to require [BJSS] to acquiesce*" (the *Nordström* standard).

54    This is supported by the fact that the situation where the arbitrator's office regularly advises
      a party to the arbitration and derives significant financial income from it is one of the four
      situations, which are considered so objectionable in international arbitration practice, that
      they are listed on the *Non-Waivable Red List* of the IBA Guidelines (see paragraph 45
      above). It is reiterated here, that the situations listed on the *Non-Waivable Red List* are
      situations that "**necessarily raise justifiable doubts** *as to the arbitrator's impartiality or
      independence*" and that are "**severe**" (see paragraph 44 above).

55    Added to this is the fact that Ter Meer failed to disclose the actual connection between Cox
      Ten Bruggencate and AIG or to 'update' his disclosure during the six years in which the
      Arbitration was pending, whereas he was under a continuing obligation of "disclosure" under
      both Section 1034 paragraph 3 DCCP and Article 11 paragraph 5 of the NAI Rules
      applicable to the Arbitration.

**4.4    International case law also provides support for setting aside the Arbitral Award on
        the basis of the above facts**

56    International case law supports setting aside an arbitral award when an arbitrator has failed
      to disclose (*discloses*) essential information.

57    BJSS refers to the following cases:

      •    In *Tecnimont SPA v. J&P Avax,* the Reims court set aside an arbitral award
           on the grounds of lack of independence. In doing so, the court considered
           that "*it took eight months, multiple reminders, and a challenge of the
           president of the arbitral tribunal for Mr. Jarvin to communicate, and still **in
           an incomplete manner** according to the investigations conducted by the
           company Avax on its part, **the information concerning the scope of the
           relationship between the company Tecnimont and the Jones Day
           firm**.*" Furthermore, the court, rejected the argument that the income of the
           arbitrator's office was limited in nature and held that "*the independence of*

LOYENS LOEFF

*the arbitrator is not judged on the basis of the significance of the fees collected from one party by his or her firm."*[50]

- In England, in the case of *Halliburton v. Chubb* before the UK Supreme Court, it was held that *non-disclosure*: *"may in certain circumstances amount to apparent bias. (...). The failure of the arbitrator to disclose such facts and circumstances is itself a factor to which the fair-minded and informed observer would have regard in reaching a conclusion as to whether there was a real possibility of bias."*[51] In that case, however, no award had yet been issued by the "tainted" arbitral tribunal.

- In Australia, in the case of *Aussie Airlines v. Australian Airlines & Others*, the Australian Federal Court held that: *"the failure to disclose, of itself, can be one of the circumstances which together with others may give rise to a reasonable apprehension of bias. **A party or the public may well be left with the impression that there was intentional concealment or non-disclosure**, or that something was 'wrong about it all'. A failure to disclose no matter how unwitting, can undermine public confidence in the integrity of, and the administration of justice by, the judicial officer or the tribunal concerned."*[52]

- In the United States, the US Supreme Court has reiterated the fundamental importance of a clear disclosure regime in arbitration cases: *"[W]e should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review. We can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias."*[53] Reflecting the importance of the duty to disclose, the US Supreme Court held that a *failure to disclose* could justify setting aside the arbitral award.[54]

- In the ICSID Annulment Award in *Plaintiff v. Spain,* the commission set aside an arbitral award based on an arbitrator's failure to disclose the nature and extent of his relationship with the plaintiff's experts, experts with whom he regularly worked as a lawyer. The committee emphasized that a reporting default deprives parties of the opportunity to challenge arbitrators and robs them of the *"benefit and protection of an independent and*

---

[50]   **Exhibit 7**, *Tecnimont SPA v. J&P Avax*, ICC Case No. 12273, Judgment of the Reims Court of Appeal, November 2, 2011. Emphasis added.
[51]   **Exhibit 8**, *Halliburton Company v. Chubb Bermuda Insurance Ltd* [2020] UKSC 48, paragraphs 117-118, 133.
[52]   **Exhibit 9**, *Aussie Airlines Pty Ltd v. Australian Airlines Pty Ltd*, Judgment, dated March 13, 1996, 135 ALR 753, paragraph 40. Emphasis added.
[53]   **Exhibit 10**, *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, U.S. Court, *Opinion*, dated Nov. 18, 1968, 393 U.S. 145 (1968).
[54]   Idem, paragraph 147.

LOYENS  LOEFF

*impartial tribunal which the right to challenge is intended to provide."*[65] A reporting default may essentially jeopardize essential *"right[s] of defense and fair trial."*[56]

- In *HSMV Corp. v. ADI Ltd. a U.S.* court set aside - on the basis of the nullification ground of *"evident partiality ... in the arbitrators"* enshrined in Section 10(2) of the U.S. Federal Arbitration Act - an arbitral award rendered by an arbitrator whose firm acted for one of the parties to the dispute. The crux of the court's decision was that the arbitrator in question had failed to investigate and report the conflicts of interest at issue.[57]

58    Ter Meer should have disclosed the true connection between Cox Ten Bruggencate and AIG in the arbitration. Failure to do so also cast at least legitimate doubt on Ter Meer's independence and impartiality. After all, if the duties of disclosure are so easily ignored, the requirements of independence and impartiality cannot be guaranteed: *"The parties are entirely reliant upon disclosure in order to consider whether an issue of disqualification may arise, and if so whether an application to disqualify is to be made."*[58]

**4.5    Conclusion**

59    The conclusion is that there are such serious doubts about Ter Meer's independence and impartiality that it would be unacceptable to require BJSS to accept the Arbitral Award. The Arbitral Award should therefore be set aside pursuant to Section 1065(1)(e) DCCP.

**5    PROCEDURE**

**5.1    Evidence**

60    In support of its contentions, BJSS refers to the exhibits listed in this subpoena, which BJSS will bring to trial on the first roll date and will also send a copy to AIG.

61    Without thereby wishing to assume any burden of proof not incumbent upon it at law, BJSS further offers to prove its contentions by all means at law, including, but not limited to, the examination of witnesses.

62    Since AIG's defenses to the claim for setting aside are unknown, BJSS is currently unable to specify any additional documents or witnesses available to it that would (further) substantiate the grounds for setting aside the Arbitral Award.

---

[55]    **Exhibit 11**, *Claimant Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, *Decision on Annulment*, June 11, 2020, para. 241.

[56]    Idem, para. 241.

[57]    **Exhibit 12**, *HSMV Corp. v. ADI Ltd*, U.S. District Court for the Central District of California, *Order Re Motion to Vacate Arbitration Award*, dated Nov. 8, 1999, 72 F. Supp. 2d 1122, 1129 (C.D. Cal. 1999).

[58]    Exhibit 9, *Aussie Airlines Pty Ltd v. Australian Airlines Pty Ltd*, Judgment, dated March 13, 1996, 135 ALR 753, paragraph 39.



**5.2     Known defenses of AIG**

63     To date, AIG has not raised a substantive defense to the claim to set aside the Arbitral Award, for which reason BJSS cannot state or address those possible defenses of AIG at this venue.

**6          CONCLUSION**

64     For the foregoing reasons, BJSS requests that the Arbitral Award be set aside pursuant to Section 1065(1)(a) DCCP.

**REASONS WHY:**

it may please the court of appeal, by judgment:

-          To set aside the Arbitral Award;

-          To order AIG to repay the amount of EUR 18 million, which BJSS paid to AIG on the basis of the Arbitral Award, plus statutory interest from the date of this summons to the date of repayment; and

-          To order AIG to pay the costs of these proceedings, plus statutory interest from fourteen days after the date of the judgment to be issued in this matter;

all of the above, to the extent permitted by law, to be provisionally enforceable.

The costs of this are: EUR 138.82

| | |
|---|---|
| Writ | EUR 112.37 |
| Information costs Chamber of Commerce | EUR 2.85 |
| Subtotal | EUR 115,22 |
| Surcharge (VAT) | EUR 23.60 |
| Total | EUR 138.82 |

Plaintiff(es) / Requirant(e) under the Turnover Tax Act 1968 cannot set off the turnover tax charged to him/her, therefore, the undersigned declares to have increased the aforesaid charges by a percentage equal to the percentage mentioned in the aforesaid Act.

The undersigned hereby declares that the above disbursements were incurred for the proper performance of the official act and were necessary, as well as that he/she has no direct or indirect interest in the company or third party, which bills the above disbursements.

Bailiff

This case is being handled by mr. T.L. Claassens and ms. E. Slabbers, Loyens & Loeff N.V., Blaak 31, 3011 GA Rotterdam. telephone: +31 (0)10-2246613; e-mail: tom.claassens@loyensloeff.com and eva.slabbers@loyensloeff.com.