# EXHIBIT B

DE BRAUW
BLACKSTONE
WESTBROEK

The Hague Court of Appeal, The Hague location Case
number: 200.341.205/01
Session: July 30, 2024

**CONCLUSION OF REPLY**

*concerni
ng:*

the company incorporated under
Luxembourg law
**AIG Europe S.A.**
based in Luxembourg, Luxembourg,

defendant,
lawyer: mr. E.R. Meerdink

*against:*

the company incorporated under
Swiss law **Bank J. Safra Sarasin AG**
based in Basel, Switzerland,

plaintiff,
lawyer: mr. T.L. Claassens

DE BRAUW
BLACKSTONE
WESTBROEK

**Table of Contents**                                                    **Page**

**1**    **INTRODUCTION** ................................................................................................1

**2**    **FACTS**.................................................................................................................3

2.1    The nomination, *disclosure* and appointment of arbitrator Ter Meer in an insurance law dispute between AIG and Bank Sarasin 3 .............................................................

2.2    The relationship between CXTB and AIG has been known since 2015.......................5

2.3    Bank Sarasin's changed position after it allegedly recently became aware of the *Legal500* from the years 2020-2024 7 ..........................................................................

**3**    **LEGAL FRAMEWORK**..........................................................................................8

3.1    Standard for setting aside an arbitral award for doubts about an arbitrator's impartiality and independence 8 ...................................................................

3.2    Annulment only if there are facts that came to *light after* the arbitration, of which Bank Sarasin was not aware during the arbitration and this is not imputable to it ..............10

3.3    Annulment only in the event of *such serious* doubts about impartiality or independence that it would be unacceptable to make the arbitral award uphold ...................................................................................................13

**4**    **BANK SARASIN'S CLAIM IS UP FOR DISMISSAL**.............................................17

4.1    No question of facts that were not discovered until after the Arbitral Award was rendered and for which it cannot be imputed to Bank Sarasin that they were would not have known about it during the arbitration.................................18

4.2    No serious doubts about impartiality or independence From Ter Meer .........................................................................................21

**5**    **BURDEN OF PROOF AND OFFER OF PROOF** ....................................................23

**6**    **CONCLUSION**.....................................................................................................25

DE BRAUW
BLACKSTONE
WESTBROEK

AIG Europe S.A. ("**AIG**") concludes for response as follows.

**1     INTRODUCTION**

1.     Bank Sarasin wrongfully sought coverage in the amount of EUR 250 million under the policy issued by AIG consisting of a *Professional Liability*, *Crime* and *Fiduciary Liability Policy* (the "**Policy**") In its efforts to get this done, Bank Sarasin purposefully obstructed the discovery of the truth during the six-year arbitration. As a result, AIG spent years to comprehensively u n c o v e r  the facts. This was done t h r o u g h  thousands of documents, which Bank Sarasin was eventually forced to hand over,[2] and hearing witnesses and experts at a hearing lasting no less than two weeks. It followed unequivocally that there was no right to coverage under the Policy and that Bank Sarasin was falsely trying to pass the buck to AIG.[3]

2.     The arbitrators unanimously rejected Bank Sarasin's claim in a very well-argued and well-reasoned arbitral award of no less than 212 pages that went into detail on the facts exposed (the "**Arbitral Award**"). The arbitral tribunal also ordered Bank Sarasin to pay the (substantial) costs incurred of EUR 18 million.

3.     Bank Sarasin is now trying to escape this unfavorable award and has therefore initiated annulment proceedings based on a few words from old editions of promotional magazine *Legal500*: it is alleged that there are doubts about the impartiality and independence of arbitrator Ter Meer, despite his extensive *disclosure* at the time. Although Bank Sarasin says it was a w a r e  even before Ter Meer's appointment that Cox Ten Bruggencate ("**CXTB**"), the law firm where Ter Meer w o r k s , was acting for AIG in the area of *Transport* and was even on the *panel* for *Marine Insurance*, it allegedly found o u t  only after the Arbitral Award was rendered that the working relationship between CXTB and AIG was "*more significant*" than it thought at the time.[4] She would h a v e  "discovered" this by looking at the *Legal500* from 2020

---

[1]     See also Section B (*The Policy*) of Chapter IV (*Factual Background*) of the Arbitral Award.
[2]     The extensive history of the arbitration is described in Chapter III (*Procedural History*) of the Arbitral Award, including the many parts of the *document production*.
[3]     For a summary of the Arbitral Tribunal's conclusion, see Arbitral Award, Subpart (f) (*The Tribunal's conclusion on Clause 3.8.1 PLP*) (Nos. 617-620).
[4]     See Subpoena Bank Sarasin, no. 15.

strike. As AIG will explain in more detail below, the nullification claim fails on two independent grounds.

4.  First, there are no new facts and circumstances that came to light only after the Arbitral Award was rendered, with which Bank Sarasin was not aware during the arbitration and this i s not imputable to it. Bank Sarasin has also not argued that and why it is not imputable to it that it was not aware of these facts and circumstances that were already known in 2016. Therefore, it has not even met its burden of proof, leaving the claim ready for dismissal.

5.  Bank Sarasin knew from the beginning of the arbitration that a working relationship e x i s t e d between CXTB and AIG. This was already evident from Ter Meer' s thorough *disclosure* prior to his appointment as arbitrator. In addition, this working relationship was also mentioned in several public notices prior to and during the arbitration. Thus, there are simply no "new" facts of which Bank Sarasin would not have been aware. It would therefore have been incumbent on Bank Sarasin at the time to investigate this working relationship further and, if it saw a need to do so, to complain about it in a timely manner. It failed to do so. Thus, the claim for annulment already fails.

6.  Second, the - meager - facts presented by Bank Sarasin about the working relationship between CXTB and AIG give no reason to doubt Ter Meer's independence and impartiality, let alone that there would be such serious doubt that the Arbitral Award cannot stand.

7.  The strict standard of annulment for breach of public policy is not met. Bank Sarasin also realizes this and therefore assumes the wrong standard in its subpoena. In addition, it attempts to fabricate "new facts" with a few references to the *Legal500*, when this information had been public for all to see for ages - and these facts did not give Bank Sarasin cause to seek a challenge to Ter Meer prior to and during the Arbitration. This attempt to get out from under the Arbitral Award should therefore fail.

## 2    FACTS

### 2.1    The nomination, *disclosure* and appointment of arbitrator Ter Meer in an insurance law dispute between AIG and Bank Sarasin

8.    AIG is one of the world's largest insurers, and also a major player in the Dutch insurance market. Bank Sarasin is a prominent Swiss bank with operations in the German market, among others.

9.    Bank Sarasin claimed coverage under AIG's Policy in 2013 that, according to Bank Sarasin, involved the full policy limit of EUR 250 million (and related costs) suffered by clients of its as a result of investment products sold by Bank Sarasin. AIG rejected coverage.

10.    On September 6, 2017, AIG and Bank Sarasin entered into a (further) arbitration agreement.[5] In this agreement, the parties agreed that they would settle their dispute in arbitration in accordance with the rules of the Netherlands Arbitration Institute dated January 1, 2015 (the "**NAI Rules**"). In doing so, they agreed that the arbitral tribunal would consist of three arbitrators. Bank Sarasin and AIG would each nominate one arbitrator, after which those arbitrators would jointly nominate the third arbitrator (as chairman).

11.    Bank Sarasin requested arbitration on December 1, 2017.[6] In its request, Bank Sarasin nominated the first arbitrator (Mr. Van Baren) and asked AIG to nominate the second arbitrator in the near future.

12.    On December 12, 2017, AIG responded to this and outlined the qualifications that AIG believed an arbitrator should meet: expertise in insurance law, experience in arbitration, and language proficiency in English and German.[7] Against this background, AIG nominated Mr. Ter Meer as the second arbitrator.[8]

---

[5]    This arbitration agreement was entered into to replace the arbitration agreement contained in the Policy, with the purpose of s k i p p i n g  the required mediation agreed upon there. See Arbitration Agreement between Bank Sarasin and AIG dated September 6, 2017, **Production 1**; see also Nos. 275 et seq. of the Arbitral Award.
[6]    Request for arbitration by Bank Sarasin dated December 1, 2017, **Production 2**.
[7]    Short Answer of AIG dated December 12, 2017, **Production 3**, p. 4. Bank Sarasin did not dispute these qualifications, as evidenced by the NAI's January 4, 2 0 1 8  letter.
[8]    Short Answer from AIG dated December 12, 2017, **Production 3**.

13.    Ter Meer was widely known as an experienced expert in Dutch insurance law.[9]

14.    On December 19, 2017, Ter Meer made a statement under Article 11(4) of the NAI Rules.[10] Ter Meer confirmed that he was available for appointment and that he considered himself independent and impartial.[11] In his *disclosure,* Ter Meer informed the parties of facts and circumstances that, in the parties' view, might cast doubt on his independence and impartiality, including express reference to work done by CXTB before - and against - AIG:

> "*1. Occasionally Cox Ten Bruggencate (CXTB) acts for (insureds) of AIG in matters relating to transportation and logistics (as defense counsel and in recovery actions). I am not personally involved in those matters.*
>
> *2. AIG included CXTB in its panel of Dutch Law firms for legal services in relation to Marine Insurance (not for other lines of business).*
>
> *3. CXTB represents a client in a dispute with AIG about coverage under a PI insurance policy. I am not personally involved in that matter.*
>
> *[...]*
>
> *5. I am currently assisting a large number of insurance companies in a dispute with their insured about coverage under a PI insurance policy. AIG and Allianz are amongst those insurers. Court proceedings are pending. Emke Tielens is involved for AIG. I mainly have contact with the respective leading insurers on the primary and the excess layers. Those leading insurers do not include AIG and Allianz.*
>
> *[...]*
>
> *7. In the past, from 2003 until 2013, I have been involved on behalf of Dutch market insurers, including AIG as leading insurer, in a matter concerning property damage.*"

---

[9]    The website https://web.archive.org involves an Internet archive page that archives snapshots of web pages from the past and retrieves them on request (the "**Wayback Machine**"). In this way, it is possible to determine what information was already easily retrievable online prior to Ter Meer's appointment. On Ter Meer's experience, see Waybackmachine snapshot Feb. 6, 2018 from www.cxtb.nl/reviews, **Production 4**.

[10]    Art. 11(4) NAI Rules reads, "*A person intending to a c c e p t his assignment shall, prior to the confirmation of appointment provided for in Article 16(1), sign and send to the Administrator a statement c o n f i r m i n g his independence and impartiality, availability and acceptance of the assignment subject to confirmation by the Administrator. If a communication r e f e r r e d to in paragraph 3 has been made, it shall be included in the statement. The administrator shall send copies of the statement to the parties and, if the arbitral tribunal consists of more than one arbitrator, to the co-arbitrators.*"

[11]    See the December 19, 2017 Ter Meer Disclosure.

DE BRAUW
BLACKSTONE
WESTBROEK

15.  Although there was extensive correspondence about Van Baren's impartiality
     and independence,[12] Bank Sarasin accepted both the nomination and Ter
     Meer's *disclosure* at the time without asking further questions:[13]

> "*By letter, dated December 20, 2017, I invited <u>Ms. Lieverse</u> and Mr. Rupert to
> provide any comments regarding the disclosures of Mr. Van Baren and Mr.
> Ter Meer within three business days.* [...] *Up until now I did not receive any further
> comments to your disclosures, as requested for by letter dated December 20,
> 2017.*"

16.  In the absence of any objections or questions about Ter Meer's *disclosure*, the
     NAI then proceeded to appoint Ter Meer, alongside Van Baren, as arbitrator.[14]
     AIG and Bank Sarasin then jointly nominated Wuisman, former Attorney
     General at the Supreme Court, to serve as the third arbitrator, also chairman,
     on this arbitral tribunal.

17.  Bank Sarasin also did not raise any question during the arbitration about Ter
     Meer's *disclosure* (in which he had described the relationship between CXTB and
     AIG), nor did it at any time question Ter Meer's independence and impartiality.

## 2.2    The relationship between CXTB and AIG has been known since 2015

18.  As is also evident from Ter Meer's *disclosure*, Ter Meer had been employed by
     CXTB prior to his appointment, namely since 2015, first as an attorney, and
     currently as a consultant. To AIG's knowledge, given public sources, Ter Meer
     was not a partner in CXTB's partnership.[15]

19.  CXTB was and is a niche firm specializing in insurance law, among other areas.
     CXTB's clients were "*primarily insurers* [...]" who are "*among the top of the
     market*," as stated on CXTB's home page at the time.[16]

---

12   Notice of Challenge from AIG dated December 13, 2017, **Production 5**, letter from NAI dated
     December 21, 2017, **Production 6**, letter from Van Baren dated December 15, 2017, **Production 7**,
     and letter from AIG dated December 21, 2017, **Production 8**.
13   Letter NAI dated Jan. 4, 2018, **Production 9**, p. 3 (emphasis added, lawyers).
14   Letter NAI dated Jan. 4, 2018, **Production 9**, p. 3.
15   See, for example, the CoC extracts dated September 28, 2016 and December 30, 2021, **Production
     10**.
16   Wayback machine snapshot dated January 27, 2015 from www.CXTB.nl, **Production 11** which
     states, "*Cox Ten Bruggencate is a driven niche firm specializing in Transportation, Logistics,
     International Trade, Insurance and Liability.  Our clients are primarily*

DE BRAUW
BLACKSTONE
WESTBROEK

20.    The *Legal500* also revealed back in 2016 - the year <u>before</u> Ter Meer<u>'s appointment -</u> in the *Insurance* category that CXTB acted primarily for insurers<u>, counting AIG as one of only three named clients </u>(the other two being global insurers as well):

> "*Cox Ten Bruggencate Lawyers' department, praised for its 'thorough analysis,' 'to-the-point advice' and value for money, is led by Joeri Cox and Carlijn ten Bruggencate; Jan ter Meer joined from Boekel. The team's clients include Delta Lloyd, Liberty and AIG.*"[17]

21.    Bank Sarasin did not mention this older notice in its subpoena, even though it was - and at least should have been - aware of it at the time. Guides such as the *Legal500* tend to be well read in the market, especially by lawyers, who in order to be mentioned in this guide normally have to p r o v i d e  the information themselves. This is especially true for Bank Sarasin's lawyers in this arbitration; they are mentioned a few lines further on in the same 2016 guide (and according to this guide also count AIG among their clients), have thus contributed to this guide themselves, and will therefore have read it:[18]

**Cox Ten Bruggencate Advocaten**'s department, praised for its '*thorough analysis*', '*to-the-point advice*' and value for money, is led by Joeri Cox and Carlijn ten Bruggencate; Jan ter Meer joined from Boekel. The team's clients include Delta Lloyd, Liberty and AIG.

Eelco Meerdink's '*devoted*', '*result-oriented*' and '*very skilled*' team at De Brauw Blackstone Westbroek counts ABN Amro, Allianz Global Investors, AkzoNobel and Aegon among its clients. Dennis Horeman is recommended. Pierre Nijnens and Francine Schlingmann are also active.

The '*very responsive*', '*very client-focused*' Victor de Vlaam heads up the department at Hogan Lovells International LLP, which advises UnitedHealth on regulatory matters, and carried out an insurance compliance audit of RSA. Other clients include RGA, Axa and Chubb.

Kennedy Van der Laan's department is led by the '*knowledgeable*' Chris van Dijk, '*a real authority*'. The '*pragmatic*', '*analytical*' Frits van de Woude successfully represented HEMA and various notaries in a test case regarding the allegedly unlawful participation by civil law notaries in HEMA's 'notarisservice'.

Kitty Lieverse's practice at Loyens & Loeff counts AIG, Aegon, Axa and Achmea among its clients. Lieverse is recommended; she is supported by Merel van Asch.

---

insurers, logistics providers, insurance brokers, shipping-related companies and trading houses, from home and abroad. They are among the top players in the market."

[17]    Waybackmachine snapshot April 14, 2016 from www.legal500.com/c/netherlands/insurance, **Production 12**.

[18]    Wayback Machine snapshot April 14, 2016 from www.legal500.com/c/netherlands/insurance, **Production 12**: "*Kitty Lieverse's practice at Loyens & Loeff counts AIG, Aegon, Axa and Achmea among its clients. Lieverse is recommended; she is supported by Merel van Asch.*" Lieverse and Van Asch were attorneys for Bank Sarasin in the arbitration.

DE BRAUW
BLACKSTONE
WESTBROEK

22. AIG was also listed in the 2018 *Legal500* as a client of CXTB in the *Transportation* category, more specifically in the area of "*transportation insurance*."

> "*Cox Ten Bruggencate Lawyers' 'top-notch' team is especially strong in transport insurance, and often acts for logistics companies. Co-heads Carlijn ten Bruggencate and Joeri Cox are "knowledgeable, down-to-earth, open-minded and solution-focused. Clients include Dutch P&I, Aon, Rhenus Group and insurers such as AIG and XL Catlin.* "[19]

23. Before 2020, the *Legal500* contained only a brief description of a firm's practice and sometimes listed a few clients. Starting in 2020, the *Legal500* publishes a more detailed description and a list of "*key clients*" for each of the highlighted firms. In line with previous entries, from 2020, AIG was also named as a client of CXTB in the areas of *Transport* and *Insurance*, alongside several other major insurers such as Allianz and ASR.[20] This information was published in 2020: that is, while the arbitration was still pending and even well over a year before the hearing, which took place in late 2021.

## 2.3 Bank Sarasin's changed position after it allegedly recently became aware of the *Legal500* from the years 2020-2024

24. Following the arbitral award that was devastating for it, Bank Sarasin's subpoena, on reflection, questions Ter Meer's independence and impartiality. The reason for this sudden turn, according to Bank Sarasin, is that it recently became aware of the *Legal500* from 2020 and beyond.[21] As explained above, the Transportation and Insurance Law sections at CXTB contained references to AIG as a "*longstanding*," "*key*" or "*major client*."

25. As AIG explained above, AIG was also mentioned as just one of a few clients of CXTV in 2016 and 2018. From 2020, the *Legal500* contributions became more extensive and CXTB again named AIG as one of its clients. This is the only fact that Bank Sarasin is seizing upon to now initiate nullification proceedings. But this information was long and widely public and Bank Sarasin was aware of it (or at least should have been) during the arbitration - and even before the arbitration was initiated. And this

---

[19]    Waybackmachine snapshot Nov. 1, 2018 from www.legal500.com/c/netherlands/transport, **Production 13**.
[20]    Subpoena Bank Sarasin, nos. 16-18.
[21]    Subpoena Bank Sarasin, para. 3.4.

is quite apart from the fact that Ter Meer clearly named in his *disclosure* prior to his appointment as arbitrator that there was a professional relationship between CXTB and AIG (and that CXTB was even on AIG's Marine Insurance *panel*). Since the rendering of the Arbitral Award, nothing has happened - and Bank Sarasin does not contend - that would cast this (public) information in a different light.

26.     Added to this is the following. Contrary to what Bank Sarasin suggests,[22] it does not follow from the qualification of "*major client*" or "*key client*" in the *Legal500* that a firm is dependent on this client. The *Legal500* contains rankings of law firms and individual lawyers. In practice, therefore, law firms and lawyers use the *Legal500* primarily for marketing purposes. For the *Legal500,* a law firm may specify who its clients are, as also known to Bank Sarasin.[23] With the *Legal500,* one can only specify "*key clients*" when listing.[24] In practice, law firms typically list well-known names within their client base, as both Loyens & Loeff and CXTB did by both l i s t i n g AIG.

27.     Against this background, it is understandable that a niche firm like CXTB has taken on one of t h e  world's largest insurer as a client for marketing purposes. CXTB had been doing so since at least 2016.

## 3     LEGAL FRAMEWORK

### 3.1     Measure for setting aside an arbitral award for doubts about an arbitrator's impartiality and independence

28.     In these proceedings, Bank Sarasin seeks annulment of the Arbitral Award on the grounds of violation of public policy due to doubts of impartiality and independence (art. 1065 paragraph 1 sub e Rv).

29.     According to established case law, an arbitral award may be set aside on grounds of public policy only if the content or execution of the award violates mandatory law of such a fundamental character that compliance with it may not be constrained by restrictions of a procedural nature

---

[22]     Subpoena Bank Sarasin, nos. 51 and 53.
[23]     Subpoena Bank Sarasin, no. 19.
[24]     Statement sheet for the 2 0 2 0 *Legal500*, **Production 14**, see p. 6 under "*Clients: publishable and non-publishable clients.*"

prevented.[25] The state court should exercise restraint in assessing a claim for setting aside: in view of the public interest in an effectively functioning arbitral jurisdiction, the state court should intervene only in special, telling cases on the grounds of conflict with public policy.[26]

30. Against this background, in the Nordström *judgment,* the Supreme Court laid down the standard for setting aside an arbitral award for the failure of an arbitrator to be impartial or independent.[27] In that case, setting aside was sought for breach of public policy, because one of the arbitrators was allegedly not independent and impartial. During the time the arbitration between Nordström and Nigoco was pending, shareholder SHV sold its interest in Nigoco to Ciaputa. Ciaputa was assisted in that transaction by counsel, who also acted as arbitrator in the arbitration between Nordström and Nigoco. The arbitrator had not reported this to the parties at the start of the arbitration. Nordström sought annulment on the grounds of violation with public policy, but this claim was rejected. The Supreme Court considered that the following strict cumulative requirements apply for setting aside and had not been met:[28]

   (a)  after the rendering of the arbitral award, facts and circumstances have come to light with which the party relying on them was not familiar during the arbitral proceedings and it cannot be imputed to him that he was not aware of them at that stage; **and**

   (b)  Based on which it must be assumed that:

       (i)  an arbitrator was not impartial or independent at the time the award was made, or

---

[25]  HR March 21, 1997, ECLI:NL:HR:1997:AA4945, para. 4.2.

[26]  See HR April 12, 2019, ECLI:NL:HR:2019:565 (*Ecuador v. Chevron II*), para. 4.3.2; HR April 24, 2009, ECLI:NL:HR:2009:BH3137 (*IMS/Modsaf II*), para. 4.3.1; HR 17 January 2003, ECLI:NL:HR:2003:AE9395 (*IMS/Modsaf I*), para. 3.3; and HR May 25, 2007, ECLI:NL:HR:2007:BA2495 (*Chiperman/Anova*), para. 3.5.

[27]  HR 18 February 1994, ECLI:NL:HR:1994:ZC1266, m.nt. H.J. Snijders (*Nordström/Van Nievelt Goudriaan & Co*), para. 3.8.

[28]  See also, for example, HR Feb. 4, 2022, ECLI:NL:HR:2022:113, in which the Supreme Court followed A-G Wesseling-Van Gent's conclusion containing this standard (ECLI:NL:PHR:2021:796).

(ii)    there is, given the circumstances of the case, such serious doubt about his impartiality or independence that it would be unacceptable to uphold the arbitral award.

31.    Pursuant to art. 150 Rv, it is up to Bank Sarasin, the party s e e k i n g annulment of the Arbitral Award, to allege and prove a violation of public policy.[29] Thus, Bank Sarasin will have to argue and prove that the foregoing requirements have been met. As Chapter 4 will show, Bank Sarasin has not and c a n n o t do so. In fact, this case does not involve a situation that meets the strict Nordström requirements. Before AIG will explain, it will zoom in further on the requirement mentioned in (a) in Section 3.2 and on the requirement mentioned in (b) in Section 3.3.

**3.2    Annulment only if there are facts that came t o  l i g h t  *after* the arbitration, of which Bank Sarasin was not aware during the arbitration and this is not imputable to it**

32.    Under *Nordström,* only facts that came to light only after the arbitral award was rendered and with which the party concerned could not have known earlier can give rise to the setting aside of an arbitral award. The Supreme Court e x p l a i n e d this as follows in the *Nordström ruling*:

> "*A party may succeed in such a claim for setting aside only <u>if the facts and circumstances on which his claim is based were not known to him during the arbitral proceedings and he cannot</u> be blamed <u>for not having been aware of them at that stage</u>. If this is attributable to him or if he was already aware of them before the arbitral award, he <u>has the option of challenging the arbitrator in question, which excludes a claim for setting aside the arbitral award on the basis of these facts and circumstances</u>.*" [30]

33.    If it is attributable to a party that it was not aware of circumstances relevant to the arbitrator's impartiality, for example, because no investigation was conducted while facts giving rise to doubt were known before or during the arbitration, the annulment claim fails if that party relies on those circumstances.[31] This requirement is also the standard in

---

[29]    Cf. Supreme Court April 23, 2010, ECLI:NL:HR:2010:BK8097, p a r a . 3.5.3.
[30]    HR 18 February 1994, ECLI:NL:HR:1994:ZC1266, m.nt. H.J. Snijders (*Nordström/Van Nievelt Goudriaan & Co*), para. 3.8 (emphasis added, lawyers).
[31]    See, for example, Arnhem-Leeuwarden Court of Appeal October 8, 2019, ECLI:NL:GHARL:2019:8203, rov. 4.18.

destruction cases in most jurisdictions.[32] Contrary to what Bank Sarasin suggests,[33] the foregoing also does not violate Article 6 of the European Convention on Human Rights ("**ECHR**"). This also follows from the case law of the European Court of Human Rights ("**ECtHR**"). In *Suovaniemi et al. v. Finland*, it was complained that the Finnish court erred in not setting aside an arbitral award due to a lack of impartiality or independence of one of the arbitrators. Against the background that the applicants were aware of doubts about the arbitrator's impartiality during the arbitration but had not requested a challenge at that time, the ECtHR held that there was no violation of Article 6 ECHR. That qualifies as a processing or waiver (or "*waiver*") of the right to still rely on the alleged bias of an arbitrator, thus not violating Art. 6 ECHR:

> "*The Court considers that the Contracting States enjoy considerable discretion in regulating the question on which grounds an arbitral award should be quashed, since the quashing of an already rendered award will often mean that a long and costly arbitral procedure will become useless and that considerable work and expense must be invested in new proceedings* [...]. *In view of this the finding of the Finnish court based on Finnish law that by approving M. as an arbitrator despite the doubt, of which the applicants were aware, about his objective impartiality within the meaning of the relevant Finnish legislation does not appear arbitrary or unreasonable. Moreover, considering that throughout the arbitration the applicants were represented by counsel, the waiver was accompanied by sufficient guarantees commensurate to its importance.* [...] *Without having to decide whether a similar waiver would be valid in the context of purely judicial proceedings the Court comes to the conclusion that in the circumstances of the present case concerning arbitral proceedings the applicants' waiver of their right to an impartial judge should be regarded as effective for Convention purposes. Therefore the refusal of the Finnish courts to quash the arbitral award on the ground of M.'s participation in those proceedings does not disclose any appearance of a violation of Article 6 of the Convention.*"[34]

34. To give parties further guidance on how to investigate arbitrators, an arbitrator is obliged to disclose to the parties concerned any facts and circumstances that might b e grounds for challenge (see Art. 1034 Rv and Art. 11(3) NAI Rules). This obligation aims to prevent subsequent challenge of an arbitrator by enabling the parties to assess, prior to appointment, whether there are any objections relating to the

[32] Gary B. Born, "Annulment of International Arbitral Awards (Updated December 2023)," in: *International Commercial Arbitration (Third Edition)*, Kluwer Law International, par. 25.04[E][4].
[33] Subpoena Bank Sarasin, section 4.4.2.
[34] ECHR 23 February 1999, ECLI:CE:ECHR:1999:0223DEC003173796 (*Suovaniemi et al. v. Finland*) (emphasis added, lawyers).

independence and impartiality of an arbitrator.[35] This also applies *a fortiori* to avoid a discussion of impartiality and independence only <u>after the entire arbitral proceedings have been completed</u>.

35. Although the parties have not agreed to, and are not bound by, the *IBA Guidelines on Conflicts of Interest in International Arbitration* ("**IBA Guidelines**"),[36] the IBA Guidelines may give further (advisory) color to the aforementioned *disclosure obligation*.[37] The IBA G u i d e l i n e s  also emphasize that the purpose is to inform parties of facts and circumstances that they <u>might wish to investigate further </u>to determine whether there is objectively justifiable doubt about the arbitrator's impartiality and independence.[38] If a disclosure is made and a party nevertheless agrees to the appointment, or at least does not object, that party has processed the right to challenge based on the circumstances set forth in the *disclosure*.[39]

36. In addition, the *disclosure* requirement thus serves as support for the litigants and *an sich* says nothing about the arbitrator's independence and impartiality. However, citing several international judgments, Bank Sarasin seems to suggest that the mere fact that a particular circumstance that should have been disclosed was not included in a *disclosure* is sufficient for setting aside.[40] Regardless of the fact that the situation of

---

[35]    Cf. art. 1033 (2) Rv. See also G.J. Meijer, *T&C Civil Procedure*, art. 1034, para. 1; Conclusion A-G de Bock March 23, 2018, ECLI:NL:PHR:2018:263, no. 3.26.

[36]    Unlike the *2010 IBA Rules on the Taking of Evidence in International Aritration*, which were agreed upon, see Procedural Order 2 of May 15, 2019 (with Procedural Order 1 of July 20, 2018 still noting that they are non-binding), "*In addition, the arbitral tribunal may seek guidance from, but shall not be bound by, the 2010 IBA Rules on the Taking of Evidence in International Commercial Arbitration.*"

[37]    For these guidelines, see Production BS-6 and <u>www.ibanet.org</u> for the guideline renewed in 2024; on their non-binding status, see, for example, C.J.M. Klaassen et al. (ed.), *Going Dutch: ADR in the Netherlands, in particular at the* NAI, Deventer: Kluwer 2019, pp. 373-374.

[38]    IBA Guidelines on Conflicts of Interest in International Arbitration (2014), Production BS-6, p. 18, no. 4: "*The purpose of the disclosure is to inform the parties of a situation <u>that they may wish to explore further </u>in order to determine whether objectively - that is, from the point of view of a reasonable third person having knowledge of the relevant facts and circumstances - there are justifiable doubts as to the arbitrator's impartiality or independence.*" (emphasis added, lawyers)

[39]    Memorandum of Understanding, Parliamentary Papers II 1983/84, 18464, 3, p. 13: "*If a party nevertheless proceeds with the appointment, the right to challenge is thereby incorporated as far as it is concerned. The third party or the President, after having received the notification, will either refrain from making the appointment or discuss the matter with the parties before making the appointment. If, in the latter case, the parties find no reason to oppose the appointment, acquiescence has also taken place.*" Cf. also IBA Guidelines on Conflicts of Interest in International Arbitration (2014), Production BS-6, p. 18, no.
4. See also Conclusion of A-G de Bock March 23, 2018, ECLI:NL:PHR:2018:263, no. 3.33.

[40]    See Subpoena Bank Sarasin, no. 57.

DE BRAUW
BLACKSTONE
WESTBROEK

an incomplete *disclosure* does not arise here, AIG notes for the sake of completeness that Bank Sarasin's view is also incorrect.

37.    First, in light of Bank Sarasin's duty of inquiry, there is no requirement to include public information in the *disclosure*. Moreover - if an arbitrator did fail to disclose certain facts that should have been included in his *disclosure* (which is not at all at issue in this case) - that in itself is no reason to hold that the arbitrator was biased or dependent or to set aside the award for violation of public policy.[41] As A-G de Bock has also recently confirmed, it is the undisclosed facts and circumstances that are decisive - and not the fact that the *disclosure obligation* was not met.[42]

38.    Also in the international judgments to which Bank Sarasin refers, the government judges and/or arbitral tribunals involved assessed the circumstances of the case. In all cases, the central issue was whether <u>the (unstated) relationship or circumstance itself </u> cast doubt on the arbitrator's independence or impartiality.[43] Ultimately, therefore, the facts and circumstances are decisive in assessing the claim for annulment. AIG explains this further in the next section.

**3.3    Annulment only if there are *such serious* doubts about impartiality or independence that it would be unacceptable to uphold the arbitral award**

39.    In the *Nordström ruling* mentioned earlier, the Supreme Court explained that only if it is established from the facts and circumstances either that the arbitrator is

---

[41]    Conclusion A-G de Bock March 23, 2018, ECLI:NL:PHR:2018:263, no. 3.33, see also Court of Rotterdam May 11, 2011 ECLI:NL:RBROT:2011:BQ6204, para. 4.15.

[42]    Conclusion A-G de Bock March 23, 2018, ECLI:NL:PHR:2018:263, no. 3.33: "*For this purpose, according to the Court of Appeal, it is not the failure to comply with the duty of disclosure that is decisive, but the undisclosed facts and circumstances.*" Incidentally, this is also confirmed by the IBA Guidelines, see IBA Guidelines on Conflicts of Interest in International Arbitration (2014), Production BS-6, p. 18, no. 5: "*Nondisclosure cannot by itself make an arbitrator partial or lacking independence: only the facts or circumstances that the arbitrator failed to disclose can do so.*"

[43]    See, e.g., Production BS-7, paras. 33-39: the Reims Court considers the relevance of the various circumstances (concealed in that case); Production BS-8, no. 143: the UK Supreme Court there considers whether the unmentioned circumstances would lead to a "*real possibility of bias*"; Production BS-11, no. 253: "*Looking at <u>all these elements holistically</u>, the Committee concludes that <u>this undisclosed relationship could have had a material effect on the Award</u>.*" (emphasis added, lawyers)

was not independent and impartial, or there is serious doubt about it, destruction is possible:

> "*After the arbitral award has been rendered, challenge or excusal is no longer possible. In the situation that then arises, in which the parties have conducted the arbitral proceedings to the end and arbitrators have completed their task, a **stricter standard** must **be applied** <u>when answering the question of whether the arbitral award is voidable for being contrary to public policy</u> **than when it comes to challenging** <u>or excusing</u>.*

> *The award may then only be set aside on the grounds of breach of public policy in connection with an arbitrator's lack of impartiality or independence <u>if facts and circumstances have come to light on the basis of which it must be assumed that either an arbitrator was in fact not impartial or not independent when he rendered the arbitral award or that his impartiality or independence at the time was **so seriously** in **doubt** that, taking into a c c o u n t the other circumstances of the case, it would be unacceptable to require the party which was ruled against in the arbitration to comply with the award.*"[44]

40. This standard thus requires that in an annulment proceeding there be *serious doubts* about the arbitrator's impartiality or independence. This criterion thus differs from the criterion for challenging, for which, pursuant to art. 1033 Rv, it is sufficient that there is *justified doubt* about the arbitrator's impartiality or independence. In line with established case law, the Supreme Court considers it advisable to intervene in the finality of arbitration only in telling cases, and maintaining the stricter standard is necessary in view of the general interest of an effectively functioning arbitral tribunal. As AIG e x p l a i n e d  in No. 30 above, t h e Nordström v. Nigoco case involved a very serious case in that one of the arbitrators was assisting Nigoco's shareholder as counsel during the same period. Even in this situation, according to the Supreme Court, the requirement of serious doubt was not met. Again, this is entirely in line with the standard applied in other jurisdictions, where a tougher test is also applied for annulment than for challenge.[45]

---

[44]   HR 18 February 1994, ECLI:NL:HR:1994:ZC1266, m.nt. H.J. Snijders (*Nordström/Van Nievelt Goudriaan & Co*), para. 3.8 (emphasis added, lawyers).

[45]   Gary B. Born, 'Annulment of International Arbitral Awards (Updated December 2023)', in: *International Commercial Arbitration (Third Edition)*, Kluwer Law International, paragraph 25.04[E][3]: "*In particular, an arbitrator can be removed based on 'justifiable doubts' regarding his or her independence or impartiality - a standard that does not require establishing that it is more likely than not that the arbitrator was biased or partial or that the arbitral tribunal's decisions have*

41.    As Bank Sarasin also recognizes,[46] the European Commission on Human Rights ("**ECRM**") subsequently confirmed, in response to a complaint by *Nordström,* that this stricter standard does not violate Art. 6 ECHR. The ECRM considers that when parties choose arbitration, they knowingly waive certain rights guaranteed by Art. 6 ECHR (such as openness of justice) and that it is up to the member states themselves to determine in which cases annulment is justified:

> "*The Commission observes that the grounds on which arbitral awards may be challenged before national courts differ among the Contracting States and considers that it cannot be required under the Convention that national courts must ensure that arbitral proceedings have been in conformity with Article 6 of the Convention.* [...] *The Commission therefore considers that an arbitral award does not necessarily have to be quashed because the parties have not enjoyed all the guarantees of Article 6, but each Contracting State may in principle decide itself on which grounds an arbitral award should be quashed.* [...]*
>
> In view of this interpretation by the Supreme Court of what could be considered to be contrary to public order interests, the Commission observes that the applicant's argument that the mere appearance of a lack of independence or impartiality should lead to a quashing of the arbitral award has no basis in Dutch law. It considers that Article 6 para. 1 of the Convention does not require the Dutch courts to apply a different criterion in determining whether or not to quash an arbitral award. It finds it reasonable that in this respect Dutch law requires strong reasons for quashing an already rendered award, since the quashing will often mean that a long and costly arbitral procedure will become useless and that considerable work and expense must be invested in new proceedings.* "[47]

42.    Despite this plain language from the Supreme Court and the ECRM, Bank Sarasin still attempts to construct a different, less stringent standard.[48] In this context, Bank Sarasin appeals to an ECHR ruling in *Beg S.p.a.v. Italy*.[49]

43.    Also at issue in that case was the annulment of an arbitral award for bias of an arbitrator. The arbitrator in question had accepted his appointment b u t  h a d failed to make a *disclosure*. The arbitrator had in the past held a management position with the parent company of one of the litigants and at that time was also acting

---

been or would be materially affected by that bias. In contrast, annulment of an award cannot be based upon 'doubts' about (or 'risks' of) arbitrator bias, but instead requires a showing, by at least a preponderance of the evidence, that an arbitrator was in fact biased or lacked the requisite independence."

[46]    Subpoena Bank Sarasin, no. 29.
[47]    ECRM November 27, 1996, ECLI:NL:XX:1996:AD2654, NJ 1997/505 cf. P.J. Boon (emphasis added, lawyers).
[48]    Subpoena Bank Sarasin, nos. 25-35.
[49]    Subpoena Bank Sarasin, nos. 30-35, 57.

acted for that parent company as an attorney in several proceedings.[50] As soon as the other litigant, Beg, became aware of the professional ties between the arbitrator and the other party's parent company, it immediately filed a request for the arbitrator's withdrawal.[51] This coincided with the time the arbitral award was rendered, so the request for withdrawal was not considered. After the Italian national court rejected the annulment claim, Beg went to the ECtHR. The ECtHR held that it did not follow from the facts that Beg had waived the right to an impartial arbitrator guaranteed by Article 6 ECHR. It was therefore necessary to assess whether this right was adequately guaranteed by Italy. The ECtHR concluded that there were justified doubts about the impartiality of that arbitrator and (thus) a violation of Article 6 ECHR.[52]

44.   Contrary to Bank Sarasin's view, it by no means follows from the *Beg S.p.a./Italy* ruling that the *Nordström standard* is obsolete. Apart from the fact that the *Beg case* is completely incomparable as regards (the seriousness of) the facts - including the fact that no *disclosure* had taken place and there were very serious forms of conflict of interest - the relevant party had also not waived the right to an impartial arbitrator guaranteed by Art. 6 ECHR; after all, Beg had requested a challenge even during the arbitration.[53]

45.   The opinion of A-G Wesseling-Van Gent, which appeared after the *Beg S.p.a./Italy judgment*, also shows that the *Nordström standard is* still fully applicable.[54] Indeed, in her opinion, A-G Wesseling-Van Gent discusses at length the interpretation of the *Nordström standard*, without a word about the *Beg S . p.a./Italy judgment*.[55]

---

[50]   ECHR 20 May 2 0 2 1 , ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v. Italy*), para. 17.
[51]   ECHR 20 May 2 0 2 1 , ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a./Italy*), para. 20.
[52]   ECHR 20 May 2 0 2 1 , ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v. Italy*), para. 130: "*it must be determined whether, quite apart from the judge's conduct, there are ascertainable facts which may raise doubts as to his impartiality. This implies that, in deciding whether in a given case there is a legitimate reason to fear that a particular judge lacks impartiality, the standpoint of the person concerned is important but not decisive. What is decisive is whether this fear can be held to b e objectively justified*".
[53]   ECHR 20 May 2 0 2 1 , ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v. Italy*), para. 141.
[54]   Opinion of A-G E.M. Wesseling-van Gent September 3, 2021, ECLI:NL:PHR:2021:796, nos. 2.38-2.45.
[55]   See in particular nos. 2.44-2.45 of the Opinion of A-G E.M. Wesseling-van Gent September 3, 2021: "With respect to *arbitrator Van der Veen, the Court of Appeal has in my opinion rightly ruled in paragraph 4.3 that [plaintiffs] have put forward too little to be able to doubt his impartiality and independence*

DE BRAUW
BLACKSTONE
WESTBROEK

46.     This is also logical: as the ECRM has also confirmed, in the c o n t e x t   o f arbitration, states have a significant degree of discretion as to when annulment is justified; this is not altered by the *Beg S.p.a* v. *Italy ruling*.

## 4       BANK SARASIN'S CLAIM IS UP FOR DISMISSAL

47.     Bank Sarasin argues that the verdict should be set aside for being contrary to public policy. According to Bank Sarasin, there would be facts and circumstances on the basis of which there would be objectively justified doubts about Ter Meer's impartiality and independence. These facts and circumstances would be located in the *Legal500 publications* from 2020-2024. It would follow from these publications that the firm for which Ter Meer works, CXTB, has a "*significant*" working relationship with AIG, the nature and extent of which Ter Meer concealed in his *disclosure*, Bank Sarasin said.

48.     This argument fails on two independent grounds - in fact, both cumulative requirements for nullification are not met:

        (i)     First, through the same *Legal500*, Ter Meers' extensive *disclosure* and publicly available information, Bank Sarasin was <u>already</u> aware of all the relevant circumstances it now complains about <u>prior to Ter Meer's appointment</u>. In the alternative, there are no facts for which it cannot be imputed to Bank Sarasin that it was unaware of them during the arbitration. Bank Sarasin has not alleged anything about this either, and thus has not met its burden of proof. Bank Sarasin did not ask questions or otherwise investigate further before or during the arbitration. Nor did Bank Sarasin take any steps in an attempt to challenge Ter Meer. Accordingly, there are no facts and circumstances that did not arise until after the award of the

---

assume. This judgment also implies that, as considered in the Nordström/Van Nievelt Goudriaan & Co, no facts and circumstances have come to light on the basis of which it must be assumed that either Van der Veen as arbitrator was in fact not impartial or not independent when giving the arbitral decision, or that his impartiality or independence at the time was so seriously in doubt that it would be unacceptable, taking into a c c o u n t  the other circumstances of the case, to require the party ruled against in the arbitration to comply with the decision. The judgment of the Court of Appeal with respect to the impartiality and independence of the arbitrators Van Buiren and Van der Veen in paragraph 4.3 and the reasons for this judgment therefore also meets the (strict) standards of the Nordström v. Van Nievelt Goudriaan & Co judgment. The court of appeal could, in para. 4.14 therefore suffice with the reference to paragraph 4.3." The Supreme Court dismissed the cassation appeal with reference to section 81 RO and thus saw no reason to motivate its judgment and thus clarify the applicable law in light of the conclusion.

DE BRAUW
BLACKSTONE
WESTBROEK

Arbitral Award came to light, and certainly not of facts of which Bank Sarasin could not be blamed for not being aware. This already leads to the nullification claim having to be rejected (**Section 4.1**).

(ii)    Second, the plea also fails on substantive grounds: there are no facts and circumstances that would cast serious doubt on Ter Meer's impartiality and independence (**section 4.2**).

**4.1    No question of facts discovered only after the Arbitral Award was rendered and of which it cannot be imputed to Bank Sarasin that it would not have been aware during the arbitration**

49.    Bank Sarasin relies only on information from the *Legal500* from 2020 onwards from which, according to Bank Sarasin, it would follow that AIG was a major client of CXTB generating significant income for CXTB.[56] Only through perusal of this would Bank Sarasin have understood the full extent of the relationship between CXTB and AIG.

50.    In doing so, Bank Sarasin effectively invokes an unsubstantiated, suggested implication of public information that was already known to Bank Sarasin and its lawyers during the arbitration.

51.    It is up to Bank Sarasin to assert and prove that the facts came to light only *after* the Arbitral Award was rendered and that it is not to blame for not having known about them earlier. And this is where Bank Sarasin's claim for annulment fails immediately: Bank Sarasin does not even state that the facts came to light only after the Arbitral Award was rendered, and is completely silent as to why it cannot be blamed for not being aware of the (in its view) relevant information.

52.    This gaping hole in the burden of proof is easily explained: after all, the facts relied upon by Bank Sarasin were known <u>prior to the issuance of the Arbitral Award</u>. To the extent that Bank Sarasin was not already aware of these facts during the arbitration - which is inconceivable and disputed by AIG - it is Bank Sarasin's fault for not being aware of them. The

---

[56]    Subpoena Bank Sarasin, nos. 49-51.

DE BRAUW
BLACKSTONE
WESTBROEK

involves public information. Moreover, that information was easy to find and was in a publication that was read at least by Bank Sarasin's handling lawyers. Thus, Bank Sarasin's claim is already stranded on that point.

53.    For completeness, AIG runs through Bank Sarasin's contentions, briefly that Bank Sarasin did not know (i) that AIG was a "*key client*" (ii) in the area of insurance law.

54.    *Re (i)*: Bank Sarasin argues that it was unknown that CXTB had a "*long-standing*" relationship with AIG and is one of the "*Key Clients*" of CXTB,[57] because Ter Meer had included in its *disclosure* that CXTB acted "*occasionally*" for AIG. This argument must fail:

   (a)    Already in 2016 (i.e.: before the arbitration), (the lawyers of) Bank Sarasin were aware that CXTB had listed AIG as one of its three clients for the *Legal500*. Indeed, Bank Sarasin's lawyers themselves participated in the same publication of the *Legal500*.
   Indeed, they are mentioned a few lines further on in this guide.[58]

   (b)    Moreover, at the time of Ter Meer's appointment, it was clear from CXTB's website that large insurers (such as AIG) were among CXTB's clients[59] AND, Ter Meer included in his *disclosure* that CXTB is a *panel firm* of AIG. The nature of a *panel firm* is that the firms involved are engaged from time to time (or "*occasionally*") by AIG. Thus, the intention is to enter into a long-term relationship. This is thus in line with how CXTB presented it in the *Legal500*, namely that it has a "*longstanding relationship*" with AIG. (Incidentally, contrary to Bank Sarasin's view,[60] Ter Meer did not have to update his *disclosure* either: after all, there is no additional information that should have been disclosed).

   (c)    The *Legal500 publications relied* on by Bank Sarasin were publicly available as of the year of publication. Among other things, Bank Sarasin points to publications from 2020 and 2021 - when the arbitration was still

---

57    Subpoena Bank Sarasin, no. 49.
58    See also No. 21 above.
59    See also No. 19 above.
60    Subpoena Bank Sarasin, no. 55.

pending and the hearing had not yet taken place. She had been aware of these "new" facts and circumstances since 2020.

55.   The foregoing shows that "*key client*" is not a new fact. This also implies that Bank Sarasin's speculation based on it, namely that this would imply that CXTB has realized significant income from the relationship with AIG, is irrelevant.[61] Incidentally, the designation "*key client*" is a lot less pompous than Bank Sarasin would like to make it appear. As explained above, when s u b m i t t i n g  a  *submission* for the *Legal500*, it i s  only possible to list clients under the designation "*key clients*" - there is no category of "*clients*."[62] Everyone who participates in those directories (including Bank Sarasin's attorney in this case) knows this. Thus, the claim about significant income based on the "*key client*" designation is purely unsubstantiated speculation; AIG therefore disputes it.

56.   <u>*Re (ii)*</u>: Bank Sarasin argues that it did not know that CXTB also acted for AIG in the area of *insurance law, rather than* only in the area of *Transport* and *Marine Insurance*.[63] This argument fails:

   (a)   AIG was already mentioned in the *Legal500 in 2016* as a client of CXTB in the *Insurance* category.[64] Moreover, during the 2018 *Legal500-based* arbitration, it was also known that AIG was one of CXTB's clients with respect to (transport) insurance.[65]

   (b)   Bank Sarasin acknowledges that based on the *disclosure* it was aware that CXTB was acting for AIG in the areas of "*transport and logistics*" and "*Marine Insurance*".[66] With this acknowledgment, it is also established that Bank Sarasin also knew that CXTB had been acting for AIG in the field of *insurance* for many years. First, because *Marine Insurance* is about insuring transport. And second, because AIG is an insurer. That Bank Sarasin did not know that AIG (an insurer) in the field of (transport) insurance was also a client of CXTB cannot be taken seriously.

---

61    Subpoena Bank Sarasin, no. 51.
62    See No. 23 above.
63    Subpoena Bank Sarasin, nos. 49-50.
64    See No. 20 above.
65    See also No. 22 above.
66    Subpoena Bank Sarasin, nos. 47-50.

57.    In short, Bank Sarasin has only alleged facts on which to base the annulment claim that were known to it during the arbitration, and even before Ter Meer's appointment. Bank Sarasin, moreover, has not argued *anything* as to why it only later became aware of the "new" facts and circumstances and why it cannot be blamed for not being a w a r e  o f  these facts and circumstances - which had already been known since at least 2016. The annulment claim must fail for that reason alone.

## 4.2    No serious doubt about Ter Meer's impartiality or independence

58.    The claim for annulment must also fail if the facts from the *Legal500* publications from 2020 do qualify as "new" facts that Bank Sarasin did not know or should have known. After all, those facts do not raise serious doubts about Ter Meer's impartiality or independence.

59.    Bank Sarasin believes that the circumstances enumerated in Nos. 54-56, together with the argument that Ter Meer would not have fulfilled his *disclosure* obligation, give rise to such serious doubts that it would be unacceptable to uphold the Arbitral Award. This is incorrect.

60.    There are no facts or circumstances at all that raise serious doubts about Ter Meer's independence and impartiality. The only circumstances put forward by Bank Sarasin are that AIG was designated as a "*key client*" by CXTB, for which CXTB also acts in the field of insurance law. As AIG e x p l a i n e d  in No. 55 above, the designation "*key client*" does not imply a dependency between CXTB and AIG. Nor does the fact that CXTB sometimes assists AIG in the area of insurance law imply that serious doubts exist as to Ter Meer's independence and impartiality.

61.    That there are no serious doubts in this case becomes clear when comparing with leading case law on the subject. The present situation differs from the situation in *Nordström*, where one of the arbitrators also simultaneously assisted the shareholder of one of the parties to the arbitration in another case (see No. 30 above). Even in that case, the Supreme Court held that t h e r e  was  no serious doubt about his

independence and impartiality, so the annulment claim failed. This demonstrates that serious doubt is  a strict standard: thus, there is not a single example of a situation where the Supreme Court has assumed that there were indeed such serious doubts that would justify annulment. The facts in *Beg v. Italy* were also of an entirely different order: as AIG explained above, one of the arbitrators had been a director at the parent company of one of the litigants in the past, and the arbitrator was assisting the parent company in various proceedings at the time of the arbitration (see No. 43 above). Bank Sarasin also did not cite any ruling where a judge concluded, based on a situation similar to this case, that serious doubt did exist.

62.    Bank Sarasin then goes on to argue that Ter Meer would not have fulfilled his disclosure obligation and that this would give rise to serious doubts about his independence and impartiality.[67] This argument, too, fails. As AIG explained in No. 36 above, a mere incomplete *disclosure* is insufficient to lead to annulment. Moreover, this situation is not at issue here: Ter Meer i n c l u d e d  all relevant facts and circumstances in his *disclosure*. Bank Sarasin has not been able to point to any specific circumstance, matter, relationship or position of Ter Meer that would have been concealed and that could possibly l e a d  to doubts about his independence and impartiality.[68]

63.    In a last attempt to escape the strict standard from *Nordström*, Bank Sarasin invokes the IBA Guidelines. Bank Sarasin falsely suggests that this is one of the so-called "*Non-Waivable Red List*" situations because CXTB regularly advises AIG and would derive significant income from it. As AIG noted in No. 55 above, this is mere speculation. Moreover, to the extent that this would be true, the following applies. Besides the fact that the IBA Guidelines do n o t  a p p l y  a t  a l l  because they have not been agreed upon, there is no circumstance at all that is included on the "*Non-Waivable Red List*".[69] There, it refers only to situations in which the arbitrator himself is the party

---

[67]    See Subpoena Bank Sarasin, no. 55.
[68]    See also No. 14 above.
[69]    For the sake of completeness, AIG notes that the mere fact that a circumstance is included on the "*Non-Waivable Red List*" does not mean that it is a right that cannot be "waived" within the meaning of Art. 6 ECHR, after all, t h e  right to an impartial arbitrator can be waived under Art. 6 ECHR, see also No. 33 above.

DE BRAUW
BLACKSTONE
WESTBROEK

AND he or his office derives significant financial income from it, as reflected in the most up-to-date version of the IBA Guidelines:

> "*The arbitrator currently or regularly advises a party, or an affiliate of a party, and the arbitrator or the arbitrator's firm or employer derives significant financial income therefrom.* "[70]

64. However, there is no evidence whatsoever that Ter Meer *himself* advised AIG on a regular basis during the arbitration; indeed, Ter Meer stated in his *disclosure* that he was not personally involved in matters for AIG from CXTB. Moreover, CXTB was not dependent on AIG at that time either; indeed, at the time of the *disclosure* CXTB was even acting against AIG.[71] In addition, there is no evidence that the relationship between CXTB and AIG provides Ter Meer, or the firm where he is employed, with significant income. There is nothing to suggest that Ter Meer and CXTB, on the one hand, and AIG, on the other, had such a working as well as financial relationship during the arbitration that Ter Meer's impartiality would be at issue. As AIG explained above in No. 26, the mere fact that AIG was named as a "*key client*" of CXTB is insufficient to assume that this was the case.

65. That Bank Sarasin only arrived with a number of old editions of the *Legal500* also demonstrates that there are no facts and circumstances that could cast doubt on Ter Meer's impartiality. That Bank Sarasin, after years of proceedings in which no expense was spared, never even checked whether Ter Meer was sufficiently independent is completely implausible. It is beyond dispute that Ter Meer was independent and impartial. Bank Sarasin's claim for annulment should be dismissed.

## 5    BURDEN OF PROOF AND OFFER OF PROOF

66. In support of the grounds of its defense, AIG has the following evidence:

Production 1   Arbitration Agreement between Bank Sarasin and AIG
              dated Sept. 6, 2017

---

[70]    IBA Guidelines on Conflicts of Interest in International Arbitration (2024), p. 15, no. 1.4, **Production 15** (emphasis added, lawyers).
[71]    See Ter Meer Disclosure of December 19, 2017, at 3.

Production 2   Request for arbitration by Bank Sarasin dated December 1, 2017

Production 3   Short Answer by AIG dated December 12, 2017

Production 4   Waybackmachine snapshot Feb. 6, 2018
from www.cxtb.nl/reviews

Production 5   Notice of Challenge from AIG dated December 13,

2017 Production 6   Letter from NAI dated December 21, 2017

Production 7   Letter from Van Baren dated December 15,

2017 Production 8   Letter from AIG dated December 21,

2017

Production      9 Brief from NAI dated Jan. 4, 2018

Production 10 Chamber of Commerce extracts dated September 28, 2016 and December 30, 2021

Production 11 Waybackmachine snapshot of Jan. 27, 2015 from www.CXTB.nl

Production 12 Wayback machine snapshot April 14, 2016 from
www.legal500.com/c/netherlands/insurance

Production 13 Wayback machine snapshot Nov. 1, 2018 from
www.legal500.com/c/netherlands/transport

Production 14 Statement sheet for the 2020 *Legal500*

Production 15 IBA Guidelines on Conflicts of Interest in International Arbitration (2024)

67.    AIG does not want the foregoing to be deemed to have assumed any burden of proof that is not incumbent on AIG as a matter of law.

68.    AIG takes the position that the burden of proof in these proceedings is on Bank Sarasin. AIG expressly offers rebuttal evidence. To the extent the burden of proof of any contention was, in the court's opinion, allowed to rest on AIG, AIG offers proof thereof by all means in law, in particular by hearing witnesses.

THE BREW
    BLAC KST0 NE
WESTBRO EK

69.  The exhibits referred to in this brief are attached to the brief.

6      CONCLUSION

70.  On these grounds, AIG concludes that the court should enter judgment, to
the extent legally possible, provisionally enforceable:

(a)  Declare Bank Sarasin inadmissible in its claims, or at least deny it these
claims; and

(b)  Bank shall order Sarasin to pay the costs of the proceedings, as well as the
usual subsequent costs (both without and with service of notice), to be
increased by the statutory interest provided for in Section 6:119 of the Civil
Code from fourteen days after the date of the judgment.

attorney

This case is being handled by Mr. E.R. Meerdink, Mr. L.C. Kampkuiper and Mr. L.F. van
Dord, T +31 20 577 1779, M +31 6 5325 6945, E eelco.meerdink@debrauw.com, De
Brauw Blackstone Westbroek N.V., P.O. Box 75084, 1070 AB Amsterdam