EXHIBIT C



The Hague Court of Appeal, location The Hague
Case number: 200.341.205/01
Docket session: 10 September 2024

**<u>STATEMENT OF REPLY</u>**


*regarding:*

the company incorporated under Swiss law
**BANK J. SAFRA SARASIN AG**
based in Basel, Switzerland,

plaintiff,
Attorney: Mr T.L. Claassens


*against*:

the company under Luxembourg law,
**AIG EUROPE S.A.**
based in Luxembourg, Luxembourg

defendant,
Attorney: Mr E.R. Meerdink

LOYENS  L  LOEFF

## CONTENTS

1    ESSENCE OF THE CASE ............................................................................................. 3

2    RELEVANT FACTS ..................................................................................................... 6

3    THE ARBITRAL AWARD SHOULD BE SET ASIDE FOR LACK OF AN INDEPENDENT AND IMPARTIAL ARBITRAL TRIBUNAL ............................................................... 7

3.1    Legal framework .......................................................................................................... 7

3.2    The Nordström *judgment* violates Article 6 ECHR and the ECHR's case law on the subject since the *Beg S.p.a.*/Italy *judgment* .................................................................... 7

3.2.1    Annulment in case of justified doubts about the impartiality and independence of an arbitrator .................................................................................................................... 10

3.2.2    Waiver of right to an independent and impartial arbitral tribunal requires actual knowledge of grounds for challenge ............................................................................. 11

3.3    Arbitrators' disclosure obligation versus parties' alleged duty to investigate ..................... 14

3.4    The IBA Guidelines on Conflicts of Interest .................................................................. 20

3.5    High requirements for duty to state reasons and/or increased duty to state reasons if relevant facts are in defendant's domain .................................................................... 22

3.6    Application of legal framework to the relevant facts of the case ...................................... 23

4    PROCEDURE ......................................................................................................... 25

4.1    Evidence ................................................................................................................. 25

5    CONCLUSION ........................................................................................................ 25

LOYENS _L_ LOEFF

**1    ESSENCE OF THE CASE**

1    BJSS seeks annulment of the Arbitral Award on the grounds that the Arbitral Award was not rendered by an independent and impartial arbitral tribunal.[1] AIG's defence to this annulment claim is twofold:

(i)   BJSS knew, or it should have known, the facts which it now bases its annulment claim on during the Arbitration; and

(ii)  the facts on which BJSS bases its annulment claim do not give rise to such serious doubts about Ter Meer's independence and impartiality that the Arbitral Award cannot be upheld.

2    AIG makes it appear as if at the time of Ter Meer's appointment, and even during the Arbitration, there was a (continuing) duty of investigation on BJSS' part to find out facts that might affect Ter Meer's independence and impartiality. AIG thus turns things around. The initiative - and responsibility - for _disclosure_ rests with the arbitrator. In the commentary on the 2009 version of the NAI rules - to which AIG's attorney, Mr Meerdink, himself contributed - Mr Meerdink's colleagues describe this as follows:

> "The provisions of Article 19 reveal that the **initiative** is with the arbitrator. **It is the arbitrator's responsibility to disclose circumstances that may give rise to debate in regard of his impartiality and independence. There is basically no obligation of the parties to conduct an investigation on their own initiative in regard of the prospective arbitrator's curriculum vitae and existing relationships. The parties can simply await the arbitrator's disclosure and challenge an arbitrator on the basis of such information, even if the information was already in the public domain**. This system is in line with international arbitration practice and is to be preferred above another system, in which any obligation of the parties to actively establish the absence of circumstances that could give rise to a challenge, brings about the need to consult the prospective arbitrators and discuss with them the dispute in at least some detail."[2]

3    The importance of disclosure is recognised and emphasised in the (international) literature. The disclosure obligation is seen as "_vital_" and "_central_" to the integrity of the arbitral process and as the "_backbone_" "_that holds together the foundation [of arbitration] that is the arbitral_

---

[1]   BJSS uses the same definitions as in the writ of summons.
[2]   G.W. van der Bend, M. Leijten & M. Ynzonides, _A Guide to the NAI Arbitration Rules. Including a Commentary on Dutch Arbitration Law_, Alphen a/d Rijn: Kluwer Law International 2009, pp. 107-108 (emphasis added). The essence of Article 11 (disclosure obligation) and Article 19 (challenge) remained the same in the 2015 version of the NAI Rules. It also follows from the articles in the 2015 version that the initiative to disclose any conflicts of interest lies with the arbitrator, and no duty of investigation on the part of the parties can be inferred from the 2015 version either.

LOYENS & LOEFF

*tribunal."*[3] Disclosure enables (or should enable) a party to judge whether it agrees with the arbitrator's *own* assessment that he is independent and impartial, or whether it wishes to challenge the arbitrator.[4] Therefore, when making disclosures, the arbitrator should 'put himself in the shoes of the distrustful party'[5] and, on his own initiative, disclose any facts that, in the eyes of a party, might give rise to doubt about his impartiality and independence.[6] A disclosure should therefore be made fairly quickly. The '*in dubio pro disclosure*' principle is generally accepted in international arbitration practice.[7] Even public information should be disclosed.[8] Parties may trust that an arbitrator's disclosure is correct and complete and therefore have no obligation to investigate.[9]

4    In the same vein, when assessing the question when a party became aware of the facts on which it bases its challenge or annulment claim, what matters is *actual* awareness. Only if a party has actual knowledge of the grounds for challenge at the time of the arbitral proceedings it can validly (because: unequivocally) waive the fundamental right to an independent and impartial tribunal. The ECHR recently confirmed this in the *Beg S.p.a.*/Italy *judgment*:

> "The reasons advanced by the domestic courts (see paragraph 27 above) and the Government are based on a **presumption of knowledge which does not rest on any concrete evidence to the effect that the applicant was in fact aware of the professional activities of N.I.** (see, mutatis mutandis, Pescador Valero v. Spain, no. 62435/00, § 26, ECHR 2003-VII). The Court therefore disagrees with the Government

---

[3]    Gary B. Born, 'Selection, Challenge and Replacement of Arbitrators in International Arbitration' (Updated December 2023), in: *International Commercial Arbitration (Third Edition)*, Kluwer Law International, para 12.05[N] ("*The timely and complete performance of this disclosure obligation is vital to the integrity of the arbitral process.*") and para 12.05[N][f] ("*The arbitrator's duty of disclosure plays a central role in international arbitration. Compliance with such obligations is central to the integrity of the arbitral process*"); Slaoui, *The Rising Issue of "Repeat Arbitrators": A Call for Clarification*, 25 Arb. Int'l 103, 118 (2009) ("*The importance of the duty of disclosure becomes quite clear as it is the 'backbone' ... that holds together the foundation [of arbitration] that is the arbitral tribunal.*").

[4]    ICSID & UNCITRAL, Draft Code of Conduct for Adjudicators in Investor-State Dispute Settlement Art. 5 Commentary, para 40 (2020) ("*Disclosures of potential conflicts are commonly required in a system of justice. Disclosures allow parties to fully learn and assess all of the relevant relations of candidates and adjudicators, and to determine whether they will take formal steps to challenge or exclude the adjudicator or whether they are prepared to waive the potential conflict. Disclosures level the playing field by ensuring that all parties receive the same information.*"); **Exhibit●** . See also paragraph 49 of this Statement of Rejoinder.

[5]    P. Sanders, *Dutch arbitration law, national and international*, Deventer: Kluwer 2001, p. 73 ("*In disclosure, the challenged arbitrator does have to put himself in the shoes of a distrustful party.*").

[6]    See also the NAI's 'availability and independence statement' (Exhibit 2), from which it follows that all facts and circumstances that "*might be of such a nature as to call into*" the arbitrators "*independence in the eyes of any of the parties*" must be reported. Emphasis added.

[7]    See, for example, IBA Guidelines on Conflicts of Interest in International Arbitration (2024), General Standard 3(d) ("*Any doubt as to whether an arbitrator should disclose certain facts or circumstances should be resolved in favour of disclosure.*").

[8]    **Exhibit●** , *Tidewater v. Venezuela*, Decision on Claimants' Proposal to Disqualify Professor Brigitte Stern, Arbitrator in ICISD Case No. ARB/10/5 of 23 December 2010, para. 46 ("*The parties are not in agreement as to whether information in the public domain as to an arbitrator's appointments to other ICSID tribunals by the same party needs to be disclosed. Arbitration Rule 6(2) does not limit disclosure to circumstances which would not be known in the public domain. The wording of this rule is all encompassing without distinguishing among categories of circumstances to be disclosed.*").

[9]    Exhibit● , *Tidewater v. Venezuela*, para 51 ("*The Two Members agree with Tidewater that in general, in considering the scope of her duty of disclosure, the arbitrator may not count on the due diligence of the parties' counsel. As pointed out by Tidewater, arbitrators will always be in 'the best position to gather, evaluate, and disclose accurate information relevant to their potential conflicts'.*"). Emphasis added.

LOYENS  LOEFF

and does not find that facts have been demonstrated from which it could infer the **unequivocal waiver** of the requirement of impartiality in respect of the arbitrator."[10]

5      During the Arbitration, BJSS was not aware of the actual extent of the relationship between AIG and Cox Ten Bruggencate, the firm with which Ter Meer is associated. There is also no "*concrete evidence to the effect that [BJSS] was in fact aware*" of the actual extent of that relationship. The only 'evidence' AIG refers to is a *Legal500* from 2016 that BJSS should then have been aware of through its lawyers.[11] Such a 'presumption of knowledge' is (therefore) insufficient.

6      Moreover, even if (i) BJSS did have a duty to investigate at the time of Ter Meer's appointment (in December 2017) and (ii) it should be assumed that it could have been aware of the 2016 *Legal500* publication, BJSS could not have been aware of the true extent of the relationship between Cox Ten Bruggencate and AIG. After all, the 2016 *Legal500* contains nothing more than what Ter Meer himself already reported in his disclosure. BJSS was aware at the time of Ter Meer's appointment that AIG was a client of Cox Ten Bruggencate. BJSS does not deny that, nor does it base its annulment claim on that fact. However, Ter Meer had not disclosed, and it does not follow from the *Legal500* of 2016, that AIG was one of Cox Ten Bruggencate's major ("*major*" and "*key*") clients and that a significant financial relationship existed/existed between AIG and Cox Ten Bruggencate (thus).

7      The situation where there is a significant financial relationship between the firm of which Ter Meer is one of only 10 lawyers and the party that appointed him to the arbitration raises serious or justified doubts about his independence and impartiality. This is supported by the fact that such a situation is included in the 'Non-Waivable Red List' of the IBA Guidelines.[12]

8      BJSS reasoned that Cox Ten Bruggencate generated significant income from its relationship with AIG. Cox Ten Bruggencate had in fact listed AIG itself as a 'key client' with the *Legal500* for years. In 2020, that list of 'key clients' in the transport category included only four clients (including AIG), implying that Cox Ten Bruggencate generated significant income from its relationship with AIG.

9      AIG argues in its statement of defence (the **Statement of Defence**) that AIG's characterisation of Cox Ten Bruggencate as a "key client" is "inflated" and it disputes that Cox Ten Bruggencate generated significant income from its relationship with AIG.[13] AIG does not substantiate this, while it is relatively easy for AIG to show that it did not pay significant amounts to Cox Ten Bruggencate during the six years that the arbitration proceedings were pending, and in the years before and after, as it now claims. Since AIG

[10]   ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, *JBPR* 2022/48 cf. B.A. Boersma (*Beg S.p.a.v Italy*). Emphasis added.
[11]   Subpoena, paras. 20 and 21.
[12]   Subpoena, para. 44; see also paras. 54-58 of this Statement of Reply.
[13]   Conclusion of Reply, marginal 55.

LOYENS _L_ LOEFF

disputes this without (any) sufficient substantiation,[14] it must be established that Cox Ten Bruggencate realised significant income from its relationship with AIG.[15]

10  The relationship between Ter Meer's law firm and AIG is therefore such that there is (i) an objectified appearance of bias on the part of the arbitrator and (ii) serious doubts about the arbitrator's impartiality and independence. For that reason, the Arbitral Award cannot stand.

## 2  RELEVANT FACTS

11  For the relevant facts, BJSS refers to section 3 of the summons. In addition to this - and in response to what AIG states in its Statement of Defence - it notes the following.

12  In the Statement of Defence, AIG lumps together all kinds of information (Ter Meer's disclosure, information on Cox Ten Bruggencate's website at the time of the appointment, the *Legal500 publications* and alleged knowledge of BJSS's lawyers) in order to construct knowledge at BJSS regarding the true extent of the relationship between Cox Ten Bruggencate and Ter Meer at the time of his appointment as arbitrator. In doing so, it attempts to paint a false picture of BJSS' knowledge at the time of Ter Meer's appointment.

13  For the avoidance of doubt, the overview below sets out (i) the facts - so far as relevant here - with which BJSS was actually acquainted through the Ter Meer Disclosure, (ii) the facts with which BJSS was not acquainted but which it could possibly have become aware of at the time of the Ter Meer Disclosure if BJSS would have been obliged to conduct any investigation at the time (which is not the case) and (iii) the facts dating from (well) after the Ter Meer Disclosure and which only became known to BJSS after the Arbitral Award.

| The relevant facts mentioned in the Ter Meer Disclosure (2017) | • Cox Ten Bruggencate occasionally acts for AIG in matters relating to transport and logistics.<br>• Cox Ten Bruggencate is included in AIG's panel for legal advice on marine insurance only ("*not for other lines of business*") |
|---|---|
| Publicly available information at the time of the Ter Meer Disclosure (2017) | • AIG is among the clients of Cox Ten Bruggencate's insurance law team (*Legal500*, 2016)<br>• "*Our clients are mainly insurers (...)*" (Cox Ten Bruggencate website, 2017) |
| Publicly accessible information from after the Ter Meer Disclosure (2020-2024) | • AIG is a "*longstanding*" and "*major client*" of Cox Ten Bruggencate and is listed as a "*key client*" in both the insurance and transport categories (*Legal500*, 2020 to 2024) |

---

[14]  Article 128(2) Rv. According to Gras, Hendrikse and Jongbloed, it follows from this provision "*that his contradiction [=the defendant's contradiction] must be substantiated by the information available to the defendant.*" See E. Gras, R.G. Hendrikse & A.W. Jongbloed, *Compendium Civil Procedure* 2024/6.5.2.

[15]  See E. Gras, R.G. Hendrikse & A.W. Jongbloed, *Compendium Civil Procedure* 2024/6.5.2. ("*All the more reasoning is required if the defendant can give his own version of the facts that the plaintiff has based his claim on. **As a rule of thumb, the more the defendant knows about the case, the better/ more elaborately he should motivate his challenge.** An insufficiently substantiated denial will be liable to be set aside by the court; the fact alleged by the plaintiff will then be deemed established in the absence of a proper dispute (art. 149 paragraph 1 Rv; see no. 7.1.3(b)*)"). Emphasis added. Incidentally, BJSS believes that AIG even has an aggravated duty to put forward evidence in this context (see margin no. 64), but even without an aggravated duty to assert, AIG has not fulfilled its duty to state reasons with its bare denial.



**3        THE ARBITRAL AWARD SHOULD BE SET ASIDE FOR LACK OF AN INDEPENDENT AND IMPARTIAL ARBITRAL TRIBUNAL**

**3.1        Legal framework**

14        BJSS refers to section 4.2 of the summons for the relevant legal framework. In addition, and in response to AIG's Reply Brief, BJSS will explain that:

(i)    the *Nordström standard* is obsolete both in terms of the 'grave doubt' criterion and the 'imputable knowledge' criterion (section 3.2);

(ii)   if there were a duty to investigate at all, this duty to investigate should be interpreted very narrowly and, in any event, does not constitute a continuous duty to investigate (section 3.3);

(iii)  AIG's reading of the *Non-Waivable Red List* in the IBA Guidelines is too limited (section 3.4); and

(iv)  AIG failed to comply with its duty to state reasons and an aggravated duty of proof rests on AIG (section 3.5).

**3.2        The Nordström judgment violates Article 6 ECHR and the ECHR's case law on the subject since the *Beg S.p.a./Italy judgment***

15        In the writ of summons, BJSS explained that the *Nordström judgment* (1994)[16] - which was already received with criticism at the time[17] - almost 30 years ago, violates Article 6 ECHR and the ECHR's jurisprudence on it since its ruling in *Beg S.p.a.v Italy*.[18]

16        AIG argues that it in no way follows from the *Beg S.p.a./Italy judgment* that the *Nordström standard* is obsolete.[19] It argues in this regard that (i) the *Beg case* is completely incomparable to the present case in terms of the seriousness of the facts, (ii) Beg, allegedly unlike BJSS, had not waived the right to an impartial arbitrator guaranteed by Article 6 ECHR, (iii) the opinion of A-G Wesseling-Van Gent, which appeared after the *Beg S.p.a./Italy judgment*, shows that the Nordström *standard* still applies in full, because in it she makes no reference to the *Beg S.p.a./Italy judgment*, and (iv) the *Beg S.p.a./Italy judgment* would do nothing to undermine the principle that states have a significant degree of discretion as to when setting aside is justified.[20]

17        That the facts of the *Beg S.p.a./Italy case* would differ from those of the present case is, whatever that may be, irrelevant to the (legal) question whether the *Nördstrom measure*

---

[16]   Supreme Court 18 February 1994, ECLI:NL:HR:1994:ZC1266 (*Nordström/Van Nievelt Goudriaan & Co*).

[17]    Supreme Court 18 February 1994, ECLI:NL:HR:1994:ZC1266, *NJ* 1994/765, cf. H.J. Snijders, at 7: "*One may also wonder whether the judgment is not at odds with art. 6 ECHR. (...). Some doubt as to the tenability of this judgment in Strasbourg is also justified by the circumstance that the European Court tends to interpret art. 6(1) extensively (...).*"

[18]   See sections 4.2.1 and 4.2.2 of the summons.

[19]    Conclusion of Reply, margin 44.

[20]   Conclusion of Reply, paras. 44 and 45.

LOYENS _L_ LOEFF

violates Article 6 ECHR and the ECHR's jurisprudence thereon since its judgment in _Beg S.p.a./Italy_. The same applies to the question, whether or not BJSS has waived the right to an impartial arbitrator guaranteed by Article 6 ECHR (which BJSS disputes). Indeed, whether the annulment measure as determined in the _Nördstrom judgment_ violates Article 6 ECHR and the case-law of the ECHR is a purely legal question, in which the facts in the present case cannot play a role. It should first be determined what the correct standard is (the _Nördstrom standard_ or the _Beg standard_), and only then can it be assessed whether the facts of this case mean that the Arbitral Award cannot be upheld on the basis of that applicable standard.

18    It also by no means follows from the opinion of A-G Wesseling-Van Gent of 3 September 2021 that the _Nordström standard_ "_still applies in full_".[21] In that case, the plaintiffs in cassation argued that the court of cassation's opinion, that the arbitral award in question had indeed been made by an impartial and independent arbitral tribunal and could therefore be upheld, was not adequately reasoned, because the court of cassation only referred in that context to its opinion in relation to another ground for annulment, namely an alleged breach of mandate.[22]

19    Indeed, the claimants in the annulment proceedings had argued not only that the alleged lack of independence and impartiality constituted a breach of public policy (Article 1065(1)(e) Rv), but also that "the same" impartiality and independence constituted a breach of the mandate of the arbitral tribunal (Article 1065(1)(c) Rv) because Article 11(2) of the NAI Rules, which obliges arbitrators to perform their duties independently and impartially, is part of the arbitration agreement and thus partly determines the content of the mandate to the arbitrators.

20    The court ruled that while the obligation to perform independent and impartial duties is indeed part of the mandate given to arbitrators, there were no circumstances in the case in question that cast doubt on the impartiality and independence of the arbitral tribunal.[23] When subsequently assessed whether the arbitral award should be set aside for being contrary to public policy because it was allegedly not made by an independent and impartial arbitral tribunal, the court, after reiterating the _Nordström standard_ (underline that the court's judgment was from before the _Beg S.p.a./Italy case_), referred back to the judgment on the alleged breach of mandate.[24] Indeed, in that context, the court had already assessed whether there were circumstances that cast doubt on the impartiality and independence of the arbitral tribunal.

21    The plaintiffs in cassation did not complain against the Nordström standard applied by the court, but only against the court's reasoning:

      "The sub-component argues that, in paragraph 4.14, the court of appeal proceeded on the basis of the correct standards of review in order to answer the

---

[21]   Conclusion of Reply, marginals 45; Conclusion A-G E.M. Wesseling-van Gent 3 September 2021, ECLI:NL:PHR:2021:796.
[22]   Opinion of A-G E.M. Wesseling-van Gent 3 September 2021, ECLI:NL:PHR:2021:796, no 2.38.
[23]   Amsterdam Court of Appeal 19 May 2020, ECLI:NL:GHAMS:2020:1278, para 4.3.
[24]   Amsterdam Court of Appeal 19 May 2020, ECLI:NL:GHAMS:2020:1278, para 4.14.

LOYENS  LOEFF

**question whether the arbitral award is voidable for breach of public order in connection with an invocation of the lack of impartiality and independence of one or more arbitrators. According to the subsection, however, the court of appeal, in abbreviated and concise form, erred in law by merely referring to paragraph 4.3 of the judgment under appeal, and its judgment was <u>not adequately reasoned</u>**, since the court of appeal did not judge and rule on the basis of these benchmarks in paragraph 4.3."[25]

22    The question of whether the Nordström standard requires adjustment in the light of recent ECHR case-law was thus not part of the debate.[26] It can therefore in no way be inferred from the A-G's conclusion that the *Nordström standard* "*still applies in full*".[27]

23    Finally, AIG argues that "*as the ECRM has also confirmed, in the context of arbitration, states have an important degree of discretion as to when setting aside is justified; this is not altered by the Beg S.p.a./Italy decision.*"[28]

24    As for BJSS, it follows *precisely* from the *Beg S.p.a./Italy ruling* that the discretion of states as to when setting aside an arbitral award is justified has its limits. That limit, in short, lies in the fact that states may not validate arbitral awards rendered in arbitration proceedings that did not meet the impartiality of the arbitral tribunal required by Article 6(1) ECHR (unless the parties have unequivocally waived the Article 6(1) ECHR right to an independent and impartial tribunal).

25    The Italian *Corte Supreme di Cassazione* found no evidence in the annulment proceedings that the arbitrator had an interest in the outcome of the dispute, namely in the limited sense required by Italian law at the time (Article 51(1)(1) of the Italian Code of Civil Procedure).[29] The Italian Supreme Court therefore rejected Beg's annulment claim.

26    However, the ECHR considered that "*[a]ccording to the Court's <u>settled</u> case-law, for the purposes of Article 6 § 1 the existence of impartiality must be determined according to a subjective test (...) and according to an objective test (...).*"[30] The subjective test involves whether the personal beliefs and conduct of a judge or arbitrator give the party concerned reason to doubt the impartiality of that judge or arbitrator. The objective test - which is relevant to this case - involves whether, for example, professional, financial or personal ties

---

[25]    Opinion of A-G E.M. Wesseling-van Gent 3 September 2021, ECLI:NL:PHR:2021:796, no 2.38. Emphasis added.
[26]    This could also have to do with the fact that the court's judgment (19 May 2020) predates the *Beg S.p.a./Italy judgment* (20 May 2021), as does the plaintiffs' cassation application (19 August 2020).
[27]    Conclusion of Reply, para. 45.
[28]    Conclusion of Reply, para. 46. AIG is referring to the ECRM ruling following a complaint by Nordström et al. against the Netherlands, in which the ECRM held that the standard set by the Supreme Court in Nordström did not violate Article 6 ECHR. This ruling was handed down by the Second Chamber of the Commission; apparently, the case was not considered of sufficient importance to bring it before the plenary committee. Boersma states about the ECRM's ruling, "*a line of reasoning that strikes me as outdated and unconvincing*" (ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, *JBPR* 2022/48 cf. B.A. Boersma (*Beg S.p.a.v Italy*), at 5).
[29]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), at para 33 ("*At the same time, however, the Court of Cassation stated that the existence of a link between the arbitrator and ENELPOWER, resulting in an 'alignment of interests' in a specific outcome of that very dispute (Article 51 § 1(1) of the CCP), had not been demonstrated.*"); see also r.o. 116 ("*The applicant maintained that the provisions of the Italian CCP in force at the time were inadequate to ensure the impartiality and independence of arbitrators, since they subjected the disqualification of the arbitrator to the presentation of proof that he or she had an interest in the dispute (it referred to Article 51 § 1(1) CCP.*").
[30]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 129. Emphasis added.



between the judge/arbitrator and a party give rise to objectively justifiable doubts about the judge/arbitrator's impartiality. This may also include the appearance of partiality. [31]

27    According to the ECHR, there was no subjective bias because there was no evidence of any personal conviction or conduct on the part of the arbitrator casting doubt on his impartiality.[32] However, the ECHR held that, because of the various professional ties between the arbitrator and the defendant's parent company, there could be objectively justifiable doubt about the arbitrator's impartiality, or at least the appearance of bias.[33]

28    The ECHR thus concluded in the *Beg S.p.a. v* Italy *judgment* that Article 6(1) ECHR had been violated, despite the fact that under the Italian legislation in force at the time, a higher standard of annulment applied (it had to be proved that the arbitrator had an interest in the outcome of the dispute). The ECHR therefore seems somewhat satisfied to note that Italian legislation in this area has since been amended and that the new legislation provides "*wider guarantees*" "*against a lack of impartiality in the context of arbitration proceedings, such that, if the case had been domestically adjudicated after this reform the outcome might have been different.*"[34]

29    States' discretion as to when annulment is justified should therefore not collide with the fundamental procedural right of Article 6 ECHR. In this regard, see also Van Zelst's note to the *Beg S.p.a./Italy judgment*:

> "While the ruling thus appears mostly logical, its importance lies in its confirmation that arbitration, notwithstanding the principle of party autonomy leading therein, always takes place in the shadow of fundamental procedural law principles as they derive from the ECHR and other treaties. In other words, all national rules of arbitration law, including the mandatory rules, only apply insofar as they are compatible with the fundamental procedural law principles."[35]

### 3.2.1    Annulment in case of justified doubts about the impartiality and independence of an arbitrator

30    In the writ BJSS already explained that the ECHR in the *Beg S.p.a./Italy judgment* applied a significantly less stringent annulment standard than the *Nordström standard*.[36]

31    In *Nordström*, the Supreme Court ruled that an arbitral award can only be set aside for lack of impartiality and independence if (i) facts and circumstances have come to light on the basis of which it must be assumed that an arbitrator was not impartial or independent at the time the award was made or (ii) given the circumstances of the case, there are *such serious doubts* about his impartiality or independence that it would be unacceptable to uphold the

---

[31]    See summons, para 31. ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 129-132.

[32]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 145.

[33]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 153.

[34]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 152.

[35]    B. van Zelst, Beg S.p.a. t. Italy (ECHR, 5312/11) - Arbitration in the shadow of principles of fundamental procedural law. EHRC Updates. 2021 Jul 13; EHRC 2021/0133.

[36]    Subpoena, sections 4.2.1 and 4.2.2.

LOYENS _ LOEFF

arbitral award.[37] Some semblance of a lack of impartiality or independence cannot lead to setting aside, according to *Nordström*.[38]

32      In the *Beg S.p.a./Italy judgment*, the ECHR held, on the contrary, that an arbitral award can be set aside on the ground of lack of impartiality and independence if there are *justified doubts* about the arbitrator's impartiality and independence, although the appearance of partiality may play a role, because "*justice must not only be done, it must also be seen to be done*."[39] This standard corresponds to the standard applied to government judges in the Netherlands and is thus (considerably) less stringent than the *Nordström standard*.[40]

33      BJSS believes that the Nordström *standard* does not sufficiently guarantee the right to an impartial and independent arbitral tribunal and thus - like the old Italian legislation on the basis of which the Italian Supreme Court rejected Beg's annulment claim - violates Article 6(1) ECHR.[41]

### 3.2.2    Waiver of right to an independent and impartial arbitral tribunal requires actual knowledge of grounds for challenge

34      AIG argues that, under *Nordström*, a claim for annulment of an arbitral award on grounds of breach of public policy on account of doubts as to the impartiality or independence of an arbitrator can succeed only if (i) the facts and circumstances on which that party bases its claim were not known to it during the arbitral proceedings and (ii) <u>it cannot be blamed for not having been aware of them at that stage</u>.[42] According to AIG, this means that if "*no investigation [was] made when facts giving rise to doubt were known before or during the arbitration, the annulment claim fails if the party relies on those circumstances.*"[43]

---

[37]   Supreme Court 18 February 1994, ECLI:NL:HR:1994:ZC1266, para 3.8.
[38]   Supreme Court 18 February 1994, ECLI:NL:HR:1994:ZC1266, para 3.9.
[39]   ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v. Italy*), para. 129 ("*According to the Court's settled case-law, for the purposes of Article 6 § 1 the existence of impartiality must be determined according to a subjective test ... and also according to an objective test, that is, whether the court offered, in particular through its composition, guarantees sufficient to exclude **any legitimate doubt about its impartiality** ...*"); r.o. 146 ("*With regard to the objective test, it must be determined whether, apart from N.I.'s conduct, there are ascertainable facts which may **raise doubts as to his impartiality**.*"); r.o. 132 ("*In this connection **even appearances may be of a certain importance**, a principle that is reflected in the adage 'justice must not only be done, it must also be seen to be done'*"); r.o. 149 ("*In this regard, **the Court reiterates that even appearances may be of a certain importance** (see paragraph 134 above).*"). Emphasis always added. See in similar vein, for example, a recent English Commercial Court decision of 1 August 2024, in which the English Commercial Court set aside three arbitral awards between an African energy company, Aiteo, and several lenders, including Shell, on the grounds of lack of independence and impartiality (Aiteo Eastern E&P Company Limited v Shell Western Supply and Trading Limited & Ors [2024] EWHC 1993 (Comm), para 173): "*When issues of apparent bias arise, the court is concerned not only with 'justice being done, but with justice being 'manifestly and undoubtedly seen to be done'': R v Abdroikov [2007] UKHL 37, paragraph [49] (Baroness Hale).*" (**Exhibit● **).
[40]   Supreme Court 30 November 1990 (*Stokkermans/Lührman*), *NJ* 1992/94 cf. HJS under NJ 1992/95. For a recent application, see, for example, District Court of The Hague 26 February 2024, ECLI:NL:RBDHA:2024:2356, at 3.
[41]   See also Asser Procesrecht/Sanders, Meijer & Ernste 8 2023/518 ("*One may strongly question whether the Supreme Court's stricter standard in Nordström v Nigoco does not conflict with the case law of the European Court since its judgment in BEG S.P.A.v Italy.*"); ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, *JBPR* 2022/48 cf. B.A. Boersma (*Beg S.p.a.v. Italy*), at 7 (emphasis added) ("*This is thus different from what follows from the Supreme Court's **judgment in Nordström**, which in my view is now **outdated**, and which wrongly - **because in violation of Article 6(1) ECHR** - distinguishes between challenge in the arbitration proceedings (justified doubt is then sufficient according to Article 1033(1) Rv) and the subsequent setting aside of an arbitral award on the same basis (this requires serious doubt).*").
[42]   Conclusion of Reply, marginals 4, 5, 32, and 33.
[43]   Conclusion of Reply, margin 33. See also margin 5: "*It would therefore have been up to Bank Sarasin at the time to investigate this working relationship further and, if it saw a need to do so, to complain about it in good time. It did not do so. Thus, the annulment claim already fails.*".

LOYENS LOEFF

35    The actual knowledge test from *Nordström* (*i.e.*, actual knowledge of the facts underlying the annulment claim during the arbitration proceedings) is perfectly in line with ECHR case law, including the *Beg S.p.a./Italy judgment*. However, the second criterion (the 'imputable knowledge test') violates Article 6(1) ECHR, as interpreted by the ECHR in the *Beg S.p.a.*/Italy *judgment*.[44] BJSS will explain this further.

36    In *Beg S.p.a.v Italy*, Italy argued that Beg had waived the right to an independent and impartial tribunal.[45] In this regard, it is important to note that the Italian law and the applicable arbitration rules in force at the time only required disclosure of ties and direct or indirect personal or economic interests that might affect the impartiality and independence of the arbitrator in question. An explicit statement that those links or interests <u>did not</u> exist (a *negative disclosure*) was not required under applicable Italian law.[46] Italy argued that by not complaining about the absence of such a negative disclosure, Beg had implicitly waived the right to an independent and impartial tribunal.[47] Italy further argued that given the substantial reputation of the arbitrator in question and the relationship between the arbitrator appointed by Beg and the arbitrator in question, it could be assumed that Beg was familiar with the arbitrator's professional activities.[48]

37    The ECHR considered that, according to ECHR case law, a party may waive the Article 6(1) ECHR right to an independent and impartial tribunal, provided that this has been done "*in a free, lawful and unequivocal manner*", i.e. (i) voluntarily, (ii) lawfully and (iii) unequivocally.[49] The ECHR found that Beg had <u>not</u> *unequivocally* waived his right to an independent and impartial court.[50] Indeed, unequivocal waiver requires that the complainant had *actual knowledge* of the grounds for challenge. According to the ECHR, the assumption made by

---

[44]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, JBPR 2022/48 cf. B.A. Boersma (*Beg S.p.a v Italy*), at 5 (emphasis added) ("*The Supreme Court's factual knowledge test (item (i)) is seamlessly in line with the subsequent case law of the ECtHR. **However, questions can (now) be raised about the second criterion, namely that objections that were not known, but which could already have been known to a party, must be raised in a timely manner with the sanction of processing the right to do so later**. (...) This duty of alert/investigation applied by the Supreme Court [is] **difficult to reconcile** with Article 6 (1) ECHR as interpreted by the ECtHR. It follows precisely from this that it cannot be assumed that a party was aware of incriminating information about an arbitrator without this actually being apparent from concrete facts or circumstances. (...). **I therefore consider it plausible that the latter standard is also contrary to Article 6(1) ECHR**.*").

[45]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 118.

[46]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v. Italy*), para 139 ("*In this regard it would note that Article 6 of the Rules of the ACR (see paragraph 41 above) compelled the arbitrators to indicate, in their written declaration, any relationship with the parties or their counsel that might have an impact on their independence and impartiality, and any direct or indirect personal or economic interest in the subject matter of the dispute. However, the said Article did not compel arbitrators to explicitly indicate the absence of such relationships and/or economic interests.*"), see also r.o. 111.

[47]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 119 ("*The Government based their argument on the fact that neither G.G. nor N.I. had indicated in their acceptance statements the absence of a conflict of interest (see paragraph 15 above) and that the applicant had not complained of this fact.*").

[48]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a./Italy*), para 119 ("*They further argued that the arbitrators were high-profile figures, that the parties were aware of the professional links of N.I. (they referred to the wording of the Rome District Court, see paragraph 27 above) and that, as a consequence, there was no need for such disclosure. In particular, the Government argued that G.G. and N.I. had been colleagues as professors at the Rome University "La Sapienza", that they had often worked as lawyers in the same defence team in important disputes and that they had been members of several eminent advisory committees. In sum, the parties had such confidence in these important and illustrious figures that they had willingly refrained from challenging the absence of an explicit negative disclosure by N.I. and G.G.*"; r.o. 140 ("*As to the Government's assertion that the arbitrators were well-known figures and that the applicant, through its arbitrator G.G., was most probably aware of the professional links between N.I. and the ENEL group, (...).*").

[49]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 127.

[50]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 136-143.

LOYENS L LOEFF

the lower Italian court[51] that Beg could be presumed to have had such knowledge because of the arbitrator's considerable reputation, without any concrete fact showing that Beg was actually aware ("*in fact aware*") of the arbitrator's professional activities, is therefore incorrect. A 'presumption of knowledge' is, according to the ECHR, insufficient to assume that a party waived its fundamental right to an impartial and independent arbitral tribunal:

> "The reasons advanced by the domestic courts (see paragraph 27 above) and the Government are based on **a presumption of knowledge which does not rest on any concrete evidence to the effect that the applicant was in fact aware of the professional activities of N.I.** (...). The Court therefore disagrees with the Government and does not find that facts have been demonstrated from which it could infer the **unequivocal waiver** of the requirement of impartiality in respect of the arbitrator."[52]

38      In making this judgment, the ECHR referred to the *Pescador* Valero *v Spain case*.[53] In this case, the judge who had to rule on the validity of the dismissal of an employee of a Spanish university was also a professor at the same university. The dismissed employee did not request the challenge of the relevant judge until two years after the start of the proceedings. The Spanish court ruled that this was too late because it had to be assumed that the dismissed employee, as manager of the campus, was aware of the professional relationship between the judge and the university ("*by reason of his position as manager of the campus, the applicant ought to have been aware of the professional relations between the judge and the university*."[54] ). The ECHR found this assessment by the Spanish judges to be incorrect, ruling that:

> "The Court cannot accept this line of argument. It is not apparent from the file that the applicant knew the judge prior to the dispute, or even that he ought to have known him. **The reasons advanced by the domestic courts and the Government are based on a presumption of knowledge which does not rest on any concrete evidence to the effect that the applicant was in fact aware of the professional activities of Judge J.B.L. at the university**. Moreover, it is difficult to see how the applicant could have proved that he did not know the judge before the start of the proceedings. As submitted by the applicant, such a requirement would have subjected him to an excessive burden of proof."[55]

39      The same applies - as follows from the *Beg S.p.a./Italy ruling* - to arbitrators. Boersma states:

---

[51]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 27 ("*As an additional ground for dismissal, the District Court made reference to the fact that, in the environment in which the parties to the dispute were operating, it was quite unlikely that the parties had not been aware, well before 5 December 2002, of the professional activities of N.I.*").

[52]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 140. Emphasis added.

[53]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 (*Beg S.p.a.v Italy*), para 140.

[54]     ECHR 24 September 2003, no 62435/00 (*Pescador Valero v Spain*), para 25.

[55]    ECHR 24 September 2003, no 62435/00 (Pescador Valero v Spain), para 26. Emphasis added.

LOYENS *L* LOEFF

> "The inadmissible reasoning of the Spanish court in *Pescador Valero* is in fact an application of the second Nordström criterion. I therefore consider it plausible that the latter criterion is also contrary to Article 6(1) ECHR."[56]

40     It therefore follows from the ECHR case-law that the waiver of the fundamental right to an impartial and independent tribunal is subject to high requirements: it must be *unequivocal*, requiring "*concrete evidence*" "*to the effect that the applicant was in fact aware*" of the grounds for challenge. Again: a 'presumption of knowledge' is insufficient.[57]

**3.3     Arbitrators' disclosure obligation versus parties' alleged duty to investigate**

41     AIG argues in the Statement of Defence that the facts on which BJSS bases its annulment claim were "*long and widely public*", that "*in light of Bank Sarasin's duty of enquiry, there is no requirement to include public information in the disclosure*" and that "*Bank Sarasin did not ask any questions or otherwise investigate before or during the arbitration.*"[58] This position is incorrect for several reasons.

42     First, AIG's (implicit) contention that by failing to conduct its own further investigation into Ter Meer's independence and impartiality at the time of his appointment and during the arbitration, BJSS processed its right to an impartial and independent tribunal, is incorrect. As just explained in detail (section 3.2.2 above), it follows from the case-law of the ECHR that a party can only validly waive its right to an independent and impartial tribunal if it had *actual* knowledge of the grounds for challenge, but did not 'squeal' about them. That is not at issue here.

43     Secondly, it is also incorrect that Ter Meer was not required to disclose public information because BJSS would have a duty to investigate, and thirdly, it is incorrect that it was up to BJSS to ask further questions.

---

[56]   ECtHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211, *JBPR* 2022/48 cf. B.A. Boersma (*Beg S.p.a.v Italy*), at 5.

[57]   AIG also does not refer to examples from Dutch case law where, based on Nordström's second criterion ('should have known'), it was assumed that a party had incorporated the right to an impartial and independent arbitral tribunal. AIG refers in paragraph 33 of its Reply to Arnhem-Leeuwarden Court of Appeal 8 October 2019, ECLI:NL:GHARL:2019:8203, r.o. 4.19. However, it follows precisely from this paragraph of law that the complainant had actual knowledge of the grounds for challenge ("*It is clear that the facts and circumstances about the alleged involvement of arbitrator [person 1] with [the respondent] and/or his wife and/or a witness on his side were already known to Amphia during the arbitration proceedings. Indeed, as it mentions and as the correspondence submitted shows, it already reported these facts and circumstances to the chairman immediately after the announcement of the composition of the Arbitral Tribunal and requested that this arbitrator be replaced. (...). The same applies to the challenged statement made by the arbitrator during the oral hearing: Amphia was also aware of this even before the arbitral award (after all: during the oral hearing).*"). AIG further refers to the case *Suovaniemi c.s. v Finland* (Conclusion of Reply, margin 33). In that case, the ECtHR held that unambiguous waiver may also be implied in silence or omission, and therefore need not be express, but this requires actual knowledge by the complaining party of the grounds for challenge.

[58]   Conclusion of Reply, paras. 25, 37 and 48(i).

LOYENS _ LOEFF

44      Under Article 11 of the NAI Rules and the form prescribed in Article 11(4) of the NAI Rules, Ter Meer was required to notify the parties of:

> "**any** facts or circumstances which **might be** of such a nature as to call into question his independence in the eyes of any of the parties or that could give rise to doubts as to his impartiality."[59]

45      Ter Meer was thus required to disclose, on his own initiative, <u>any facts</u> that <u>might be</u> of such a nature as to cast doubt on its impartiality and independence in the eyes of a party.[60] Neither Article 11 of the NAI Rules nor Article 1034 DCCP nor the IBA Guidelines have any limitation/exclusion of this duty to disclose public information.

46      Similarly, Mr Meerdink's colleagues, in commenting on a previous version of the NAI rules, argue (i) that the responsibility for disclosing possible conflicts of interest lies with the arbitrator, (ii) that there is no duty of investigation on the parties, and (iii) that a party's right to challenge an arbitrator is not affected by the fact that the information may already be in the public domain:

> "The provisions of Article 19 reveal that the **initiative** is with the arbitrator. **<u>It is the arbitrator's responsibility</u> to disclose circumstances that may give rise to debate in regard of his impartiality and independence. <u>There is basically no obligation of the parties to conduct an investigation on their own initiative in regard of the prospective arbitrator's curriculum vitae and existing relationships</u>. The parties can simply await the arbitrator's disclosure and challenge an arbitrator on the basis of such information, <u>even if the information was already in the public domain</u>**. This system is in line with international arbitration practice and is to be preferred above another system, in which any obligation of the parties to actively establish the absence of circumstances that could give rise to a challenge, brings about the need to consult the prospective arbitrators and discuss with them the dispute in at least some detail."[61]

---

[59]   See the NAI's 'availability and independence statement' (<u>Exhibit 2</u>). See also the IBA Guidelines (AIG's Exhibit 15), General Standard 3(a) ("*If facts or circumstances exist that may, in the eyes of the parties, give rise to doubts as to the arbitrator's impartiality or independence, the arbitrator shall disclose such facts or circumstances to the parties, the arbitration institution or other appointing authority (if any, and if so required by the applicable institutional rules), and the co-arbitrators, if any, prior to accepting their appointment or, if thereafter, as soon as the arbitrator learns of them.*").

[60]   GS Civil Procedure, art. 1034 Rv, infra. 1 ("*Every person requested is thereby obliged to ascertain possible grounds for challenge. In doing so, he must consider his own position from the point of view of the parties.*").

[61]   G.W. van der Bend, M. Leijten & M. Ynzonides, *A Guide to the NAI Arbitration Rules. Including a Commentary on Dutch Arbitration Law*, Alphen a/d Rijn: Kluwer Law International 2009, pp. 107-108; see also Court of Rotterdam 11 May 2011, ECLI:NL:RBROT:2011:BQ6204, r.o. 4.14 ("*As the arbitrators were subject to an obligation of disclosure, Bivac did not have to be expected to conduct its own investigation into any links between the proposed arbitrators on the one hand and [defendant] and his counsel on the other hand.*"); Rechtbank Utrecht 12 January 20212, ECLI:NL:RBUTR:2012:BV0635, r.o. 4.1 ("*It is an established fact that the functional relationship between Messrs [Arbitrator 1] and [B], which [the applicant] (partly) founded on the request, only became known after [Arbitrator 1] was appointed as arbitrator. It can be left open for whose account or risk it is that that relationship was not noticed prior to [arbitrator 1]'s appointment. Indeed, that is irrelevant to the question of admissibility. As [the applicant] was not aware of the said relationship prior to the appointment of [arbitrator 1], she could not take that circumstance into account in her choice of this arbitrator. It is not in dispute that [the applicant] challenged the arbitrators as soon as it became aware of the functional relationship between [arbitrator 1] and [A]'s former counsel.*"). Emphasis added throughout.

LOYENS _L_ LOEFF

47     That an arbitrator is also required to disclose public information and that an arbitrator generally "*may not count on the due diligence of the parties' counsel*" was also confirmed in the *Tidewater case*.[62] *Tidewater* involved an investment arbitration. Unlike commercial arbitration, arbitral awards of investment arbitrations are public and it is easy to consult on the website of the International Centre for Settlement of Investment Disputes (**ICSID**) which arbitrators are/have been acting in ongoing and completed ICSID cases. Professor Brigitte Stern - a well-known arbitrator - was appointed by Venezuela as an arbitrator in the investment arbitration against Tidewater. She accepted that appointment, making no disclosures even though she had previously been appointed by Venezuela in investment arbitrations. Stern and Venezuela took the position that this information did not need to be disclosed because it was public information that could be easily found out via the ICSID website. The two other members of the arbitral tribunal that had to rule on the challenge did not agree with this. They ruled that the disclosure obligation under the ICSID rules - like the disclosure obligation under the NAI rules - has no limitation for public information:

> "Arbitration Rule 6(2) does not limit disclosure to circumstances which would not be known in the public domain. The wording of this rule is all encompassing without distinguishing among categories of circumstances to be disclosed."[63]

And that:

> "(...) in general in considering the scope of her duty of disclosure, the arbitrator may not count on the due diligence of the parties' counsel. As pointed out by Tidewater, arbitrators will always be in 'the best position to gather, evaluate, and disclose accurate information relevant to their potential conflicts'". [64]

48     Thus, under Article 11 of the NAI Rules and Article 1034 Rv, Ter Meer was under a far-reaching disclosure obligation; he had to disclose all information - including publicly available information - that could, in the eyes of a party, give rise to doubts about his impartiality and independence. When in doubt, under the *in dubio pro disclosure* principle, a fact or circumstance should be reported.[65]

49     Compliance with the disclosure obligation is essential for the integrity of the arbitral process and ensuring the right to an independent and impartial arbitral tribunal. See, for example, Gary Born:

> "The timely and complete performance of this disclosure obligation is vital to the integrity of the arbitral process."[66]

---

[62]   Exhibit●, *Tidewater Inc. v. Venezuela*, ICSID Case No. ARB/10/5, 'Decision on Claimant's Proposal to Disqualify Professor Brigitte Stern' dated 23 December 2010.
[63]   Exhibit●, *Tidewater Inc. v. Venezuela*, marginal 46.
[64]   Exhibit●, *Tidewater Inc. v. Venezuela*, marginal 51.
[65]   See, for example, IBA Guidelines on Conflicts of Interest in International Arbitration (2024), General Standard 3(d) ("*Any doubt as to whether an arbitrator should disclose certain facts or circumstances should be resolved in favour of disclosure.*").
[66]   Gary B. Born, 'Selection, Challenge and Replacement of Arbitrators in International Arbitration' (Updated December 2023), in: *International Commercial Arbitration (Third Edition)*, Kluwer Law International, para 12.05[N].

LOYENS L LOEFF

And:

> "The arbitrator's duty of disclosure plays a central role in international arbitration. (...).
> Compliance with such obligations is central to the integrity of the arbitral process."[67]

50    If an arbitrator does not (fully) comply with his disclosure obligation, the arbitrator effectively deprives a party of the opportunity to consider, on the basis of all relevant information, whether it wishes to challenge the arbitrator or whether it is willing to waive the right to be heard by an impartial and independent arbitral tribunal.[68] For example, in *Claimant v. Spain*, the ICSID Ad Hoc Committee (Article 51 ICSID Convention) ruled as follows:

> "In this case, the Committee is of the opinion that in the facts and circumstances of this case, Dr Alexandrov's absence of disclosure, deprived Spain of the opportunity to challenge him in the arbitration proceedings. Consequently, it also deprived Spain from seeking the benefit and protection of an independent and impartial tribunal which the right to challenge is intended to provide. This affected Spain's right of defence and fair trial, as well. This failure cannot be regarded as a mere inconsequential error or omission or something insignificant having no bearing on the outcome of the proceedings before the Tribunal."[69]

51    Even if there would be a duty for parties to investigate the independence and impartiality of an arbitrator (which there is not, as explained in section 3.2.2 above), then, in light of the far-reaching disclosure obligation of arbitrators, and its background, this duty of investigation should be interpreted very narrowly and the disclosure obligation always

---

[67]    Gary B. Born, 'Selection, Challenge and Replacement of Arbitrators in International Arbitration' (Updated December 2023), in: *International Commercial Arbitration (Third Edition)*, Kluwer Law International, para 12.05[N][f]; see also *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret ve Sanayi, AS*, 2006 U.S. Dist. LEXIS 44789, at 27-28 (S.D.N.Y.) on the rationale for disclosure: "*It is important that courts enforce rules of ethics for arbitrators in order to encourage businesses to have confidence in the integrity of the arbitration process, secure in the knowledge that arbitrators will adhere to these standards. In the years since Justice Black's decision, international arbitrations have taken on an extremely important role in facilitating international commercial transactions among businesses located in all parts of the world. Businesses in many countries are wary of the courts favouring the party resident within their jurisdiction and favour an independent arbitral panel for the prompt resolution of any commercial dispute. Confidence in the arbitral panel to render fair and impartial decisions is important to this country's international trade, and full disclosure is integral to the integrity of the panel's decision. Because of the increase in international transactions and the corresponding increase in disputes it is crucial that there exist a requirement of an appearance of impartiality in arbitrations conducted in this jurisdiction, and that courts take actions designed to assure foreign entities that arbitrations in the United States are free from the suggestion of partiality.*" (**Exhibit●**).

[68]    See footnote 4. See also Anastasia Christina Kalantzi, "Conflicts of Interest in International Commercial Arbitration", *Erasmus Law Review*, 1, (2022): 45-55 ("*Disclosure guarantees that the parties are fully informed when deciding on the appointment or disqualification of the arbitrator. Indeed, developing trust is a key feature of international arbitration that is cultivated by full transparency. Therefore, lack of disclosure could work as a 'negative interference' that some courts have declared as a determinative factor.*").

[69]    **Exhibit●** , *Claimant Infrastructure Limited and Energía Solar Luxembourg S.A R.L. v. Spain*, ICSID Case No. ARB/13/36, Decision on the Kingdom of Spain's Application for Annulment, 11 June 2020, para. 241; see also *Aussie Airlines Pty Ltd v. Australian Airlines Pty Ltd*, Award of 13 March 1996, 135 ALR 753, para. 39 (Exhibit 9) ("*The parties are entirely reliant upon disclosure in order to consider whether an issue of disqualification may arise, and if so whether an application to disqualify is to be made.*"); Gary B. Born, 'Selection, Challenge and Replacement of Arbitrators in International Arbitration' (Updated December 2023), in: *International Commercial Arbitration (Third Edition)*, Kluwer Law International, para 12.05[N][f] ("*This presumptive requirement of independence and impartiality cannot be adequately assured or implemented unless the parties are apprised of the facts and circumstances relevant to an arbitrator's independence - which are wholly or largely within the arbitrator's knowledge and control in most cases.*").



prevails. In this regard, BJSS refers to Supreme Court 30 October 2009 (*Feadship c.s./Van Wieringen c.s.*).

52    In that case, the civil-law notary, acting as binding counsel, had drafted the termination agreement between the parties, which was the subject of the dispute, in which he had acted as counsel to Feadship et al.[70] Van Wieringen et al. were aware of the fact that the civil-law notary had drawn up the termination agreement and that he had acted as adviser to Feadship et al. in that connection. However, according to the court of appeal, this did not mean that they were also aware of the fact that the civil-law notary was the permanent (party) adviser of Feadship c.s. According to the court of appeal, the civil-law notary should have informed Van Wieringen c.s. about "*the extent and merits*" of his relationship with Feadship c.s. before accepting his assignment to give binding advice:

> "Under these circumstances, [the notary] should have ascertained, before accepting the instruction to give the binding opinion, that [the defendant] c.s. had an adequate understanding of the extent and merits of [the notary]'s relationship with [the plaintiff] c.s. and realised, as [the notary] himself apparently did, that [the notary] did not have an independent and impartial position. The circumstance that in 2000, on the occasion of the sale of the shares in [A] B.V., [the notary] had informed [defendant] et al. that he was also acting as adviser to 'the buyer' ([plaintiff] et al.) does not automatically imply that [defendant] et al. should have understood that and to what extent that involvement went beyond advising in the context of the share sale, nor that the advisorship had continued in a permanent advisory relationship in the years thereafter and that [the civil-law notary], although a civil-law notary, was not independent and impartial in the dispute on that account. Concrete facts and circumstances from which it follows that [the defendant] et al. did or should have had this knowledge to a sufficient degree, have not or not sufficiently been stated or shown. (para. 4.7)."[71]

53    Furthermore, in any event, the parties' alleged duty to investigate does not concern a continuous duty to investigate (*i.e.*, that the parties can be expected to continue to investigate during the arbitration about facts and circumstances that might lead to justified doubts about the arbitrator's independence and impartiality). BJSS refers in this regard to two French judgments that have strong similarities to the present case:

(i)    On 3 October 2019, the French *Cour de Cassation* upheld a judgment of the *Cour d'appel de Paris*, in which the court set aside an arbitral award of March 2016 between Saad Buzwair Automotive Co (**SBA**) and Audi Volkswagen Middle East Fze (**Audi**) on grounds of lack of independence and impartiality.[72] SBA claimed that it had become aware after the arbitration with edition of the German legal guide JUVE from 2010/2011 (*i.e.*, from before the arbitration) and from 2015/2016 (*i.e.*, during the arbitration).[73] It stated that the arbitrator's office was acting for a consortium of banks, including Volkswagen Bank, in a competition dispute with a German bank.

---

70    According to A-G Huydecoper, *Nordström/Nigoco* can be applied analogously to binding advice (see A-G Huydecoper to HR 30 October 2009, ECLI:NL:PHR:2009:BK1548, at 17).
71    Supreme Court 30 October 2009, ECLI:NL:HR:2009:BK1548, para 4.1-4.3.
72    **Exhibit●** , Cour de Cassation, 3 October 2019, ECLI:FR:CCASS:2019:C100787.
73     See: https://www.juve.de/. JUVE, like *Legal500*, publishes rankings of law firms and lawyers.

LOYENS LOEFF

In the 2015/2016 JUVE edition, the arbitrator's office's list of '5 most noteworthy cases' included an ongoing dispute for Porsche. Both the case for Volkswagen Bank and Porsche, Audi-affiliated parties, had not been disclosed by the arbitrator. According to SBA, it followed from the fact that the arbitrator's office had apparently listed the case for Porsche itself as one of the 5 most mentionable cases, that Audi was a very important client of the arbitrator's office, leading to legitimate doubts about its impartiality and independence. Audi argued, inter alia, that (a) the JUVE guide is public information that every German law firm should be familiar with and which information does not need to be disclosed, and (b) the information in the 2015/2016 JUVE edition was inaccurate and probably a mistake by the publisher. The Paris court ruled that it was unlikely that JUVE had made an error in the 2015/2016 edition and that Audi had not submitted any evidence in this regard (e.g. the form provided to JUVE by the law firm for the 2015/2016 JUVE edition containing the list of the firm's top five cases). The court further ruled that while SBA should have been familiar with the 2010/2011 JUVE edition, *i.e.*, the edition published before the arbitration, SBA could not be expected to investigate the arbitrator's impartiality and independence during the arbitration and therefore SBA should not have been familiar with the 2015/2016 JUVE edition.[74] The French *Cour de Cassation* upheld this judgment.[75]

(ii) On 16 December 2015, the French *Cour de Cassation* upheld a judgment of de *Cour d'appel de Paris*, in which the court denied exequatur for an arbitral award dated 27 March 2011 on the grounds of lack of independence and impartiality.[76] The arbitral award had been made by Henri Alvarez (**Alvarez**), a partner at the international law firm Fasken Martineau (770 lawyers spread across Canada, Europe and South Africa). Alvarez reported at the start of the arbitration that a partner at Fasken Martineau's Vancouver office (Alvarez himself was with the Toronto office) had assisted the shareholder of one of the parties in the arbitration "*in respect of Canadian-based matters over a number of years*" and that "*I understand that at present there are no matters in respect of which my firm is currently providing advice to Leucadia National Corporation.*" Following the arbitral award of 27 March 2011, Auto-Guadeloupe Investissements (**AGI**) took the position that a news item published on Fasken Martineau's website on 15 December 2010 (*i.e.*, during the arbitration) showed that Fasken Martineau had advised the relevant shareholder, Leucadia National Corporation, during the arbitration in the context of the sale of a copper mine. The French *Cour de Cassation* ruled that "*AGI did not have the obligation to investigate Mr Alvarez's independence, given the guarantees he provided in his statement, and that he had not disclosed a clearly significant transaction for the firm, in view of the wide publicity given by the latter; the Court of Appeal duly concluded that, these circumstances, unknown to AGI, being such*

---

[74] We understand that under French law, the parties are expected to consult public and very easily accessible sources about the arbitrator before the arbitration begins. This means that disclosure of *notorious* facts (commonly known facts) is not required. However, no such duty of enquiry rests on the parties during the arbitration. The question is how the "*notoriety doctrine*" relates to the recent case law of the ECtHR. See in this regard, e.g. the article 'A duty to disclose, a duty to inquire: French and European Courts Address an Arbitrator's Independence and Impartiality' by the French firm Debevoise & Plimpton of 7 August 2021, **Exhibit●** : "*In BEG v. Italy, the ECtHR reasoned that courts may not presume that a party knows about an arbitrator's undisclosed professional activities, without concrete evidence of such knowledge. The impact of this holding on the French courts' 'notoriety' doctrine remains to be seen.*".

[75] On this judgment, see the article 'French court upholds annulment over law firm conflict' of 25 October 2019 on the Global Arbitration Review website, **Exhibit●** .

[76] Cour de Cassation, 16 December 2015, Decision No. 1433-D F, with attached also the decision of the Cour d'appel de Paris of 14 October 2014, **Exhibit●** .

LOYENS LOEFF

*as to reasonably cause a doubt regarding the independence and impartiality of the arbitrator (...)".*[77]

54    Finally, AIG argues that the mere fact that a particular circumstance, which should have been disclosed, was not included in a disclosure is insufficient for nullification. Ultimately, the undisclosed facts and circumstances are decisive.[78] This is indeed correct, but what AIG ignores is that the failure to comply with the disclosure obligation can indeed be an important indication that there are serious or justified doubts about the arbitrator's independence and impartiality.[79]

**3.4    The IBA Guidelines on Conflicts of Interest**

55    As AIG also agrees, the IBA Guidelines are relevant when assessing a claim to set aside an arbitral award on the grounds of the absence of an independent and impartial arbitral tribunal.[80]

56    However, AIG argues that the *Non-Waivable Red List* circumstance referred to in paragraph 1.4 refers only to situations, where the arbitrator *himself* assists the party (AND he or his office derives significant financial income from it). In support of that argument, AIG refers to paragraph 1.4 of the new version of the IBA Guidelines:[81]

> "**The arbitrator** currently or regularly advises a party, or an affiliate of a party, and the arbitrator or the arbitrator's firm or employer derives significant financial income therefrom."[82]

---

[77]    On this judgment, see also the article 'Alvarez conflict of interest ruling upheld in France'of 29 January 2016 on the website Global Arbitration Review, **Exhibit●** . See also Herbert Smith Freehills' blog of 10 February 2016 on this Supreme Court ruling: "*This case reiterates the broad scope of the arbitrators' disclosure obligations under French law. Arbitrators have a continuous obligation to disclose, throughout the arbitration proceedings, not only personal circumstances that may become grounds for a challenge to their independence and impartiality, but also factual circumstances involving the law firm in which they work. On the other hand, the parties themselves are only required to search for public and easily available information prior to the commencement of the arbitration.*", **Exhibit●** .

[78]    Conclusion of Reply, paras. 36-38.

[79]    Opinion of A-G de Bock 23 March 2018, ECLI:NL:PHR:2018:263, no. 3.33; P. Sanders, *Het Nederlands arbitragerecht, nationaal en internationaal*, Deventer: Kluwer 2001, p. 73 ("*Failure to disclose is not punishable, but it will, in my view, play a role if later, after appointment, challenge follows for reasons that he could have already disclosed at the appointment stage. That concealment then, can be blamed on the arbitrator. The disclosure obligation should be taken seriously.*"); Asser Procesrecht/Sanders, Meijer & Ernste 8 2023/187 ("*A disclosure obligation should be taken seriously. There is no direct sanction for wrongfully failing to comply with the disclosure obligation, but it may play a role if the arbitrator is later challenged for reasons the arbitrator could have disclosed. It may also play a role if an action for setting aside is brought, regardless of whether it is brought under Section 1065(1)(c) Rv or Section 1065(1)(e) Rv. In case of an appeal on the latter ground, the latter may even possibly lead to a relativisation of the strict standard to be applied in that case in principle.*"); Anastasia Christina Kalantzi, *Conflicts of Interest in International Commercial Arbitration*, Erasmus Law Review, 1, (2022):45-55 ("*Failure to disclose an important fact does not automatically lead to the disqualification of the arbitrator; however, it may be considered as a strong proof of bias and lack of impartiality.*"). See also the recent judgment of the English Commercial Court mentioned in footnote 39 above, para. 170: "*The observer would in my view regard these non-disclosures as highly relevant to the question of real possibility of bias, and as adding to the cumulative picture of a significant number of arbitral appointments by Freshfields.*"

[80]    Subpoena, paras. 36-45; Conclusion of Reply, para. 35.

[81]    Conclusion of Reply, para. 63. As already explained in the summons, the circumstances mentioned on the *Non-Waivable Red List* are so serious that legitimate doubts about the arbitrator's independence and impartiality necessarily arise and are 'non-waivable'; see summons, paras. 43 and 44.

[82]    IBA Guidelines (version 2024), p. 15, at 1.4. Emphasis added.

LOYENS ⌇ LOEFF

This is incorrect.

57     First, paragraph 1.4 of the *Non-Waivable Red List* at the time of the Arbitration read as quoted in the initiating summons.[83]

58     Secondly, the text change does not mean that paragraph 1.4 now suddenly - let alone retroactively - refers only, as AIG wants to make it appear, to situations where the arbitrator *himself* assists a party. Underlying the intended text change is only the idea that, where the arbitrator's office (but not the arbitrator himself) regularly advises a party, a non-waivable conflict of interest does not automatically or necessarily exist.

59     Invariably, it follows from General Standard 6(a) of the IBA Guidelines (new version) that, when answering the question whether or not there is a non-waivable conflict of interest, *"the activities of an arbitrator's law firm or employer, if any, the law firm's or employer's organisational structure and mode of practice, and the relationship of the arbitrator with the law firm or employer"* will (among other things) be significant. However, the <u>starting point</u> still remains that the arbitrator is equated with his/her law firm, as reflected in the opening words of General Standard 6(a) of the IBA Guidelines (new version):

> **"The arbitrator is in principle considered to bear the identity of the arbitrator's law firm or employer**, but when considering the relevance of facts or circumstances to determine whether a potential conflict of interest exists, or whether disclosure should be made, **the activities of an arbitrator's law firm or employer, if any, the law firm's or employer's organisational structure and mode of practice, and the relationship of the arbitrator with the law firm or employer, should be considered** in each individual case."[84]

60     In the present case, there is no reason to deviate from this principle. On the contrary: Cox Ten Bruggencate is a small boutique firm, with only one branch/office and with only ten lawyers (of which Ter Meer was thus one), which specialises in insurance law (to which the Arbitration also related). Under these circumstances, it is all the more obvious that, in accordance with the premise quoted above, Ter Meer had to be deemed to bear the identity of Cox Ten Bruggencate at the time of the Arbitration.

61     Incidentally, the principle that an arbitrator (or lawyer), when it comes to the question of the possible existence of conflicting interests, is put on an equal footing with his/her office is also generally accepted. See, for example, the aforementioned in para. 53 quoted French

---

[83]   See, inter alia, marginal 45 thereof: *"1.4 The arbitrator **or his or her firm** regularly advises the party, or an affiliate of the party, and the arbitrator or his or her firm derives significant financial income therefrom."* (emphasis added). IBA Guidelines (2014 version), p. 20, at 1.4.

[84]   IBA Guidelines (version 2024), p. 10, at 6(a). Emphasis added. In the same context, see also the 'ICC Note to Parties and Arbitral Tribunals on The Conduct of Arbitration' dated 1 January 2021, marginal 32: "*For the scope of disclosures, an arbitrator is considered to bear the identity of his or her law firm, and a legal entity includes its affiliates. In addressing possible objections to confirmation or challenges, the Court will consider the activities of the arbitrator's law firm and the relationship of the law firm with the arbitrator in each individual case.*"

LOYENS LOEFF

rulings as, for example, the regulation on conflicts of interest in the Rules of Conduct for the Legal Profession.[85]

62    Incidentally, the circumstance that AIG is a "*key client*" of Cox Ten Bruggencate is in any case also covered by section 2.3.6 of the *Waivable Red List*:

> "2.3.6 The arbitrator's law firm or employer currently has a significant commercial relationship with one of the parties, or an affiliate of one of the parties."[86]

### 3.5    High requirements for duty to state reasons and/or increased duty to state reasons if relevant facts are in defendant's domain

63    In the Response Brief, AIG labels BJSS's contention that Cox Ten Bruggencate realised significant income from its relationship with AIG as "*mere unsubstantiated speculation*", that "*AIG disputes*".[87] According to AIG, "*the designation 'key client' is a lot less pompous than Bank Sarasin wants to make it appear*." [88]

64    BJSS did, however, substantiate that there is a significant working relationship between Cox Ten Bruggencate and AIG. Indeed, BJSS pointed to several editions of the *Legal500*, in which AIG was always part of Cox Ten Bruggencate's limited list of "*key clients*" in the "insurance" category and in the "transport" category. This implies that Cox Ten Bruggencate realised significant revenues from/with that relationship. AIG also acknowledges that the *Legal500* is compiled on the basis of information, which law firms provide *themselves*.[89]

65    Under Section 128(2) Rv, the statement of reply must be 'reasoned'. This means that the defendant's rebuttal must be supported by the information available to the defendant.[90] According to Gras, Hendrikse and Jongbloed, a statement of reasons is "*all the more ... required if the defendant is able to give his own version of the facts that the plaintiff has based his claim on. As a rule of thumb, the more the defendant knows about the case, the better/ more detailed the reasons for his challenge should be*."[91]

66    AIG does not substantiate at all that Cox Ten Bruggencate did not realise any significant income from the relationship with AIG, whereas AIG should be able to substantiate this relatively easily. For example, AIG could provide copies of Cox Ten Bruggencate's invoices that AIG, and AIG affiliates, received during the Arbitration, and in the years before and after. AIG could also specify in how many and what cases Cox Ten Bruggencate advised it, and its affiliates, in those years, and whether the AIG group engaged Cox Ten Bruggencate for new cases in the years following the disclosure. Of course, this could be

---

[85]    Paragraph 6 of its Article 15, which sets out the rules regarding conflicts of interest, states in so many words that *"[w]here this rule states 'lawyer', it also means the partnership of which he is a member."*
[86]    IBA Guidelines (version 2024), p. 16, at 2.3.6.
[87]    Conclusion of Reply, marginal 55.
[88]    Conclusion of Reply, marginal 55.
[89]    Conclusion of Reply, margin 26.
[90]    E. Grass, R.G. Hendrikse & A.W. Jongbloed, *Compendium of Civil Procedure* 2024/6.5.2.
[91]    E. Grass, R.G. Hendrikse & A.W. Jongbloed, *Compendium of Civil Procedure* 2024/6.5.2.

LOYENS | LOEFF

done in a way that would not reveal any sensitive information. After all, it is only about the relevant amounts of money.

67     AIG, by its bare denial, has not sufficiently - or rather, not at all - substantiated its claim that Cox Ten Bruggencate realised significant income from its relationship with AIG. This should therefore be taken as established.[92]

68     Moreover, case law has accepted that if the facts to be proved by the plaintiff are in the 'domain' of the defendant, the defendant may be subject to an aggravated duty of proposition/disclosure. See Gras, Hendrikse and Jongbloed:

"If the defendant can be deemed to have more data concerning the facts to be proved by the plaintiff than the plaintiff himself (data that are in his 'domain'), he may even be required, in order to justify his challenge to the plaintiff's contentions, to provide that data so that the plaintiff can find in it points of reference for his proof. Then the reasoning requirement of Section 128 DCCP leads to a duty of disclosure."[93]

69     BJSS believes that such an aggravated duty to assert is appropriate in this case.

**3.6     Application of legal framework to the relevant facts of the case**

70     During the Arbitration, BJSS was aware of the facts stated in the Ter Meer Disclosure. Those facts amount to the fact that BJSS knew (i) that Cox Ten Bruggencate acted "*occasionally*" (*i.e.*, sometimes, but not often) for AIG in disputes relating to transport and logistics and (ii) that Cox Ten Bruggencate had been included by AIG in AIG's "*panel*" for legal services in the <u>limited</u> area of "*Marine Insurance*". [94]

71     BJSS saw no reason to challenge Ter Meer on the basis of this information. Indeed, based on this information, it concluded - and could reasonably conclude - that the relationship between AIG and Cox Ten Bruggencate was limited in scope.[95] Ter Meer also never made any additional disclosures in the six-year Arbitration, whereas he was under a continuing disclosure obligation under Section 1034(3) DCCP and Section 11(5) of the NAI Rules. BJSS could therefore assume that the relationship between AIG and Cox Ten Bruggencate had not intensified.

---

[92]   E. Gras, R.G. Hendrikse & A.W. Jongbloed, *Compendium Civil Procedure* 2024/6.5.2. ("*An insufficiently substantiated denial will be able to be set aside by the court; the fact alleged by the plaintiff will then be deemed established in the absence of a proper dispute (art. 149 paragraph 1 Rv; see no. 7.1.3 under b)*".

[93]   E. Gras, R.G. Hendrikse & A.W. Jongbloed, *Compendium Civil Procedure* 2024/6.5.2; see also Supreme Court 4 April 2014, ECLI:NL:HR:2014:831, r.o. 3.6.2 (emphasis added): "*If, as in the present case, the plaintiff argues that the damage was caused by the public road being defective, and the public body sued (in this case: the Municipality), which is responsible for ensuring that the road is in good condition, relies as a defence (in part) on the fact that its financial resources were too limited to take the required measures, it is for that public body to sufficiently substantiate this defence; after all, the facts and circumstances in question are in its domain. The mere assertion by the public body that the financial resources were insufficient will not, as a rule, suffice.*"

[94]   See edge number 13 of this Conclusion of Reply.

[95]   A disclosure serves to enable a party to make an informed decision whether it wishes to take formal steps to challenge the arbitrator, or whether it can acquiesce in the potential conflict of interest. See paragraphs 3 and 50 of this Statement of Rejoinder.

LOYENS LOEFF

72      BJSS disputes that it should have investigated public sources at the time of Ter Meer's appointment, and that Ter Meer was not required to disclose public information. There is a far-reaching disclosure obligation on arbitrators, and such a duty of enquiry on parties is contrary to Article 6 ECHR and the ECHR's jurisprudence thereon.[96]

73      Moreover: even *if* it were the case that BJSS did have a duty to investigate, that duty to investigate should be interpreted in a very limited way and, in any case, it is true that BJSS could not be required, even *during* the Arbitration, to continue to investigate facts and circumstances that could give rise to doubts about Ter Meer's independence and impartiality.[97]

74      This means that even if your court were to hold that, despite the ECHR's case law on the subject, a duty of enquiry on the part of the parties does not violate Article 6 ECHR, BJSS could only have known about the 2016 *Legal500* prior to the Arbitration. Indeed, the public sources to which AIG further refers (*i.e.*, the *Legal500* editions of 2018 and 2020 to 2024) are all sources that only appeared during the Arbitration (see para. 13). That *Legal500* edition of 2016 stated the following:

> **Cox Ten Bruggencate Advocaten**'s department, praised for its '*thorough analysis*', '*to-the-point advice*' and value for money, is led by Joeri Cox and Carlijn ten Bruggencate; Jan ter Meer joined from Boekel. The team's clients include Delta Lloyd, Liberty and AIG.

75      Based on this information, therefore, BJSS could not know more than what it already knew on the basis of the Ter Meer Disclosure: AIG was one of Cox Ten Bruggencate's ("*include*") clients. It does not follow from the *Legal500* of 2016 how important AIG was as a client and how significant its financial and business ties with AIG were. So this is not different or new information from the information in the Ter Meer Disclosure. BJSS could not - and did not need to - infer from this that AIG was one of Cox Ten Bruggencate's most important ("*key*") clients and that Cox Ten Bruggencate generated significant income from its relationship with AIG.

76      BJSS only became aware after the Arbitration with the *Legal500* editions from 2020 to 2024, from which it follows that Cox Ten Bruggencate does not only act for AIG "*sometimes, but not often*", but that AIG is one of its "*major*" and "*key*" clients in the limited areas in which Cox Ten Bruggencate operates. This implies that the firm realised significant income from/with that relationship, which has not been substantiatedly disputed by AIG.[98]

---

[96]    See section 3.2.2 and section 3.3 of this Statement of Reply.
[97]    See section 3.3 of this Statement of Reply.
[98]    See also, for example, the recent judgment of the English Commercial Court mentioned in footnote 39 above, margin 188: "*I reject this argument. As Mr Diwan submitted, the disclosures made in November and December 2023 were the "tipping point". It was only at that stage that the full picture emerged. Prior to that time, Aiteo only had part of the picture. It did not make, and no doubt considered that it could not make, a successful challenge based on that partial picture. It does not follow, however, that when the full picture emerged, Aiteo were somehow precluded from relying on all the facts which showed apparent bias.*"; M.C. van Leyenhorst, 'Procedural aspects of challenges, *TvA* 2013/2: "*Incidentally, in practice, it is often the case that a challenge is lodged on the basis of a series of successive incidents or circumstances, which collectively give rise to doubts as to the arbitrator's impartiality or independence. In such cases, in my view, a challenge request will have to be filed within the applicable time limit, counting from the moment the proverbial last drop became known (or should have been known).*"

LOYENS LOEFF

77      Ter Meer failed to disclose the actual connection between Cox Ten Bruggencate and AIG or to 'update' his disclosure during the Arbitration. This breach of the disclosure obligation should be taken into account when assessing whether there were justified or serious doubts about Ter Meer's impartiality and independence.[99]

78      It follows from the foregoing that there are significant professional and/or financial ties between Ter Meer and the firm he is associated with on the one hand and AIG on the other, which give rise to objectively justifiable doubts about his impartiality, or at least that the appearance of bias may exist (*Beg standard*). These circumstances also lead to "*so serious a degree [of] doubt*" about Ter Meer's impartiality and independence that it would be "*unacceptable to require [BJSS] to acquiesce*" (*Nordström standard*).

## 4      PROCEDURE

### 4.1      Evidence

79      BJSS refers in support of its contentions to the exhibits mentioned in the summons and this Statement of Reply.

80      Without wishing to assume any burden of proof not incumbent on it at law, BJSS further offers to prove its contentions by all means at law, including, but not limited to, hearing witnesses.

## 5      CONCLUSION

81      It is concluded that there are such serious doubts about Ter Meer's independence and impartiality that it would be unacceptable to require BJSS to accept the Arbitral Award. The Arbitral Award should therefore be set aside pursuant to Section 1065(1)(e) Rv.

---

[99]   See edge number 54 of this Conclusion of Reply.

LOYENS LOEFF

**REASONS WHY:**

It may please your court, by judgment:

-        set aside the Arbitral Award;

-        Order AIG to repay the amount of EUR 18 million referred to in para. 14 of the summons, which BJSS paid to AIG in execution of the Arbitral Award, plus statutory interest from the date of this summons to the date of repayment; and

-        order AIG to pay the costs of these proceedings, plus statutory interest, as from 14 days from the date of the judgment to be given in this case,

all this, to the extent permitted by law, provisionally enforceable.

Attorney

This case is being handled by Mr T.L. Claassens and Mr E. Slabbers, Loyens & Loeff N.V., Blaak 31, 3011 GA Rotterdam. telephone: +31 (0)10-2246613; e-mail: tom.claassens@loyensloeff.com and eva.slabbers@loyensloeff.com.

# 54694306                                                                                                                   26