EXHIBIT D

DE BRAUW
BLACKSTONE
WESTBROEK

The Hague Court of Appeal, The Hague location Case
number: 200.341.205/01
Session: 19 November 2024

**REJOINDER**

*on:*

the company incorporated under
Luxembourg law
**AIG EUROPE S.A.**,
based in Luxembourg, Luxembourg

defendant,
Advocate: Mr E.R. Meerdink

*Against:*

the company incorporated under Swiss
law
**BANK J. SAFRA SARASIN AG**,
based in Basel, Switzerland

plaintiff,
Advocate: T.L. Claassens

DE BRAUW
BLACKSTONE
WESTBROEK

## Table of contents                                                 Page

1    **INTRODUCTION** ....................................................................................1

2    **FACTS** ................................................................................................2

3    **LEGAL FRAMEWORK** ...........................................................................6

    3.1    Annulment of the Arbitral Award requires that facts give rise to serious doubt about Ter Meer's independence or impartiality 6 .................................

    3.2    Nullification not possible if facts were known before or during the arbitration or it is attributable to the complaining party that he was not aware of them ...............................................................................................
        12

4    **APPLICATION** ....................................................................................17

    4.1    No serious or justified doubts about Ter Meer's impartiality and independence ................................................................................................
        17

    4.2    Facts and circumstances were known to Bank Sarasin before or during the Arbitration, or at least it is to its credit that it was not aware of them ..
        22

5    **CONCLUSION** ....................................................................................24

DE BRAUW
BLACKSTONE
WESTBROEK

AIG concludes for rejoinder as follows.

**1      INTRODUCTION**

1.      Bank Sarasin's statement of reply (the "**Rejoinder**") makes it clear that the annulment claim lacks any factual basis.[1] Part of the factual basis has been withdrawn,[2] and what essentially remains is alleged doubt based on the adjective "*key*" in the online marketing magazine *Legal500*.[3] However, the text of the *Legal500 publications* is consistent with what Ter Meer had stated in his extensive *disclosure*. There is no new fact.

2.      Ter Meer's *disclosure* thus precludes the existence of any doubt about his independence or impartiality that would follow from the *Legal500 publications*. After all, in this 2017 *disclosure*, Ter Meer had already indicated that CXTB was a *panel firm* of AIG AND that CXTB acted for AIG from time to time (or, in other words, "*occasionally*").[4] It can therefore have come as anything but a surprise to Bank Sarasin that AIG, one of the world's largest insurers, was listed as a client by CXTB in a market journal - which usually lists clients with internationally known names.

3.      In its Summons and Rejoinder, Bank Sarasin throws up a smokescreen of legal argumentation to disguise the fact that its claim lacks factual basis.[5] Bank Sarasin's elaborate argument that revision of settled Supreme Court case law (the *Nordström standard*) would be necessary,[6] cannot help Bank Sarasin: even applying the standard advocated by Bank Sarasin, there is no justifiable doubt. Bank Sarasin's contention

---

[1]      Defined terms shall have the same meanings as in AIG's Statement of Reply dated 29 July 2024 (the "**Reply**").

[2]      For instance, in its summons dated 8 April 2024 (the "**Summons**"), Bank Sarasin still claims that it only knew that AIG was one of CXTB's clients in the "limited" area of "only" *Marine Insurance*, and that it would thus not know that AIG had been one of CXTB's "*key clients*" in the area of insurance as well for many years (see nos. 50-51). In the Rejoinder, Bank Sarasin retracts this argument, having no doubt realised how ridiculous that argument is, since *Marine Insurance* obviously concerns 'insurance'. It shows how much Bank Sarasin is looking for nails in low water.

[3]      See also the overview of Bank Sarasin's facts in the Rejoinder, pp. 6-7.

[4]      Reply, Nos 13-15.

[5]      To illustrate: Bank Sarasin's account of the facts in the Rejoinder covers only three margin numbers (of less than a page in length), while the legal framework consists of about 20 pages.

[6]      Rejoinder, sections 3.1-3.3.

that it would not have actually discovered the online *Legal500 publications* from the years 2020, 2021, 2023 and 2024 until sometime in the period between 8 January 2024 and 8 April 2024 is - besides implausible - also irrelevant when applying that standard.

4.  However, as AIG explains below, the yardstick from *Nordström* still a p p l i e s  in full. Under the Nordström *standard*, the annulment claim fails already on the sole ground that the publications in the *Legal500* were already known, or at least known to Bank Sarasin during the Arbitration.[7]

5.  Bank Sarasin's claim for annulment is thus ready for dismissal for two independent reasons, as AIG has also set out in its Reply dated 29 July 2024 (the "**Reply**") and further explained below in this submission in response to the contentions in the Rejoinder. First, there are no facts or circumstances that warrant any doubt about Ter Meer's impartiality or independence (AIG will discuss the applicable standard in **section 3.1** and apply it in **section 4.1**). Secondly, the contentions raised by Bank Sarasin are not facts that were not discovered or known to Bank Sarasin until after the A r b i t r a l  Award was rendered (AIG will discuss the applicable standard in **section 3.2** and apply it in **section 4.2**). First, AIG will briefly address the facts, which will already provide insight that the factual basis for the claim is lacking.

## 2    FACTS

6.  On the relevant facts, AIG can be brief; indeed, the parties agree on the vast majority of the facts:

    (a)  Ter Meer indicated in his 19 December 2017 *disclosure* that CXTB acted "*occasionally*" for CXTB, and that CXTB was a "*panel*" firm of AIG in the field of *Marine Insurance*.[8]

    (b)  At the time of the arbitrators' appointment, Bank Sarasin raised no objections to Ter Meer's appointment.[9]

---

[7]    Reply, section 3.2.
[8]    Reply, No 14; Rejoinder, No 70.
[9]    Reply, no. 15; not refuted in the Summons or Rejoinder.

(c)    Bank Sarasin, following Ter Meer's *disclosure*, did not ask Ter Meer any further questions about the extent of the financial relationship between CXTB and AIG - either at the time of the appointment or at the time of the six-year Arbitration.[10]

(d)    The *Legal500* primarily serves marketing purposes and is widely read in the legal community.[11] On its own website, the *Legal500* commends law firms for providing a platform to promote their expertise and capabilities to potential clients and other law firms.

> *"How to profile your firm in The Legal 500*
>
> *The Legal 500 provides your firm with the perfect platform to promote the expertise and capabilities of your firm to corporate clients and law firms. "*[12]

Against this backdrop, law firms independently provide the information to profile themselves in the most favourable way possible.[13]

(e)    AIG is a globally known big name in insurance and (therefore) a more frequently mentioned client in the *Legal500*.[14]

(f)    In the 2016 edition of the *Legal500*, AIG was already listed as one of CXTB's three clients in the *Insurance* section.[15] Moreover, in 2018, CXTB had also mentioned AIG in relation to transport insurance.[16]

(g)    The *Legal500* has only included a list of "*key clients*" at each of the firms since 2020.[17] In short: where previously clients were listed under the heading "*client*", from 2020 clients could only be listed under the heading "*key client*". Since 2020, AIG has been listed in the *Legal500* as one of four "*key clients*"

---

[10]    Reply, nos. 15-16; not refuted in the Summons or Rejoinder.

[11]    Reply, nos. 21 and 26; not refuted in the Summons or Rejoinder.

[12]    Snapshot 22 October 2024 from www.legal500.com/how-it-works, **Production 16**, p. 8.

[13]    Reply, No 21; Rejoinder, Nos 8 and 64.

[14]    Reply, no. 21; not refuted in the Summons or Rejoinder.

[15]    Bank Sarasin also does not dispute in the Rejoinder that it and its lawyers were aware of this, see nos. 5-6. It only argues that it was not aware of the true extent of the relationship between CXTB and AIG.

[16]    Reply, No 22.

[17]    Reply, nos. 23 and 26; not refuted in the Summons or Rejoinder.

of CXTB in the *Transport* category and one of 12 (!) "*key clients*" in the *Insurance* category.[18]

7.   The parties only d i f f e r on two factual points, with AIG explaining why Bank Sarasin's reading is incorrect:[19]

*(1)*   First, AIG disputes that from the change from " *client*" in 2016 and 2018 to "*key client*" in 2020 and the years thereafter in the *Legal500*, the inference can be drawn that the financial relationship between AIG and CXTB has become more intimate than is apparent from Ter Meers' *disclosure*. The fact that the *Legal500* chose to change the way law firms' clients were represented from 2020 onwards by using a different qualification (namely: a list of "*key clients*" instead of just a few "*clients*") does not follow that this also had consequences for the relationship between AIG and CXTB.[20] Even before 2020, firms were asked to provide a list of "*key clients*",[21] only the Legal500 itself picked out a few high-profile names at the time. In practice, this change also meant that firms did not give up fewer clients on balance. The *Legal500* shows that law firms - since the *Legal500* added the adjective "*key*" - actually listed more clients.[22] Similarly, CXTB: where until 2020 a total of only 4 clients were listed in the *Insurance* category, from 2020 no less than 12 clients are listed as "*key client*" in that category.[23] According to Bank Sarasin's logic, from 2020, all firms, including CXTB, would suddenly have started earning significantly more from all the clients they list in the *Legal500*, simply because the *Legal500* has started naming the clients listed by firms as "*key clients*". This is absurd. Professional parties, assisted by law firms, will not understand the *Legal500* that way.

---

[18]   Reply, No 23.
[19]   See also Bank Sarasin's overview in the Rejoinder, no 13.
[20]   Disputed is Rejoinder, No 63, in which Bank Sarasin states that branches only declare clients as "*key client*" with whom they h a v e a close (financial) relationship. This does not f o l l o w anywhere.
[21]   As shown in the 2018 *Legal500* statement sheet (for the 2019 *Legal500 edition*); Statement sheet for the 2019 Legal500, **Production 17**.
[22]   Overview change in numbers ("*key*") clients of law firms during 2016-2024, **Production 18**.
[23]   Overview change in numbers ("*key*") clients of law firms during 2016-2024, **Production 18**.

In short, from the change in terminology used in the *Legal500* (i) it does not follow that CXTB started generating larger revenues from the relationship with AIG and (ii) it does not follow that this information is 'new' compared to Ter Meer's *disclosure*.

*(2)*   Second, the parties dispute the interpretation of " *longstanding*" and "*major client*" and that this would be new information for Bank Sarasin. *The Legal500* has contained the following text since 2020:[24]

> "[n]*ame partners Joeri Cox and Carlijn ten Bruggencate have developed longstanding relationships with major clients including AIG and Allianz* "

That AIG had a "*longstanding*" relationship with Cox and Ten Bruggencate already follows from Ter Meer's **2017** *disclosure*. Indeed, at the time, CXTB was already on a panel for AIG's *Marine Insurance* jurisdiction and CTXB was doing "*occasional*" work for AIG on transport and logistics. Firms that are on a client's panel for a specific jurisdiction are selected as one of the preferred suppliers for legal services within that jurisdiction. They simply have a long-term relationship with that client and get work from it. That is the whole idea of a panel, as Bank Sarasin also knows and recognises.[25]

That in **2020** Cox and Ten Bruggencate had a long-term, or long-standing, relationship with AIG is thus consistent with Ter Meer's *disclosure* and not new. Furthermore, the length of a relationship still says nothing about the level of financial income or whether the income from that relationship has increased. Indeed, the term "*longstanding*" indicates a continuation of the relationship Ter Meer had named in his 2017 *disclosure* rather than a further intensification of that relationship.

As for the word "*major*" client, it also cannot be seriously argued that it implies a larger revenue source or that it provides a new fact. AIG (like Allianz) is one of the largest insurers in the world, and thus a "*major*" client.

---

[24]   Summons, no. 51; Rejoinder, no. 13.
[25]   See also Reply, no. 54 at (b) and Summons, no. 50.

Thus, the words "*longstanding*" and "*major*" also provide no basis for the inference that (i) CXTB was generating significant revenue from its relationship with AIG and (ii) this information is new compared to Ter Meer's *disclosure*.

8. Also incorrect is the contention that AIG should only have to prove that the relationship between CXTB and AIG *did not* become more significant than apparently assumed by Bank Sarasin. It would have been incumbent on Bank Sarasin to sufficiently state and prove the facts on which it based its claim for annulment. It failed to do so. Bank Sarasin did not even state exactly what financial relationship it would have assumed at the time based on Ter Meer's *disclosure*.

9. Incidentally, unlike Bank Sarasin's view, AIG does not have a conclusive understanding of the data on (the extent of) the financial relationship between AIG and CXTB in the relevant years, nor, of course, of the ratio of CXTB's income from AIG to CXTB's total income. All this is addressed in more detail by AIG in **section 4.1.**

10. Bank Sarasin did not further present any new circumstances which, in its view, cast doubt on Ter Meer's impartiality. This already negates the factual basis of the claim.

11. Nevertheless, AIG will address the legal basis for the annulment claim below. Thus, what the legal framework reads is actually irrelevant: the conclusion remains the same whether tested against the standard advocated by AIG or that advocated by Bank Sarasin. With regard to the facts underlying the claim (an alleged greater financial relationship), Bank Sarasin has simply not sufficiently alleged and proven.

## 3    LEGAL FRAMEWORK

### 3.1    Annulment of the Arbitral Award requires that facts give rise to serious doubt about Ter Meer's independence or impartiality

12. In fleshing out what constitutes legitimate doubt according to Bank Sarasin, it refers to the old version of the IBA Guidelines and an alleged breach of a disclosure obligation. If there is a situation on the *Non-Waivable Red List* of the old IBA Guidelines or a

DE BRAUW
BLACKSTONE
WESTBROEK

breach of a disclosure obligation, Bank Sarasin says this provides sufficient doubt.[26]

13. Bank Sarasin thereby misses that:

> (i) in case of setting aside for breach of public policy, the doubt must be *so serious* that it would be *unacceptable* to require a party to accept the arbitral award;[27]

> (ii) the IBA Guidelines are not normative (they weigh at most as insights) and the old IBA Guidelines are not relevant at all; and

> (iii) the question of whether there is 'such a serious doubt' must look at the facts and circumstances that would have given rise to that doubt - the role of any disclosure obligations is a very different one here than Bank Sarasin outlines.

*(i) Restraint on destruction requires serious degree of doubt*

14. There seems to be no dispute between the parties that setting aside an arbitral award should be approached with great restraint.[28] The public interest in an effectively functioning arbitral jurisdiction requires the court to intervene in arbitral decisions only in exceptional and clear cases. The threshold for setting aside an arbitral award is therefore particularly high, as the Supreme Court has confirmed several times.[29]

15. Where the ground for setting aside is based on an alleged breach of public policy, t h e  following is added.[30] According to the Supreme Court, setting aside an arbitral award for breach of public policy is

---

[26]    Subpoena, no 54.
[27]    HR 18 February 1994, ECLI:NL:HR:1994:ZC1266, cf. H.J. Snijders
        (*Nordström/VanNieveltGoudriaan & Co*), para 3.8.
[28]    Reply, No 29; Bank Sarasin did not dispute this.
[29]    Cf. HR 17 January 2003, ECLI:NL:HR:2003:AE9395 (IMS/Modsaf I), para. 3.3; HR 9 January 2004,
        ECLI:NL:HR:2004:AK8380    ([...]    /SFT    Bank),    para.    3.5.2;    HR    25    May    2007,
        ECLI:NL:HR:2007:BA2495 ( Spaanderman/Anova Food), para 3 .5; HR 4 December 2020,
        ECLI:NL:HR:2020:1952, para 3.3.1; HR 5 November 2021, ECLI:NL:HR:2021:1645 (Russian
        Federation/HVY), para 5.5.4.
[30]    Reply, No 29; Bank Sarasin did not refute this.

DE BRAUW
BLACKSTONE
WESTBROEK

possible only if the content or execution of the judgment violates mandatory law of such a fundamental nature that its compliance should not be prevented by restrictions of a procedural nature.[31]

16.    In its Rejoinder, Bank Sarasin fails to recognise that under applicable Dutch law, this high threshold is expressed through the *Nordström measure*.[32] In *Nordström*, the Supreme Court determined that annulment requires facts and circumstances that cast doubt o n  independence and impartiality to such a serious extent that a party cannot be required to comply with the judgment.[33] In recent y e a r s , Dutch courts have consistently stuck to the *Nordström* standard.[34]

17.    In the Rejoinder, Bank Sarasin ignores this consistent line of jurisprudence, arguing that the *Beg S.p.a./Italy ruling* would have rendered it obsolete. In that ruling, the ECtHR held that an arbitrator's impartiality requires that there should be no legitimate doubts about his impartiality. This assessment requires examining whether there are verifiable facts that could raise such doubts. [35] The crucial issue here is whether the fear of bias can be objectively justified. [36] The circumstances of the case determine whether the connection between the arbitrator and a particular party is of such an order that objectively

---

[31]    Cf. HR 21 March 1997, ECLI:NL:HR:1997:AA4945, para 4 .2; HR 17 January 2003, ECLI:NL:HR:2003:AE9395 (IMS/Modsaf I), para 3.3; HR 5 November 2021, ECLI:NL:HR:2021:1645 (Russian Federation/HVY), para 5 .4.9 and HR 17 March 2023, ECLI:NL:HR:2023:422 (Attero/Omgevingsdienst Brabant Noord c.s.), para 3.3.

[32]    Bank Sarasin does take the Nordström *ruling* as a starting point, but believes it would be outdated, see Rejoinder, section 3.2.

[33]    HR 18 February 1994, ECLI:NL:HR:1994:ZC1266, cf. H.J. Snijders (*Nordström/Van Nievelt Goudriaan & Co*), para 3.8.

[34]    See, for example, Court of Appeal Arnhem-Leeuwarden 8 October 2019, ECLI:NL:GHARL:2019:8203, para 4.17;
       Court of Appeal of The Hague 18 February 2019, ECLI:NL:GHDHA:2020:234, para 9.1.5; Rb. Amsterdam 26 May
       2021, ECLI:NL:RBAMS:2021:2700, para 6.16; Den Bosch Court of Appeal 17 May 2022, ECLI:NL:GHSHE:2022:1550, para 3.12; Amsterdam Court of Appeal 16 July 2024, ECLI:NL:GHAMS:2024:1974, para 3.4.12.

[35]    ECHR 20 May 2 0 2 1 , ECLI:CE:ECHR:2021:0520JUD000531211 ( *Beg S.p.a./Italy*), para 129.

[36]    ECHR 20 May 2 0 2 1 , ECLI:CE:ECHR:2021:0520JUD000531211 ( *Beg S.p.a./Italy*), para 130: "*it must be determined whether, quite apart from the judge's conduct, there are ascertainable facts which may raise doubts as to his impartiality. This implies that, in deciding whether in a g i v e n  case there is a legitimate reason to fear that a particular judge lacks impartiality, the standpoint of the person concerned is important but not decisive. What is decisive is whether this fear can be held to be objectively justified*".

justifiable doubt about the arbitrator's impartiality can be found.[37]

18.  The *Nordström standard* still applies in full; the "*serious doubt*" from the
     *Nordström standard* does not contradict the *Beg S.p.a./Italy ruling*. Both rulings
     presuppose that the facts and circumstances must be of such a nature and gravity
     as to justify doubt. This is also evidenced by the fact that the ECRM has explicitly
     ruled that the *Nordström* test is consistent with Article 6 ECHR.[38] In addition,
     recent case law - rendered after the *Beg S.p.a./Italy judgment* - confirms that the
     *Nordström standard* is still fully applicable.[39]

19.  In the Rejoinder, Bank Sarasin also does not cite international case-law that
     would show that a standard requiring 'serious doubt' is inconsistent with the *Beg
     S.p.a./Italy ruling*.[40] To the contrary, other European jurisdictions also still apply a
     strict standard for setting aside for doubting the impartiality and independence of
     an arbitrator. For example, as recently as 2022, Switzerland's highest court, the
     *Tribunal Federal,* emphasised that a strict standard applies when assessing
     alleged bias in annulment proceedings.[41] Therefore, there is also no reason to
     b e l i e v e  that setting aside an arbitral award does not require a serious degree
     of doubt as to the impartiality of an arbitrator.

     *(ii) The IBA Guidelines are not a benchmark, they can weigh in as insights (but
     only the most recent version)*

20.  As AIG also explained in its Reply, the IBA Guidelines are not normative in
     assessing the independence and impartiality of arbitrators;[42] the IBA Guidelines
     are not binding. This is all the more true in this case as the parties have not
     explicitly agreed to the IBA Guidelines.

---

[37]    ECHR 20 May 2 0 2 1 , ECLI:CE:ECHR:2021:0520JUD000531211 ( *Beg S.p.a./Italy*), para 131.
[38]    ECRM 27 November 1996, ECLI:NL:XX:1996:AD2654.
[39]    Den Bosch Court of Appeal 17 May 2022, ECLI:NL:GHSHE:2022:1550, para 3.12; Amsterdam Court
of Appeal 16 July 2024,
        ECLI:NL:GHAMS:2024:1974, para 3.4.12.
[40]    The international case-law relied on by Bank Sarasin in section 3.2 of the Rejoinder does not relate
        to the standard with regard to the required serious doubt; it relates only to the imputation of
        knowledge, the duty to investigate and the disclosure obligation.
[41]    Swiss Tribunal Federal 7 February 2022, 4A_462/2021, **Production 19**, para 3.2: "*The Federal
        Supreme Court applies a strict standard when assessing the alleged bias of an arbitrator.*"
[42]    Reply, No 35.

DE BRAUW
BLACKSTONE
WESTBROEK

21.    Both in its Summons and the Rejoinder, Bank Sarasin wrongly relies on an old
       version of paragraph 1.4 of the *Non-Waivable Red List* of the IBA Guidelines.[43] As
       the IBA Guidelines are non-binding anyway, they can at most be taken into
       account to colour the open standard of "*serious doubts*", but then, of course, they
       must b e  the most recent IBA Guidelines. Therefore, contrary to Bank Sarasin's
       submission in its Rejoinder, AIG does not claim that the current IBA Guidelines are
       retroactive.[44]

22.    Moreover, the comments on the current IBA Guidelines show that paragraph
       1.4 of the IBA Guidelines has been deliberately curtailed.[45] The amendment to
       paragraph 1.4 shifted the focus to the direct and current involvement of the
       arbitrator. This revision responded to criticism - particularly in government courts -
       that the earlier wording was too broad and comprehensive.[46] The current wording
       distinguishes more clearly between the arbitrator, on the one hand, and the
       arbitrator's office or employer, on the other.[47] Bank Sarasin's argument that "[t]*he
       arbitrator*" in paragraph 1.4 of the new IBA Guidelines should be equated with his
       or her office in view of the preamble to General Standard 6(a) of the IBA
       Guidelines fails, as the current IBA Guidelines have been deliberately narrowed on
       this point. The above means that section 1.4 of the old IBA Guidelines (relied
       upon by Bank Sarasin) cannot in any case play a role in colouring societal
       perceptions of conflicts of interest.

23.    Finally, Bank Sarasin's reference to section 2.3.6 of the new IBA Guidelines (the
       *Waivable Red List*)[48] shows precisely that a potential formal

---

43    Summons, no. 45; Rejoinder, nos. 55-56: "*The arbitrator <u>or his or her firm </u>regularly advises the
      party, or an affiliate of the party, and the arbitrator or his or her firm derives significant financial
      income therefrom.*" (emphasis added, lawyers).
44    Rejoinder, no 58.
45    It now reads, "<u>The arbitrator </u>currently or regularly advises a party, or an affiliate of a party, and the
      arbitrator or their firm or employer derives significant financial income therefrom. " (emphasis
      added, lawyers), see IBA Guidelines on Conflicts of Interest in International Arbitration 2024,
      **Production 15**.
46    International Bar Association, Commentary on the 2024 IBA Guidelines on Conflicts of Interest,
      **Production 20**, p. 15: "*However, criticism, particularly from State courts, has been levied against the
      latter formulation over the past decade as courts raised concerns that prior requirements were
      treated compendiously.*"
47    International Bar Association, Commentary on the 2024 IBA Guidelines on Conflicts of Interest,
      **Production 20**, p. 15: "*These revisions ensure clarity and precision in identifying situations where
      conflicts of interest may arise, while also distinguishing between the arbitrator and their firm or
      employer. Specifically, by way of the proposed revisions, situations where an arbitra tor's firm or
      employer, rather than the arbitrator directly, advises or works for a party and derives significant
      income therefrom have been removed from the Non-Waivable Red List.*"
48    Rejoinder, no. 59.

DE BRAUW
BLACKSTONE
WESTBROEK

conflict of interest is acceptable if an arbitrator has no personal direct interest in a particular client relationship (and the parties agree), as also stated in the commentary to the IBA Guidelines:

> *"These amendments are also reflected in the Waivable Red List. Paragraph 2.3.1 of the Waivable Red List has been updated to allow an arbitrator who currently or regularly advises a party but does not derive significant income therefrom, to act if the parties agree. In addition, revised paragraph 2.3.6 allows the arbitrator to act in circumstances where the arbitrator's firm or employer (but not the arbitrator himself) currently has a significant commercial relationship with one of the parties, provided that the parties agree."*

*(iii) Any disclosure obligations play a very different role in whether there is 'such serious doubt' than Bank Sarasin outlines*

24.   Bank Sarasin also disregards the relationship between the disclosure obligation and the existence of serious doubt. In its Rejoinder, Bank Sarasin, on the one hand, assigns disproportionate weight to <u>non-compliance</u>, or incomplete compliance, with the disclosure obligation. Indeed, according to Bank Sarasin, this would provide a "*significant indication*" that that there are serious doubts about the arbitrator's independence and impartiality. [49] On the other hand, in its Rejoinder, Bank Sarasin completely ignores the significance of <u>indeed</u> complying with the disclosure requirement.

25.   In determining whether there is "such serious doubt" that acquiescing to an arbitral award would be unacceptable, it is necessary to look at the facts and circumstances, which would have given rise to this doubt. The role of disclosure obligations here is quite different from what Bank Sarasin outlines. Whether or not a disclosure obligation is breached (assuming there is one) is not the yardstick. If facts are not a ground for serious doubt (m a k i n g  maintenance of the arbitral award unacceptable), any disclosure obligation in respect of those facts is i r r e l e v a n t . If facts do constitute a ground for serious doubt, the *disclosure* of those facts and the fact that no challenge is filed may be taken into account in the conclusion that *the parties* obviously did not regard those facts as grounds for serious doubt.

26.   Bank Sarasin erroneously ignores this other side of the coin: the unqualified acceptance of disclosure of certain facts and circumstances in the *disclosure*, which parties have no reason to question

---

[49]   Rejoinder, no 54.

gave, is an important indication that independence and impartiality were not in doubt at the time. If an arbitrator *disclosed* facts that could objectively give cause for serious doubt, and a party accepts this *disclosure* without raising any questions or objections, that is a clear indication that that party did not have serious doubts at the time.

27. Bank Sarasin's contention that failure to comply with the disclosure obligation would always constitute an important indication of serious doubt in annulment proceedings is also incorrect. As A-G De Bock also explains in the opinion to which Bank Sarasin refers: the failure to comply with a disclosure obligation can play a role in deciding whether an arbitral award should be set aside, but in each case what matters is the relevance of the undisclosed facts and circumstances.[50] These are decisive.

**3.2    Nullification not possible if facts were known before or during the arbitration or it is attributable to the complaining party that he was not aware of them**

28. As briefly touched upon above, the *Nordström measure* reflects current law - also with regard to the second requirement for setting aside on grounds of violation of independence and impartiality. In short, for setting aside there must be facts that came to light only after the arbitral award was made and could not have been discovered earlier.[51] In its Summons, Bank Sarasin left this requirement entirely unmentioned, but it had to concede in Rejoinder that an annulment claim can only succeed on the basis of 'new' facts.[52]

29. That should be the end of the matter: Bank Sarasin based its claim only on facts that were already known during the Arbitration. In fact, therefore, the discussion about the interpretation of the *Nordström measure* and the scope of the disclosure obligation is irrelevant, because Ter Meer made a comprehensive *disclosure* and Bank Sarasin based on that since the appointment of Ter Meer was "actually aware" of all relevant facts. Just for the sake of completeness, AIG explains that Bank Sarasin advocates an incorrect standard.

---

[50]    Opinion of A-G de Bock 23 March 2018, ECLI:NL:PHR:2018:263, no 3.33.
[51]    HR 18 February 1994, ECLI:NL:HR:1994:ZC1266, cf. H.J. Snijders (*Nordström/VanNieveltGoudriaan & Co*), para 3.8.
[52]    Rejoinder, no 34.

30. In an attempt to make it appear that this threshold has been met, argues
Bank Sarasin that all facts should count as 'new' facts unless it is established
that a party had actual knowledge of those facts during the arbitration. [53] It also
argues that Bank Sarasin had no duty to investigate, partly in light of Ter Meer's
disclosure obligation.[54] Both contentions are incorrect.

*(i) Under the Nordström measure, there is a duty to investigate*

31. According to Bank Sarasin, the applicable law also needs to be amended on the
issue of the duty to investigate: the *Nordström standard* would b e outdated
insofar as it requires for setting aside that the complaining party is not t o blame
for being unaware of the basis for d o u b t i n g independence and impartiality
during the arbitration. [55] The latter would be untenable since the *Beg S.p.a./Italy
ruling*, Bank Sarasin said.

32. Bank Sarasin reads more into the *Beg S.p.a./Italy ruling* than it says. As a
preliminary remark, that case involved an arbitrator who (i) had not m a d e a
*disclosure*, (ii) was a board member of one of the group companies (ENEL) of the
party (ENELPOWER) that appointed him, and (iii) at the time of the arbitration was
acting as a lawyer for ENEL in various other court proceedings.[56] None of these
circumstances are present in the present s i t u a t i o n .

33. The ECtHR looked at the question purely in the context of whether there was an
"*unequivocal waiver*" of the right to an independent and impartial arbitrator
(against the background of the then Italian arbitration law). The ECtHR found that
this was not the case, inter alia because (i) the arbitrator in question had not made
a *disclosure*[57] and (ii) a complaint had still been made during the arbitration about
a lack of independence and impartiality of the arbitrator, but the arbitral tribunal
had not addressed this complaint.[58] (*Neither aspect is at issue in this case*)

34. Further, the issue in *Beg S.p.a.v Italy* was whether the claimant (BEG) knew
about the arbitrator's management position at ENEL. Italy had merely argued
that it knew

---

[53]    Rejoinder, nos. 4 and 34 et seq.
[54]    Rejoinder, nos. 42 et seq.
[55]    Rejoinder, no 35.
[56]    ECHR 20 May 2 0 2 1 , ECLI:CE:ECHR:2021:0520JUD000531211 ( *Beg S.p.a./Italy*), para 149-151.
[57]    ECHR 20 May 2 0 2 1 , ECLI:CE:ECHR:2021:0520JUD000531211 ( *Beg S.p.a./Italy*), para 139.
[58]    ECHR 20 May 2 0 2 1 , ECLI:CE:ECHR:2021:0520JUD000531211 ( *Beg S.p.a./Italy*), para 142.

or probably knew, not that he should have known and it was imputable that he did not know. The court therefore says nothing about this. The court merely ruled: Italy argues that BEG knew about the board position, but there is no concrete evidence of that.[59] In short: the court ruled nothing about any duty to investigate and about imputability of not knowing new facts.

35.    Thus, the *Beg S.p.a./Italy judgment* does not render the second *Nordström requirement* obsolete. As AIG also explained in Reply, in response to a complaint on the Nordström *judgment*, the ECRM confirmed that *the Nordström standard* does not violate Article 6 ECHR.[60]

36.    In light of the above, it is not surprising that Bank Sarasin seems to be the only one who believes that the applicable law would be outdated following the *Beg S.p.a./Italy ruling*: Dutch courts still apply the *Nordström* standard. For example, the Amsterdam Court of Appeal recently rejected a claim for annulment on the grounds of alleged independence and impartiality, because it was attributable to the complainant that during the arbitration it had not become aware of the facts on which it had based its annulment claim when it could have discovered them.[61] Other Dutch courts also consistently apply the *Nordström standard* - explicitly stating that the facts must be those for which it is not imputable to the complaining party that it was unaware during the arbitration.[62] It follows that no 'actual' knowledge of the grounds for doubting impartiality and independence is required if the complaining party did not fulfil its duty to investigate. If a party could easily have known about certain facts but failed to investigate, it is its own fault and the annulment claim should fail.

37.    Similar requirements are also applied in other European jurisdictions (following the *Beg S.p.a./Italy ruling*). For example, it already follows from the two recent decisions of the French Cour de Cassation, which Bank Sarasin itself cites, that under French law, the parties are expected to investigate the relevant

---

[59]    ECHR 20 May 2021, ECLI:CE:ECHR:2021:0520JUD000531211 ( *Beg S.p.a./Italy*), paras 140, 147.
[60]    See Reply, no 33.
[61]    Amsterdam Court of Appeal 16 July 2024, ECLI:NL:GHAMS:2024:1974, para 3.4.12.
[62]    Rb. Amsterdam 26 May 2021, ECLI:NL:RBAMS:2021:2700, para 6.16; Court of Appeal Den Bosch 17 May

        2022, ECLI:NL:GHSHE:2022:1550, para 3.12.

arbitrators and cannot seek annulment on the basis of public information that they could easily have found.[63] Recent case law of the Swiss *Tribunal Federal,* confirming the prevailing doctrine in Switzerland, follows a similar line. There, too, it is required that the applicant, despite doing the necessary *due diligence*, could not have discovered the ground for doubting independence and impartiality already during the arbitration proceedings. [64] It also follows that - contrary to Bank Sarasin's claim[65] - an annulment claim based on easily discoverable public information cannot lead to annulment. Moreover, the duty to investigate has recently been codified in the new version of the IBA Guidelines regarding grounds for challenge during arbitration:

> "*A party shall be deemed to have learned of any facts or circumstances* [...] *that a reasonable enquiry would have yielded if conducted at the outset or during the proceedings.*"

38.  It follows from this new wording that a party is deemed to be aware of facts and circumstances when they could have come to light through a "*reasonable enquiry*" at the beginning or during the arbitration. This means that litigants are expected to carry out a reasonable enquiry throughout the proceedings into possible grounds for challenge.[66]

---

63    Rejoinder, footnotes 75 and 78, where Bank Sarasin recognises that " *under French law, the parties are expected to consult public and very easily accessible sources about the arbitrator before the arbitration begins. This means that disclosure of notorious facts (generally known facts) is not required.*" See also Production 18 of Bank Sarasin, para 1: "*that an arbitrator is not required to disclose generally known or easily ascertainable facts to the parties prior to the acceptance of his assignment, nor thereafter during the arbitration.*"

64    Swiss Tribunal Federal 24 August 2022, 4A_100/2022, **Production 21,** para 3.1: "*a party may request a revision of an arbitral award if a ground for challenge* [...] *was only discovered after the conclusion of the arbitration proceedings despite due dilligence and no other remedy is available. The party wishing to challenge an arbitrator must assert the grounds for objection as soon as it becomes aware of them* [...]. *This rule, which flows from the principle of good faith,* applies both to grounds for challenge of which the party was actually aware and to those of which it could have become aware if it had paid due attention* "; see also Daniel Girsberger and Nathalie Voser, *International Arbitration: Comparative and Swiss Perspectives* (Fourth Edition, Schulthess Juristische Medien AG 2021), p. 486: "*This means that a party is obliged to invoke the grounds for a challenge immediately upon becoming aware of such grounds; failure to do so leads to the party forfeiting its right* [...] *As a rule, this limitation also applies if the irregularity and, in particular, potential conflicts of interests of the arbitrators, were not but could have been detected before the notification of the award (so-called 'duty of investigation' of the party*", see also p. 201.

65    Rejoinder, no 43.

66    See also: B. van Zelst, 'The revised IBA Guidelines on Conflicts of Interest in International Arbitration: genesis and significance for Dutch arbitration law', *TVA* 2024/48, no. 5: "*In other words, a litigant may be expected to conduct the ongoing investigation that can reasonably be expected of him into possible grounds for challenge .*"

DE BRAUW
BLACKSTONE
WESTBROEK

39.  From the point of view of an effectively functioning arbitral tribunal, it is also logical that parties should do a certain amount of research and then immediately raise this information. Were there no duty to investigate at all, the parties may choose to keep such information in reserve and use it to b r i n g  an annulment action only in the event of a negative arbitral award. This would not b e n e f i t  an effectively functioning arbitral jurisdiction. This is all the more true if a party relies on public information that arbitrators need not be wary of.

*(ii) The disclosure obligation does not negate the duty to investigate*

40.  Bank Sarasin is also still trying to get out from under its duty to investigate by i n v o k i n g  the disclosure obligation.[67] AIG and Bank Sarasin agree on the importance of this obligation. The disclosure obligation aims to allow parties to assess whether there are doubts about the arbitrator's independence and impartiality during the arbitration. Contrary to Bank Sarasin's claims,[68] it is not the case that the disclosure obligation relieves Bank Sarasin of its duty to investigate. This follows directly from the *Nordström standard*. And it also follows from case law from other leading jurisdictions, such as Switzerland and the US, that parties may not blindly rely on a *disclosure* and must conduct their own investigations.[69] Moreover, it also follows from US case law that, on the contrary, specific research should be conducted if the *disclosure* gives rise to it.[70] This fits with the purpose of the

---

[67]  Rejoinder, nos. 41 et seq.
[68]  Rejoinder, nos. 41 et seq.
[69]  See, for example, *Tribunal Federal* 20 March 2008, 4A_506/2007, **Production 22**, para 3.2: " *The most elementary prudence therefore required him to investigate whether the arbitrators appointed to rule on his claim offered sufficient guarantees of independence and impartiality. In this respect, he could not be satisfied with the general declaration of independence made by each arbitrator on the ad hoc form.* "; Court of Appeals of the State of New York May 2, 1974, 34 N.Y.2d 123 (1974), **Production 23**: "*This does not mean that a party to an arbitration may sit idly back and rely exclusively upon the arbitrator's disclosure. If a party goes forward with arbitration, having actual knowledge of the arbitrator's bias, or of facts that reasonably should have prompted further, limited inquiry, it may not later claim bias based upon the failure to disclose such facts. This applies not only prior to the arbitration beginning, but also if an alleged bias arises during the arbitration.*"
[70]  For example, in two separate cases, the District Court of New York held that a party who becomes aware of certain facts through a *disclosure* must immediately investigate them under penalty of waiver. See District Court of the Southern District of New York 16 February 2017, 238 F. Supp.3d 452, 467 (S.D.N.Y. 2017), **Production 24**: "*And while Bronner could have been - and, no doubt, should have been - more forthcoming[,] he shared at least enough to put the Kleins on inquiry notice. Yet they failed to investigate, let alone object, until after the panel had issued its interim award in LGC's favour*"; District Court of the Southern

disclosure obligation: the disclosure obligation gives the parties tools to further investigate independence and impartiality.

41. The *disclosure* ensures that the parties do not have to challenge the arbitrator later in the arbitration, and aims to a v o i d  annulment for alleged independence or impartiality of arbitrators on the basis of facts known to the parties before the appointment.[71] Where an arbitrator has named the relevant facts in his *disclosure* prior to his appointment, and a party apparently takes them for granted, it means that a party thus did not doubt the arbitrator's impartiality and independence and cannot complain about it later.

42. In this light, it is also not the case that public information should be included in the *disclosure* - as Bank Sarasin claims.[72] For example, the French *Cour d'Appel* recently confirmed that easily findable information, in that c a s e information from the online arbitration journal *Global Arbitration Review*, <u>did not</u> have to be i n c l u d e d  in the *disclosure*.[73] And even if this information did have to be included in the *disclosure*, this would not mean that there should be immediate annulment.

## 4    APPLICATION

### 4.1    No serious or justified doubts about Ter Meer's impartiality and independence

43. The facts as set out in paragraph 2 show that Bank Sarasin's claim for annulment must fail, because these facts do not justify the required (serious) doubts about Ter Meer's impartiality and independence. Both application of the standard advocated by Bank Sarasin from the *Beg S.p.a./Italy judgment* and the standard applicable under Dutch law

---

District of New York May 6, 2019, 18-CV-8415 (JPO) (S.D.N.Y. May. 6, 2019), **Production 25**: "*Arbitrator Rolnick's affirmative answer on his disclosure checklist was sufficient to put Miller on notice of 'facts possibly indicating bias or partiality on the part of an arbitrator.' Miller's decision to forgo the issue during arbitration proceedings thus 'constitutes a waiver of the objection,' and it cannot serve as a ground for vacatur of the arbitration award.*"

[71]    Cf. art. 1033(2) Rv. See also G.J. Meijer, T&C Civil Procedure, art. 1034, para. 1; Opinion of A-G de Bock 23 March 2018, ECLI:NL:PHR:2018:263, no. 3.26.

[72]    Rejoinder, no 43.

[73]    Chambre commerciale interantionale of the Cour d'appel de Paris 26 January 2021, RG 19/10666 (*Vitadel*), **Production 26**, para 126: "*In addition, the links between Mr (D)'s firm and certain companies in which Mr (U) had shareholdings were notorious, as they were published in the Global Arbitration Review (GAR), a specialist journal known throughout the world of arbitration.*"

DE BRAUW
BLACKSTONE
WESTBROEK

*Nordström measure* lead to the same conclusion: there is no basis for the claim for annulment to succeed now that (i) the *Legal500 publications* give no reason to doubt Ter Meer's *disclosure*, nor his independence or impartiality; and ( ii) Bank Sarasin is otherwise only speculating and has not alleged any facts or circumstances other than the *Legal500 publications*, when it would have had the opportunity to do so.

*(i) No serious or justified doubts about Ter Meers' independence and impartiality based on the Legal500*

44.   At its core, Bank Sarasin's argument rests solely on its interpretation of the words "*key*" client, "*major*" client and "*longstanding relationship*" used in the *Legal500* to describe the relationship between CXTB and AIG.

45.   As noted above:[74] that the Legal500 talks about a "*longstanding relationship*" between CXTB and AIG and that AIG is presented as one of CXTB's 12 and four " *key clients*" in Insurance and Transport respectively is fully in line with Ter Meers' *disclosure*. Also, that AIG is a "*major*" client brings nothing new.[75] That makes no new facts, and in any case no reason to seriously doubt Ter Meer's independence and impartiality.

46.   Bank Sarasin also ignores the fact that when a law firm does "*occasional*" work for a client, or is on the '*panel*' with that client for a specific area of law, that this may well i n v o l v e  significant financial revenue. It could not and cannot assume that an interpretation - now - favourable to it would apply, which would entail that this could not involve significant revenue. That such a word (*occasionally*) - just like the fact that CXTB is a '*panel firm*' of AIG - does not in itself say anything about the extent of financial revenue, is another reason why Bank Sarasin had a duty to investigate.[76]

47.   Contrary to Bank Sarasin's claims in the Rejoinder,[77] , nothing also follows from the information in the Legal500 *publications* about the significance of the financial relationship between CXTB and AIG. Indeed, the *Legal500* does not reveal anything about the financial relationship, or an alleged intensification of it, between CXTB and AIG.

---

[74]   See above, no. 8.
[75]   See above, no. 8 under (2).
[76]   See below, section 4.2.
[77]   Rejoinder, no 76.

DE BRAUW
BLACKSTONE
WESTBROEK

The qualification "*key client*" in the *Legal500* does not - and the term "*client*" does not - provide any information about the significance of the (financial) relationship between law firm and client. And as Bank Sarasin's lawyers know (and Bank Sarasin should be credited for this) and AIG has explained, "*key client*" is simply at the top as the only template on the basis of which clients can be submitted to the *Legal500*. That the qualification "*key client*" says nothing about the financial relationship is also demonstrated by the fact that law firms in the *Insurance* section actually reported more clients between 2016 and 2024 since the *Legal500* started using the word "*key*".[78] The fact that the representation has changed does not mean that this has also had consequences for the relationship between AIG and CXTB.

48.    Furthermore, "*key client*" also has the meaning of prestigious client, or a client with whom a long-term contract has been entered into, for example under a '*panel firm*' arrangement.[79] The *Legal500* aligns with this and explicitly recognises that law firms b e n e f i t from p a s s i n g  on their most prestigious clients to the *Legal500*.[80] Based on the information provided, the marketing magazine conducts a benchmark to provide the law firms with a certain ranking, paying specific attention to the "*most prestigious clients*".[81] In this light, it is no wonder that a boutique firm like CXTB has listed AIG as one of its clients in the *Legal500*. However, this says nothing about the financial relationship between CXTB and AIG.

49.    In view of the above, Bank Sarasin's contention that the mere fact that AIG was listed as a "*key client*" of CXTB in *Legal500* magazine is covered by paragraph 2.3.6 of the IBA Guidelines is therefore incorrect.[82]

50.    In addition, the IBA Guidelines relied on by Bank Sarasin underline that there can be no serious or justified doubts about Ter Meer's independence and impartiality. Even if
Bank Sarasin's factual assertions would be taken for true and there would be a

---

[78]    Overview change in numbers ("*key*") clients of law firms during 2016-2024, **Production 18**.

[79]    Blog 'How to identify key accounts for sales development', https://www.avoma.com/blog/identifying-key-accounts, **Production 27**: "*For some, key accounts are customers who either bring in a lot of revenue, offer higher profit margins, sign up for a multi-year contract, or have a good reputation in their industry* ." (emphasis added, lawyers).

[80]    Snapshot 22 October 2024 from www.legal500.com/how-it-works, **Production 16**.

[81]    Snapshot 22 October 2024 from www.legal500.com/how-it-works, **Production 16**, p. 1.

[82]    Rejoinder, no 62.

significant financial relationship between CXTB and AIG existed - which AIG disputes[83] - even then this situation would not fall under the *Non-Waivable Red List* and paragraph 1.4 specifically of the current IBA Guidelines. Indeed, as explained above, paragraph 1.4 only covers the situation where the arbitrator also has a personal direct relationship with one of the parties. [84] This has Bank Sarasin did not state: Ter Meer was not personally involved in working for AIG.[85] Instead, Bank Sarasin's reliance on section 2.3.6 of the current IBA Guidelines (the *Waivable Red List*) shows that even if there was a significant financial relationship between CXTB and AIG, this potential conflict of interest was acceptable given Ter Meer's *disclosure.* With the consent of both parties to Ter Meers' appointment following his *disclosure*, it is generally accepted under the IBA Guidelines that Ter Meer could act as an impartial and independent arbitrator.[86]

*(ii) Speculating is not enough and does not reverse the burden of proof*

51.    In addition to the *Legal500 publications*, Bank Sarasin does not cite any other facts and circumstances showing that it would have justified (serious) doubts about Ter Meer's impartiality. This would have been within its powers, however.

52.    It is for Bank Sarasin to state, and if necessary prove, on the basis of which new facts and circumstances the Arbitral Award should be set aside. Bank Sarasin provides no further - and thus insufficient - justification for its unfounded speculation that there is a much more significant (financial) relationship between CXTB and AIG than Bank Sarasin apparently assumed on the basis of the *disclosure*.[87] Bank Sarasin does not even state what it expected on the basis of the *disclosure* was the financial relationship between AIG to CXTB (which was apparently not sufficiently significant). Bank Sarasin thus failed to meet its burden of proof and, for that reason alone, the annulment claim is ready for dismissal.

---

[83]    See above, section 2.
[84]    See above, section 3.1.
[85]    Ter Meer also i n c l u d e d  this in his *disclosure*, see Disclosure Ter Meer of 19 December 2017, Production BS-2, under 1: "*Occasionally Cox Ten Bruggencate (CXTB) acts for (insureds) of AIG in matters relating to transportation and logistics (as defence counsel in recovery actions). I am not personally involved in those matters.*"
[86]    See No 23 above.
[87]    Summons, nos. 2-3, 14-16, 49 and 51; Reply, nos. 6, 47, 55 and 64; Rejoinder, Nos 5-8, 13 and 64.

53.     Against this background, therefore, there is no reason to assume an aggravated duty to state reasons and to present evidence on the part of AIG.[88] According to Bank Sarasin, AIG would be obliged to bring in data regarding the significance of the financial relationship between CXTB and AIG. Indeed, according to Bank Sarasin, it would be easy for AIG to prove that such a 'significant' - whatever that might be - financial relationship existed, for example by submitting invoices received from CXTB.

54.     In this case, AIG can suffice with the (reasoned) challenge to this bare assertion. The plaintiff's duty to assert and the defendant's reasoned challenge are communicating vessels. The more comprehensively the plaintiff asserts, the more comprehensively the defendant is expected to dispute.[89] In this case, Bank Sarasin does nothing more than make an unsubstantiated speculation about the existence of a significant financial relationship. The reasoning requirement for the challenge is thus limited and AIG has met it.

55.     Moreover, there is no aggravated duty of justification or proposition for AIG, as the facts alleged are neither easy for AIG to prove nor in AIG's domain.

56.     Contrary to Bank Sarasin's view, the extent of the financial relationship with CXTB is not easy for AIG to prove. AIG has looked at what information it can extract from its systems in the relevant years, but because of the way it keeps records, it cannot get an accurate understanding of how much it paid to CXTB during the Arbitration. The above may be different for CXTB, but that is not in AIG's domain.

57.     Second, AIG has no insight into the significance of AIG's payments to CXTB. Indeed, AIG does not have the total revenues of CXTB.

58.     Finally, Bank Sarasin also argues that there is a significant financial relationship between Ter Meer and AIG.[90] Again, Bank Sarasin does not sufficiently allege, motivate and prove. Why Ter Meer himself would have a financial interest is not substantiated. Nothing indicates that Ter Meer was personally involved in advising AIG, let alone that he had a personal interest in it. Given Ter Meer's position as an employee (not: partner in the partnership) of

---

[88]     Rejoinder, section 3.5.
[89]     B.M. Paijmans, 'The aggravated obligation to suppose revisited', *NTBR* 2016/2, vol. 1, no. 2.
[90]     Rejoinder, no 78.

CXTB will Ter Meer is also not obvious that he had a personal financial interest. AIG therefore disputes this.

59.    In short, Bank Sarasin is merely speculating - without any concreteness - about the significance of the financial relationship between CTXB and AIG. That speculation cannot cause the burden of proof or burden of proof to fall on AIG. It would therefore have been up to Bank Sarasin to provide evidence of the alleged significance of the financial relationship between CXTB (or Ter Meer himself) and AIG. Only Ter Meer or (the mates of) CXTB can provide insight into what exactly is the (financial) interest of CXTB, or Ter Meer personally, in the relationship with AIG. Just in case the court of appeal is nevertheless of the opinion that it was up to AIG to prove that there was no significant financial relationship, it offers to hear Ter Meer or at least one of CXTB's mates (Carlijn ten Bruggencate, Joeri Cox or Jacco van de Meent).

**4.2    Facts and circumstances were known to Bank Sarasin before or during the Arbitration, or at least it is to its credit that it was not aware of them**

60.    As AIG explained in Reply, all relevant facts were already known to Bank Sarasin before the Arbitral Award was made. Indeed, AIG has explained that Bank Sarasin has failed to argue why it is not imputable to it that it was not already aware of them at the time of the arbitration.[91] Bank Sarasin has not refuted this, but merely argues that it did not have to investigate public sources.[92] As AIG explained in Nos 36-38 above, Bank Sarasin did have an obligation to conduct (at least superficial) research, especially if a *disclosure* made gave rise to it. That includes research into public sources. Since all the information on which Bank Sarasin based its annulment claim was public and very easy to consult, it is imputable to it for not doing so. Thus, the annulment claim is ready for dismissal.

61.    Bank Sarasin counters that if there was a duty to investigate, this would only have been in place before Ter Meer's appointment and it should therefore only have known about the *Legal500* from 2016.[93] From that text

---

[91]    Reply, No 51.
[92]    Rejoinder, no 72.
[93]    Rejoinder, no 74.

However, according to Bank Sarasin, it shows nothing about the alleged enormous significance of the relationship between CXTB and AIG. On this, AIG can be brief: the "intensification" alleged by Bank Sarasin is and remains mere speculation and cannot be extracted from the later editions of the *Legal500* either, as explained above. Moreover, Bank Sarasin still had a duty to investigate even during the arbitration,[94] and it is therefore simply imputable to it that it did not consult these public sources *during the arbitration*.

62.     Ter Meers' extensive *disclosure* stated that CXTB occasionally acts for AIG in the transport and logistics jurisdiction and, in addition, that CXTB is on AIG's panel in *Marine Insurance*. Bank Sarasin knew that this meant there was a financial relationship, but did not know the extent of it. If the exact extent of the financial relationship between CXTB and AIG was really important for Bank Sarasin to be able to assess Ter Meers' independence and impartiality, it would have been up to it to ask further questions about this in 2017. This could - again in the context of its duty of investigation and the rationale of the disclosure obligation - have been required of it. However, Bank Sarasin did not ask any questions about this and accepted Ter Meers' *disclosure* without question. This means that, to the extent that the exact extent of this financial relationship would be relevant to the assessment of Ter Meers' independence and impartiality at all (which AIG disputes), it is attributable to Bank Sarasin that it was not already aware of this in 2017 by not asking any questions about it.

63.     For the sake of completeness, AIG notes that the annulment claim should also fail if the standard advocated by Bank Sarasin were to apply. In that showing, the fact that Bank Sarasin had actual knowledge of the relevant *Legal500 editions* from 2020-2024 before the Arbitral Award was rendered would preclude setting aside. As AIG has already explained in Reply, Bank Sarasin was 'actually' aware of it, as its lawyers read the relevant *Legal500 editions* (in which they themselves are cited and participated). Bank Sarasin has also not disputed that its lawyers were aware of it. This knowledge can be imputed to Bank Sarasin. Even on that presentation, therefore, Bank Sarasin cannot maintain that it did not have 'actual' knowledge of the facts it now cites as facts that would lead to justified doubts

---

[94]     As follows from the *Nordström* judgment and confirmed by the updated IBA Guidelines, see No 37 above.

DEBRAUW
BLACKSTONE
WESTBROEK

lead. The conclusion is that - whether the /loods/röm standard or the lighter standard as advocated by Bank Sarasin is used - Bank Sarasin was actually aware of all the facts that it now bases its claim on, or at least it should have been. The annulment claim must also fail for that reason.

## 5    CONCLUSION

64.    The facts cannot lead to annulment. They simply give no reason to doubt Ter Meer's independence and impartiality, especially in light of the extensive *disclosure* he made prior to his appointment. Anything that Bank Sarasin has put forward about the alleged intensification of the (financial) relationship between CXTB and AIG is mere speculation based on a standard qualification in the *Legal500.* Moreover, there are no facts that came to light only after the arbitration; all the facts were already known before or at least during the Arbitration.

65.    The burden of proof is on Bank Sarasin. AIG expressly offers rebuttal evidence. To the extent that any burden of proof may, in the court's opinion, rest on AIG, AIG offers evidence by all means in law, in particular by hearing witnesses.

66.    On these grounds, AIG concludes that the court, so far as legally possible enforceable:

(a)    Declare Bank Sarasin inadmissible in its claims, or at least deny it these claims; and

(b)    Order Bank Sarasin to pay the costs of the proceedings, as well as the usual post-court costs (both without and with service of notice), to be increased by the statutory interest referred to in Section 6:119 of the Civil Code from 14 days after the date of the judgment.

lawyer

This casebe    dt bby Mr E.R. Meerdink, Mr L.C. Kampkuiper and Mr L.F. van Dord, T +31 20 577 1779, M +31 6 5325 6945, E eelco.meerdink@debrauw.com, De Brauw Blackstone Westbroek N.V., P.O. Box 75084, 1070 AB Amsterdam

DE BRAUW
BLACKSTONE
WESTBROEK

**CONSOLIDATED PRODUCTION LIST**

| | |
|---|---|
| **Production 1** | Arbitration agreement between Bank Sarasin and AIG dated 6 September 2017 |
| **Production 2** | Request for arbitration by Bank Sarasin dated 1 December 2017 |
| **Production 3** | AIG's short answer of 12 December 2017 |
| **Production 4** | Waybackmachine snapshot February 6, 2018 from www.cxtb.nl/reviews |
| **Production 5** | Notice of Challenge from AIG dated 13 December 2017 |
| **Production 6** | Letter from NAI dated 21 December 2017 |
| **Production 7** | Letter from Van Baren dated 15 December 2017 |
| **Production 8** | Letter from AIG dated 21 December 2017 |
| **Production 9** | Letter from NAI dated 4 January 2018 |
| **Production 10** | Chamber of Commerce extracts dated 28 September 2016 and 30 December 2021 |
| **Production 11** | Waybackmachine snapshot of 27 January 2015 from www.CXTB.nl |
| **Production 12** | Waybackmachine snapshot 14 April 2016 from www.legal500.com/c/netherlands/insurance |
| **Production 13** | Waybackmachine snapshot November 1, 2018 from www.legal500.com/c/netherlands/transport |
| **Production 14** | Submission sheet for the 2020 *Legal500* |
| **Production 15** | IBA Guidelines on Conflicts of Interest in International Arbitration (2024) |
| **Production 16** | Snapshot 22 October 2024 of www.legal500.com/how-it-works |
| **Production 17** | Submission sheet for the 2019 Legal500 |
| **Production 18** | Overview of change in numbers ("*key*") clients of law firms during 2016-2024 |
| **Production 19** | Swiss *Tribunal Federal* 7 February 2022, 4A_462/2021 (unofficial English translation and German original text) |
| **Production 20** | International Bar Association, Commentary on the 2024 IBA Guidelines Conflicts of Interest |
| **Production 21** | Swiss *Tribunal Federal* 24 August 2022, 4A_100/2022 (unofficial English translation and German original text) |
| **Production 22** | Swiss *Tribunal Federal* 20 March 2008, 4A 506 2007 (unofficial English translation and French original text) |
| **Production 23** | Court of Appeals State of New York 2 May 1974, 34 N.Y.2d 123 (1974) |
| **Production 24** | District Court Southern District of New York 16 February 2017, 238 F. Supp.3d 452, 467 (S.D.N.Y. 2017) |

DE BRAUW
BLACKSTONE
WESTBROEK

| | |
|---|---|
| **Production 25** | District Court Southern District of New York May 6, 2019, 18-CV-8415 (JPO) (S.D.N.Y. May. 6, 2019) |
| **Production 26** | Chambre commerciale interantionale of the Cour d'appel de Paris 26 January 2021, RG 19/10666 (Vitadel) (unofficial English translation and French original text) |
| **Production 27** | Blog 'How to identify key accounts for sales development', snapshot 27 October 2024 from https://www.avoma.com/blog/identifying-key-accounts |